**UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 18-65681 |
| | ) | |
| CHARLES D. MENSER, JR. | ) | |
| | ) | CHAPTER 7 |
| Debtor. | ) | |
| _____ | ) | _____ |
| EDWIN K. PALMER, as CHAPTER  7 | ) | |
| TRUSTEE for the ESTATE OF | ) | |
| CHARLES D. MENSER, JR. | ) | |
| | ) | ADVERSARY ACTION NO. |
| Plaintiff, | ) | |
| | ) | _____ |
| vs. | ) | |
| | ) | |
| PHYLLIS J. MENSER, | ) | |
| CHARLES D. MENSER, JR. | ) | |
| CHARLES D.     MENSER III, | ) | |
| CONNIE MENSER; | ) | |
| SARAH L. CONNELL, | ) | |
| GEORGE H. CONNELL, | ) | |
| MENSER FAMILY PARTNERS, L.P., | ) | |
| MENSER FAMILY TRUST, | ) | |
| MENSER FAMILY PARTNERSHIP II, | ) | |
| L.P., | ) | |
| P.J. MENSER FAMILY PARTNERSHIP, | ) | |
| L.L.L.P., | ) | |
| STONEWALL CAPITAL PARTNERS, | ) | |
| L.L.L.P., | ) | |
| STONEWALL CAPITAL PARTNERS II, | ) | |
| L.L.L.P., | ) | |
| DAMASCUS 36, L.L.L.P., | ) | |
| ARCHER AUGUSTA, LLC, | ) | |
| ARCHER I, L.L.L.P., | ) | |
| ARCHER I GP, L.L.L.P., | ) | |
| ARCHER PROPERTIES, L.L.L.P., | ) | |

ARCHER III, L.L.L.P.,                          )
ARCHER VI, L.L.L.P.,                           )
100 OAKMONT PARTNERS, L.L.L.P.,                )
TRAVEL CONCEPTS, LLLP,                         )
1266 MOORES MILL ROAD, LLC,                    )
ETO, L.P.                                      )
BIBB 185 L.L.L.P.,                             )
POSITIVE VENTURES, INC.,                       )
POINTER INVESTMENTS,                           )
INCORPORATED                                   )
LODGE AMERICA, LLC                             )
BLUFFS AT LANIER, L.L.L.P.,                    )
MENSER & CO., P.C.                             )
and                                            )
UBS FINANCIAL SERVICES, INC.                   )
                                               )
             Defendants.                       )

## COMPLAINT

COMES NOW Plaintiff Edwin K. Palmer as Chapter 7 Trustee for the Estate of

Charles D. Menser, Jr. ("Plaintiff") who files this Complaint and respectfully shows the

following:

### Jurisdiction and Venue

1.

On September 19, 2018 (the "Petition Date") Charles D. Menser, Jr. ("Debtor")

filed his voluntary Chapter 7 petition in the United States Bankruptcy Court for the

Northern District of Georgia, Atlanta Division, under Case No. 18-656-81.

2.

Jurisdiction of this proceeding is conferred upon this Court pursuant to the

provisions of 28 U.S.C. §157 and 28 U.S.C. §1334

3.

This action is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

4.

Venue is proper in this Court pursuant to 28 U.S.C. §§1408 & 1409(a); this proceeding arises from and is related to the Bankruptcy Case.

**Parties**

5.

Plaintiff is the duly qualified and acting trustee authorized to bring this action pursuant to 11 U.S.C. § 323.

6.

Defendant Phyllis J. Menser is the spouse of the Debtor, is subject to the jurisdiction of this Court, and may be served at her dwelling house or usual place of abode at 4102 Brookview Drive SE; Atlanta, Georgia 30339.

7.

Defendant Charles D. Menser, III is the son of the Debtor, is subject to the jurisdiction of this Court, and may be served at his dwelling house or usual place of abode at 4025 Vista Point Lane; Suwanee, Georgia 30024.

8.

Defendant Connie Menser is the wife of Charles D. Menser, III and therefore the

daughter-in-law of the Debtor, is subject to the jurisdiction of this Court, and may be served at her dwelling house or usual place of abode at 4025 Vista Point Lane; Suwanee, Georgia 30024.

9.

Defendant Sarah L. Connell is the daughter of the Debtor, is subject to the jurisdiction of this Court, and may be served at her dwelling house or usual place of abode at 214 Townsend Place NW; Atlanta, Georgia 30327.

10.

Defendant George H. Connell III is the step-son of the Debtor, is subject to the jurisdiction of this Court, and may be served at his dwelling house or usual place of abode at 3595 Chochise Drive; Atlanta, Georgia 30339.

11a.

Defendant Charles D. Menser, Jr. is the Debtor, is subject to the jurisdiction of this Court, and may be served at 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339

11.

Defendant Menser Family Partners, L.P. is a Georgia limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

12.

Defendant Menser Family Trust is a trust created in Georgia, is subject to the jurisdiction of this Court, and may be served care of its Trustee James L. Dickert, at the Trust address, 2255 Cumberland Parkway SE; Building 1600; Suite 150; Atlanta, Georgia 30339, and at the Trustee's dwelling house or usual place of abode, 5645 Glen Errol Road, Atlanta, Georgia 30327-4853.

13.

Defendant Menser Family Partnership II, L.P. is a Georgia limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

14.

Defendant P.J. Menser Family Partnership, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

15.

Defendant Stonewall Capital Partners, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland

Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

16.

Defendant Stonewall Capital Partners II, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

17.

Defendant Damascus 36, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

18.

Defendant Archer Augusta, LLC is a Georgia limited liability company, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150; Atlanta, Georgia 30339.

19.

Defendant Archer I, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building

1600; Suite 150, Atlanta, Georgia 30339.

20.

Defendant Archer I GP, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

21.

Defendant Archer Properties, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

22.

Defendant Archer III, L.L.L.P. is a Georgia limited liability company, is subject to the jurisdiction of this Court, and may be served care of its registered agent Archer I Advisory Committee LLC, at its registered office, 42 W Brookhaven NE, Atlanta, Georgia 30319.

23.

Defendant Archer VI, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent

George H. Connell, III at its registered office, 2255 Cumberland Parkway; Building

1600; Suite 150; Atlanta, Georgia 30339.

24.

Defendant 100 Oakmont Partners L.L.L.P. is a Georgia limited liability limited

partnership, is subject to the jurisdiction of this Court, and may be served care of its

registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland

Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

25.

Defendant Travel Concepts, L.L.L.P. is a Georgia limited liability limited

partnership, is subject to the jurisdiction of this Court, and may be served care of its

registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland

Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

26.

Defendant 1266 Moores Mill Road, LLC is a Georgia limited liability company,

is subject to the jurisdiction of this Court, and may be served care of its registered agent

Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway, Building

1600, Suite 150, Atlanta, Georgia 30339.

27.

Defendant ETO, L.P. is a Georgia limited partnership, is subject to the jurisdiction

of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its

registered office, 4422 Northeast Expressway; Doraville, Georgia 30340.

28.

Defendant Bibb 185 L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

29.

Defendant Positive Ventures, Inc. is a Georgia corporation, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

30.

Defendant Pointer Investments, Incorporated is a Georgia corporation, is subject to the jurisdiction of this Court, and may be served care of its registered agent Matthew M. Wilkins at its registered office, 192 Anderson Street; Suite 125; Marietta, Georgia 30060.

31.

Defendant Bluffs At Lanier, L.L.L.P. is a Georgia limited liability limited partnership, is subject to the jurisdiction of this Court, and may be served care of its registered agent Stonewall Capital Partners at its registered office, 2255 Cumberland

Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

32.

Defendant Lodge America, LLC is a Georgia limited liability company, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

33.

Defendant UBS Financial Services, Inc. is a Delaware corporation registered to do business as a foreign company in the State of Georgia, is subject to the jurisdiction of this Court, and may be served care of its Georgia registered agent Corporation Services Company, 40 Technology Parkway South; Ste. 300; Norcross, Georgia 30092.

33b.

Defendant Menser & Company P.C. is a Georgia company, is subject to the jurisdiction of this Court, and may be served care of its registered agent Charles D. Menser, Jr. at its registered office, 2255 Cumberland Parkway; Building 1600; Suite 150, Atlanta, Georgia 30339.

## **Introduction and Overview**

34.

The purpose of this adversary proceeding is to unravel complex web of fraud that Debtor constructed over time in order to hide his assets from creditors.

35.

The Debtor has created and held direct or indirect ownership interests in and/or control of more than thirty-five different interrelated entities currently known to Plaintiff (collectively, the "Menser Entities", and individually a "Menser Entity")[1], In addition, he has been involved in the creation of numerous trusts (the "Menser Trusts"). With the cooperation of his wife, son, daughter, and other relatives, certain business associates, the Menser Entities, and the Menser Trusts, the Debtor maneuvered investments and real estate deal after real estate deal, all while creditors were left unpaid for millions of dollars of debt and were suing him.  He arrived at bankruptcy's door with next to nothing in his name, but at all times has enjoyed a lavish lifestyle with the fruits of his business dealings –his family, the Menser Entities, and Menser Trusts holding all the wealth and assets on paper.

36.

Phyllis Menser is a mere "strawperson" that Debtor has used to shield himself from his creditors.  Similarly, Charles Menser III, Sarah Connell, and George Connell have served as straw men for the Debtor's business affairs (collectively with Mrs. Menser, the "Family").   In addition, the Debtor's numerous Entities and Trusts are mere sham alter egos (sometimes used only once), maneuvered by Debtor in his elaborate financial shell game meant to conceal assets. On information and belief, Phyllis Menser,

---

[1]        Only seventeen of these entities were identified in the Debtor's Schedules.

Charles Menser III, Sarah Connell and George Connell did not actually make capital contributions in return for any of their alleged interests held in the Menser Entities.

37.

Of the entities that the Debtor did identify in his Schedules, he claims no or unknown values for all but his professional accounting business, Menser & Co. PCm which the Schedules claim is worth only $275.00.  Menser & Co. is also named as the Debtor's sole source of income.

38.

In his Schedules, the Debtor reports having no interest in any real estate or any assets of significant value other than a vehicle, $200.00 in a cash, and exempt household goods and furnishings.

39.

In the meantime, the Menser Entities, Menser Trusts, and the Family have held and continue to hold substantial assets which were transferred to them or finances by the Debtor, including valuable interests in real property, which currently includes property still held in the name of one or more of the Defendants in this matter, but is not limited to:

i)      214 Townsend Place, NW, Atlanta, Georgia 30327 ("214 Townsend

Place")[2];

      ii)   3129 Damascus Road, Augusta, Georgia 30909 (the "Augusta Property")[3]; and

      iii)   The Debtor's residence at 4102 Brookview Drive SE, Atlanta, Georgia 30339 (the "Residence")[4].

<div align="center">40.</div>

It is the Debtor and the Debtor alone who has funded his and his Family's luxury lifestyles with money and property he controlled through channels he created in their names, all in name only.  On information and belief, before 1980, Debtor amassed wealth as a Waffle House franchisee in Arkansas, which at its peak included 47 Waffle House locations.  He sold the locations back to Waffle House in 1979 and moved to Atlanta.  It appears that the profit generated from that business success is the original source of funding for his business dealings over the years since.

<div align="center">

**Debtor's Insolvency**

41.

</div>

---

[2]     214 Townsend Place is a parcel of real property located in Fulton County, Georgia, identified with more particularity in that certain Limited Warranty Deed recorded at Deed Book 58235, Page 190, Fulton County Georgia records, a true and correct copy of which is attached hereto as Exhibit "A," and incorporated herein by reference.

[3]     The Augusta Property is a parcel of real property located in Richmond County, Georgia, identified with more particularity in that certain Limited Warranty Deed recorded at Deed Book 01467, Page 1395, Richmond County Georgia records, and that certain Quitclaim Deed recorded at Deed Book 01467, Page 1399, Richmond County Georgia records, true and correct copy of which deeds are attached hereto collectively as Exhibit "B," and incorporated herein by reference.

[4]     The Residence is a parcel of real property located in Cobb County, Georgia, identified with more particularity in that certain Limited Warranty Deed recorded at Deed Book 15344, Page 5705, Cobb County Georgia records, a true and correct copy of which deed is attached hereto as Exhibit "C," and incorporated herein by reference.

All of the Debtor's transfers occurred at a time when he was insolvent or became insolvent as a result, as evidenced by his report of virtually no assets on the Petition Date.

### BC35 Indebtedness

42.

Debtor is indebted to BC35, LLC pursuant to, *inter alia*, that certain Guaranty dated February 18, 2008 ("Guaranty 1") guarantying St. Mary's Hotel, LLC's ("St. Mary's")(collectively, Debtor and St. Mary's are referred to herein as "Obligors") indebtedness under that certain Note from St. Mary's to Rockbridge Commercial Bank ("Original Lender") dated February 18, 2008, in the original principal amount of $4,500,000.00, as subsequently amended, extended, renewed or modified (the "Note 1").

43.

In addition, on May 7, 2009, St. Mary's executed a promissory note to Original Lender in the original principal amount of $220,000.00 ("Note 2")(collectively, Note 1 and Note 2, and all modifications and renewals thereto are referred to herein as the "Notes"), which Debtor guaranteed pursuant to that certain Guaranty to Original Lender dated May 7, 2009 ("Guaranty 2")(collectively, Note 1, Note 2, Guaranty 1, Guaranty 2 and all related loan documents, including all renewals, modifications and amendments to same, are referred to herein as the "Loan Documents").

44.

On December 18, 2009, the Federal Deposit Insurance Corporation ("FDIC") was

appointed as receiver for Original Lender.

45.

On December 18, 2010, effective December 2, 2010, the FDIC transferred the Loan Documents to South CRE Venture 2010-2, LLC ("CRE").

46.

On June 22, 2015, CRE and Obligors entered into that certain Loan Modification and Forbearance Agreement ("Forbearance Agreement") which, *inter alia,* extended the maturity date of the Loan Documents to February 1, 2016.

47.

Pursuant to the Forbearance Agreement, St. Marys executed Renewal Notes for Note 1 and Note 2 ("Renewal Notes"), and the Debtor executed new Guaranties of the Notes ("Additional Guaranties").

48.

On February 28, 2017, CRE transferred the Loan Documents to BC35, LLC, pursuant to those certain Assignments of Security Deed and Related Loan Documents.

49.

Obligors failed to pay the debt owed as required by the Forbearance Agreement.

50.

On May 5, 2017, BC35 filed a Complaint against Debtor, seeking to recover the amounts owed to it on the Loan Documents, in that certain case styled as <u>BC35, LLC v.</u>

Charles D. Menser, Jr., State Court of Cobb County, Case No. 17-A-1201 ("BC35 Case").

51.

On June 11, 2018, BC35 received a Judgment in the State Court Case against Debtor in the principal amount of $1,152,374.25 and accrued interest in the amount of $134,808.17 through June 11, 2018, plus $128,743.23 in attorney's fees for a total judgment in the amount of $1,415,925.66 on the Note 1, and on Note 2, unpaid principal in the amount of $27,969.05, $3,270.82 in interest and $3,148.98 in attorney's fees, for a total judgment amount of $34,388.85 on the Note 2, with interest accruing on the Judgment (the "Judgment").

**Archer Indebtedness**

52.

On October 3, 2016, Alamo Opportunity Fund, LLC, et al. (the "Archer Plaintiffs") filed a lawsuit against, *inter alia*, Debtor, alleging that the Debtor had defrauded Alamo Opportunity Fund, LLC and various other investors in Archer I, G.P., LLP, in that certain case styled as Alamo Opportunity Fund, LLC, et al. v. Charles D. Menser, Jr., Menser & Co., Stonewall Capital Partners, LLLP, and Archer I GP, LLLP, Civil Action File Number 16-1-7777-56)("Archer Lawsuit").

53.

On April 11, 2018, the Archer Plaintiffs received a Judgment against, *inter alia*, the Debtor in the Archer Lawsuit for $3,000,000.00 ("Archer Consent Judgment").

## **Other Indebtedness of the Debtor**

54.

Among other things, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.).

55.

In addition, the Debtor was also liable on numerous debts which were delinquent for secured properties in which he claimed to have no interest in the actual property, including $314,750.13 to First Landmark Bank guaranteeing a debt of Building 1600, LLC and $693,276.92 to Suntrust guaranteeing a debt of 100 Oakmont, LLP, as well as debts of $1,374,851.33 to PNC, and approximately $576,000 to First National Community Bank, which were also secured by properties that the Debtor claimed he did not own, being the Building 1600 Property, the 100 Oakmont Property, the Lot 710 Property and the 4102 Brookview Property. Finally, according to a Criticized Asset Report prepared by First Community National Bank on or about September 1, 2019, the bank denotes a decline in the Debtor's credit score after 2016 because of past due amounts owed on a home equity line of credit, consistently late monthly mortgage payments between 2016 and 2017, and a downgrade of the mortgage on the Menser's current residence due to these issues and his "inability to document cash flow". The Debtor did not have sufficient assets in his name to even come close to the amount of his debts during

the preference period.

<div align="center">Relief Sought</div>

<div align="center">56.</div>

Through this Complaint, the Trustee seeks declaratory judgments that the assets and properties nominally titled in the names of the Defendants are assets of the Debtor's bankruptcy estate, subject to turnover pursuant to 11 U.S.C. §542, a declaratory judgment that the Defendants are shams and mere strawmen for the Debtor himself which thus should be disregarded, the avoidance of specific transfers to or for the benefit of various Defendants that are avoidable under 11 U.S.C. §544, 548 and 550 and the Georgia Uniform Avoidable Transactions Act, that constructive trusts be placed on real property acquired by way of the Debtor's fraudulent transfers and against any assets transferred to Defendants by or through Debtor or for Debtor's benefit, and for a full accounting of all the assets of the Defendants to aid in unraveling the Debtor's schemes and the securing his assets for the benefit of his creditors who have been left high and dry.

<div align="center">57.</div>

As described herein, the Debtor created an elaborate shell game for his fraud, for which Plaintiff will need discovery to fully comprehend. As such, the Plaintiff expressly reserves the right to amend this Complaint to assert additional related causes of action and to add additional defendants should facts be discovered to justify the same.

<div align="center">**The Menser Entities**</div>

58.

The key to Debtor's strategy has been his creation of networks of entities to use as vehicles through which he funnels and hides his money.  As is apparent in the information set forth above for service of process on the Menser Entity Defendants[5], the Debtor is the registered agent and his accounting office is the registered office for most of them.  While it is lawful to conduct business through business entities, the Debtor has used them as mere sham instrumentalities and alter egos.

59.

Despite Debtor's decades of real estate and investment expertise and his regular provision of services based on that experience to the Menser Entities, Menser Trusts, and thus for the benefit of his Family members, Debtor's only reported income in his Schedules is a mere $1,000 a month from his accounting firm Menser & Co. plus $1,790 a month in "retirement" income, in total much less than his expenses for food, housekeeping supplies, and insurance.

60.

The Debtor essentially provides all his labor and services for the benefit of the Family and the Menser Entities without holding any assets in his name. The Debtor's personal expenses are instead paid primarily by the Family, Menser Entities and the

---

[5]      Hereinafter, each entity named in the caption are collectively referred to as the "Menser Entity Defendants".  The term "Menser Entities" include other entities associated with the Debtor which are not named as defendants.

Menser Defendants with assets or proceeds of assets that the Debtor has transferred to the Family, Menser Entities and the Menser Defendants.

61.

The Debtor has intentionally concealed his income and assets that would normally have been paid to the Debtor or held in the name of the Debtor, such that he could pay his creditors or his creditors could collect from but for his dominion and control over the Menser Entities.

62.

The Debtor has effectively transferred assets and compensation to which he had a right as part of his overall scheme to hinder, delay, and defraud his creditors by putting assets out of their reach.

63.

For most of the Menser Entities, the Debtor nominally placed his own ownership interest in the businesses and the funds generated by them in the name of his Family members or other of the entities.  Regardless, the Debtor remained fully in control of the entities, including having access to their funds and paying the debts of the Menser Entities, like mortgages, taxes, insurance, etc.  The Debtor's hand is apparent in the activities of each and every one of the Menser Entities, yet he maintains that he only holds interests in a handful, and those interests are purported to be minor and of no value. Internally, the purported ownership structure of almost every one of the Menser Entities

has been altered by the Debtor over the past two decades to shift interests from himself and to and between his family members and other entities and trusts. The history, ownership, and hidden hand of the Debtor in each of the Menser Entities is described in the paragraphs that follow.

### Menser Family Partners, L.P.

64.

Defendant Menser Family Partners, L.P. ("MFP") was created on September 18, 1995. While it is unknown what the original structure was, the 2006 Limited Partnership Agreement identifies the Debtor and Mrs. Menser as 50/50 general partners, and the Menser Family Trust as the 99% limited partner. As seen below, the Menser Family Trust is *de facto* the Debtor himself. As of the end of 2017, according to MFP's federal tax return, this ownership structure remained the same. MFP's principal office is the same as the Debtor's Menser & Co. business office at 2255 Cumberland Parkway; Building 1600; Suite 150; Atlanta, Georgia 30339 (the "Debtor's Office"), a building he owns through Building 1600, LLC.

65.

On the Plaintiff's current information and belief, the Debtor used MFP to funnel at least $75,000 from Travel Concepts, LLLP ("TC") and himself to Mrs. Menser to purchase 214 Townsend Place, which on information and belief, is being used as a residence by Sarah. In summary, on or about April 3, 2017, TC distributed $187,000 to

the Debtor as part of his share of proceeds from a real estate sale. On April 5, 2017, the Debtor endorsed that check over to MFP. Two months later on June 6, 2017, MFP transferred $75,000 to Mrs. Menser to use to purchase Sarah's home, 214 Townsend Place. Further details of this transaction are set forth below.

66.

MFP should be disregarded as a sham entity and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

**Menser Family Trust**

67.

Defendant Menser Family Trust (the "Family Trust") is a Cook Island irrevocable trust the Debtor created on April 16, 1996, approximately six months after MFP was created. The Settlement of Trust document identifies the Debtor and Mrs. Menser as co-settlors and as beneficiaries along with all the other Family members. That document also identifies the original investment in the Family Trust as the Debtor's and Mrs. Menser's interest in MFP. The Family Trust held a TD Ameritrade Account, account number ending 7346 naming the Debtor as Trustee, which had an investment account balance of $25,431.32 as of July 31, 2018.

68.

On current information and belief, the Debtor directly transferred at least

$11,500.00 to the Family Trust in the one year period preceding the Petition Date as follows:

      a)      On October 17, 2017, the Debtor issued check number 7182 from his SunTrust bank account, account number ending 1006, to TD Ameritrade in the amount of $5,000.00, with the memo line identifying "TD Ameritrade [redacted]7346";

      b)      On December 5, 2017, the Debtor issued check number 5755 from his same SunTrust account to TD Ameritrade in the amount of $500.00, with the memo line identifying "Menser Family Trust" and a note of a "TDA" account number [redacted]7346; and

      c)      On December 17, 2017, the Debtor arranged a wire transfer from his Fidelity bank account to the Family Trust's Ameritrade Account in the amount of $6,000.00 (together, the "Family Trust Transfers").

69.

The Family Trust Transfers are avoidable under 11 U.S.C. §548 and the Plaintiff is entitled to recover the value of those transfers from the Family Trust under 11 U.S.C. §550.

**Menser Family Partnership II, L.P.**

70.

Defendant Menser Family Partnership II, L.P. ("MFP II") was formed on April 1, 1996 with ES&G, Inc. named as its general partner.  The Debtor and Mrs.

Menser purportedly each held 49.75% as limited partners, though it was the Debtor who signed the Certificate of Limited Partnership.  Based on the most recent tax return obtained by the Plaintiff, at the end of 2017 these ownership interests remained the same (though ES&G was administratively dissolved in 2018).  As with most of the Menser Entities, MFP II's principal office was the Debtor's Office.

<div align="center">71.</div>

On current information and belief, MFP II was used by the Debtor in 2016 to funnel $170,000 of his own funds to purchase real property located at 1266 Moores Mill Road, Atlanta, Georgia 30327 (the "Moores Mill Property").  Specifically, in April 2010, the Debtor transferred $170,000 to MFP II then caused MFP II to transfer that money to a Swiss currency account.   In 2013, the Debtor caused MFP to move $247,716.20 from that Swiss account to its PNC bank account, and then on September 9, 2013 MFP II paid $247,000 from the PNC account to the escrow agent to close on the purchase of the Moores Mill Property.

<div align="center">72.</div>

MFP II should be disregarded as a sham entity and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

<div align="center">**P.J. Menser Family Partnership, L.L.L.P.**</div>

<div align="center">73.</div>

Defendant P.J. Menser Family Partnership, L.L.L.P. ("PJMFP") is one of several similarly named limited partnerships the Debtor used in his scheme. PJMFP was created December 9, 1998 with Mrs. Menser originally holding 97% ownership as limited partner plus 1% as general partner. *See* 1998 Limited Partnership Agreement. In addition, Sarah and George each held 1%. By 2011 and at least until 2017, ownership percentages were shuffled so that Mrs. Menser held only a total of 88.414%, and Sarah and George's interests were increased to 5.793% each. The principal office for PJMFP has always been the Debtor's Office. Also, the original name reservation for the partnership was made by the Debtor's attorney, who stated in his attached letter that he was making the reservations "on behalf of Mr. Menser"; the partnership application also named Debtor as the applicant.

74.

PJMFP should be disregarded as a sham entity as the Debtor has disregarded its corporate form and used its assets for his personal purposes, and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

**Stonewall Capital Partners, L.L.L.P.**

75.

Defendant Stonewall Capital Partners, L.L.L.P. ("Stonewall") is one of two known Stonewall Capital entities in the Menser family of businesses. Stonewall was

formed in September 2001 and Defendant Stonewall Capital Partners II, L.L.L.P. ("Stonewall II") was formed months later on January 1, 2002. The first Stonewall named the Debtor as the 98% limited partner. The Debtor's interest was moved around over time, being held equally with George at least as of 2008 and through the end of 2016, but was increased back to 98% by 2017. As with other Menser Entities, Stonewall's principal office has always been the Debtor's Office. The original paperwork for Stonewall filed with the Georgia Secretary of State's office was signed by the Debtor on behalf of his accounting firm, Menser & Co.

76.

Stonewall should be disregarded as a sham entity as the Debtor has disregarded its corporate form and used its assets for his personal purposes, and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

**Stonewall Capital Partners II, L.L.L.P.**

77.

Debtor's use and control over Stonewall II evidences clearly that this entity is, for all intents and purposes, really the Debtor himself. It was created in 2002 with its principal office being the Debtor's Office. While George signed the initial paperwork filed with the Georgia Secretary of State, at least as of 2011, he did not hold any ownership interest in the partnership. Rather, a trust in his name is identified as a limited

partner but with "nil" percentage ownership, along with a Sarah trust, numerous Menser Entities, and the Family Trust.  At that time PJMFP, Charles III, and an outside company each held one-third interests.  This structure changed over time, such that between 2014 and 2017, ownership, on paper, was spread out among Family and Menser Entities in varying percentages, the largest being MFP II and Mrs. Menser, with 26.3% each.

78.

Regardless of what was stated on paper, the Debtor held himself out as the true owner of Stonewall II and at all times was in control of it.  For example, Stonewall II opened two accounts with UBS Financial Services, Inc. ("UBS")[6].  Stonewall II opened UBS account number Y5 19462 ("SW II UBS 19642 Acct) on or about April 30, 2008. In the application to open this account, the Debtor named himself as the "Principal Officer or Owner" of Stonewall II.  In addition, the Debtor signed UBS' Partnership Form as part of opening this account, and identified himself as the person authorized to manage the purchase and sale of securities for this account.

79.

Over the years, the Debtor made transfers in and out of the SW UBS 19642 Acct which appear to have been to himself, to Mrs. Menser and otherwise for personal expenses of the Debtor.  For example, in 2017, among other things, the Debtor wrote a

---

[6]    UBS is a subsidiary of Swiss financial services giant UBS Group AG, providing wealth and assets management, investment banking, and personal and corporate banking.

check from this account to himself in the amount of $85,610.34. In 2018, he made thirty

withdrawals from this account by way of checks made payable to him, to Mrs. Menser,

to various mortgage companies, and for other apparent personal expenses totaling

$32,415.32. The Debtor made similar withdrawals from this account in 2019 in the total

amount of $30,755.84. On information and belief, as of the end of 2019 there was cash

in the account of only $249.56, but there were securities with a value of $9,064.00 plus

500,000 shares in two private equity funds for which the unit values are unknown.

<div align="center">80.</div>

In 2012, the Debtor opened another UBS account for Stonewall II under

account number Y5 04076 (the "SW UBS 04076 Acct"). Again, the Debtor signed the

Partnership Certification for this account and named himself as the general partner of

Stonewall II. Between 2014 and 2019, numerous funds were moved from this account to

the SW UBS 19462 Acct and also to a Stonewall II account at Fidelity Bank. The amount

of these inter-account moves appear to somewhat match the amount of dividends and

interests from the investments in the SW UBS 19462 Acct. On information and belief,

at the end of 2019, the SW UBS 04076 Acct had cash of only $78.58, securities with a

market value of $24,496.00, and shares in a private equity fund for which the unit value

is unknown.

<div align="center">81.</div>

In summary, the Debtor was holding his investments in one of Stonewall II's

UBS accounts, transferring most of the investment income therefrom to a second Stonewall II UBS account, and using that second account to make payments to himself, his wife, and to third parties for his personal expenses. These UBS transactions alone show that Stonewall II was a mere piggybank for the Debtor to earn hundreds of thousands of dollars from securities and private equities which he funneled out for personal use, all while keeping it hidden from his creditors.

82.

Stonewall II should be disregarded as a sham entity and the remaining securities and funds in its UBS accounts, in addition to any other assets Stonewall II is holding, should be turned over to the Plaintiff for the bankruptcy estate.

**Damascus 36, L.L.L.P.**

83.

Defendant Damascus 36, L.L.L.P. ("Damascus") was created in 2005. At its inception, the Debtor and George were named as 50/50 limited partners with Stonewall serving as general partner. There was a shift in the ownership structure of this entity; by 2014, the Debtor was no longer a named partner, and in the most recent tax returns obtained by the Plaintiff, in 2017, MFP was the 99% limited partner. As outlined above, MFP is owned by the Family Trust, and both concealed the Debtor himself. Stonewall continues to serve as general partner. Thus, Damascus is yet another entity created to mask the true actor, the Debtor, under several layers.

84.

The Debtor used Damascus with Archer Augusta, LLC to buy and hold property in Augusta, Georgia.   In summary, Damascus "sold" the Augusta Property, defined above, to newly-created Archer Augusta, LLC in December 2014.   Thereafter and until the present, that property has been titled in the name of Archer Augusta, LLC even though the Debtor made the loan reserve deposit as well as additional payments on the mortgage loan and other expenses related to the Augusta Property.   In these various transactions, the Debtor's records often interchange Damascus and Archer Augusta LLC as the involved entity and he even funneled $6,400 in April 2017 to Damascus then immediately back to Archer Augusta, LLC.   It is clear that the Debtor viewed these two entities as interchangeable cogs for his money and for ownership of the Augusta Property.

85.

Damascus should be disregarded as a sham entity and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

**Archer Augusta and the Other "Archer" Entities**

86.

The Debtor created and controlled several entities using variations of the same name but all including the name "Archer".  Most seem to have been created for single real estate deals in or around Augusta, Georgia, but all are sham entities manipulated by

the Debtor.

<u>Archer Augusta, LLC</u>

87.

Defendant Archer Augusta LLC ("Archer") was created in December 2014. The Operating Agreement for Archer names the Debtor and George as 50/50 partners. Archer's 2017 tax return claims the Debtor reduced his share to 35.2% and increased George's share to 64.8%, however neither the Debtor nor Archer have produced an amended operating agreement showing a transfer in interest from the Debtor to George, nor has the Debtor or Archer provided any evidence of consideration given from George to the Debtor in exchange for the alleged transfer of 14.8% of the Debtor's interest in Archer.

88.

As mentioned above, Archer was created for the sole purpose of holding the Augusta Property that had previously been held by Damascus.

89.

Weeks after Archer was created, on December 18, 2014, it "purchased" the Augusta Property from Damascus (the "Augusta Purchase"). The approximate fair market value of the property was $560,000 at the time, but it is currently unknown how much money if any changed hands between the entities.

90.

In fact, it would appear that the Augusta Purchase was really a ruse that allowed the Debtor to obtain borrowed money. The Augusta Purchase was funded with a $300,000 one-year balloon note from State Bank and Trust Company (the "Archer Loan"). The Archer Loan required interest-only payments for one year, and was guaranteed by the Debtor and George. In addition, this loan was secured by the Augusta Property.

91.

The Agreement for the Archer Loan required that Archer deposit $15,000 simultaneous with the closing into an account to be used as "Interest Reserve."

92.

On the date of the Augusta Purchase, the Debtor—not Archer —wrote a check to State Bank for $15,000 from his personal SunTrust Account, and deposited that check into the State Bank account of Archer (the "Augusta $15,000 Transfer"). Notwithstanding that this check contains the Memo comment "Funding for Damascus 36," this payment clearly was the required "Interest Reserve" deposit and was applied against the Augusta Loan.

93.

Thereafter, Debtor Menser made additional payments to State Bank and others that benefitted Archer, as follows:

- On or about January 25, 2016, the Debtor—not Archer—wrote a check to State Bank for $7,500 from his personal SunTrust Account. This check contains the Memo comment

"Funding for Archer Augusta."  It appears that this check was deposited into the Archer "Interest Reserve" account with State Bank and applied against the Archer Loan.

- On or about February 4, 2016, the Debtor—not Archer—wrote a check to the Georgia Secretary of State for $50 from personal SunTrust Account.  This check contains the Memo comment "For Archer Augusta LLC - # 14114650."  It appears that this check was accepted by the Georgia Secretary of State as Archer's 2016 annual registration fee.

- On or about April 18, 2017, in a convoluted transaction, the Debtor issued a check from his personal SunTrust Account to Damascus  for $6,400 for no discernible reason, which check was deposited into Damascus' Fidelity bank account. On the same date, Damascus issued a check from its Fidelity account for $6,389.83 which was deposited in Archer's State Bank operating account.[7]     The Memo portion of this check indicates it is a "Loan"—apparently to Archer.  There is no indication in the bank records of Damascus or Archer that any purported "Loan" between them was ever "repaid" in whole or in part nor do there appear to be any records that same was a Loan.

The transfers described in this paragraph (collectively, the "Augusta Property Transfers") were made for the benefit of Archer.  The references to Damascus and the inexplicable use of Damascus to funnel the Debtor's money to Archer are further evidence that the Debtor considered these Menser Entities to be interchangeable alter egos, serving solely to conceal his own personal assets from his creditors.

94.

In summary, Archer was a Menser Entity created for the sole purpose of shifting ownership of the Augusta Property.  Menser caused it to "purchase" the property from another Menser Entity, then used that property to secure loans of either or both of these Menser Entities, but transferred not less than $28,939.83 of his own funds over time to or for the benefit of Archer (collectively, the Augusta $15,000 Transfer and the

---

[7]     The Damascus Fidelity account had a balance of only $18.11 prior to these transactions and afterward had a balance of only $28.28.  There was no Memo identification on the Debtor's check, and running the funds in and out of the Damascus account on the same day may have merely been an attempt to mask the source and use of them.

Augusta Property Transfers are hereinafter referred to as the "Augusta Transfers").  The

Augusta Transfers are avoidable under O.C.G.A. §§18-2-70 et seq.

95.

At some point the Augusta Loan was paid off as there is currently no security

deed related to the Augusta Property.  It is still titled 100% in the name of Archer Augusta,

but is being marketed for sale or lease at a price of $330,000 ($1200 per month for a

lease).  The Plaintiff is entitled to a constructive trust as to this property.

96.

In addition to the recovery of the Augusta Transfers and constructive trust,

Archer should be disregarded as a sham entity and all assets that it currently holds

should be turned over to the Plaintiff for the bankruptcy estate.

Archer I, L.L.L.P.

97.

Defendant Archer I, L.L.L.P. ("Archer I") was created earlier, in 2005.  The most

current information the Plaintiff has about this entity is its 2014 tax returns which identify

Archer I GP, LLLP as its general partner, holding a 35% interest, and MFP holding a

4.29% -- the remainder of the ownership of Archer I is unknown.  Originally, Stonewall

was the general partner, its principal office was Debtor's Office, and the Debtor signed

the Certificate of Partnership.

98.

Archer I should be disregarded as a sham entity and to the extent that it currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate.

<div align="center">Archer I GP, L.L.L.P.</div>

<div align="center">99.</div>

Defendant Archer I GP, L.L.L.P. ("Archer I GP") was created on the same day as Archer I, January 1, 2005. This entity also has its principal office at the Debtor's Office, and as of 2014 was purportedly owned half and half by the Debtor and George, with Stonewall as general partner. By 2016, the Debtor was identified as holding 99% as limited partner, still with Stonewall as general partner holding 1%. It seems that Archer I GP was created for the purpose of serving as general partner of Archer I.

<div align="center">100.</div>

To the extent Archer I GP owns any assets, it should be disregarded as a sham entity and those assets should be turned over to the bankruptcy estate.

<div align="center">Archer Properties, L.L.L.P.</div>

<div align="center">101.</div>

Defendant Archer Properties, L.L.L.P. ("Archer Properties") was the third Archer entity created on January 1, 2005. Like the others, its principal office is the Debtor's Office. As of 2015, the Debtor and George were listed as equal partners (49.5% each), with Stonewall as 1% general partner. However, the next year and at least as of 2017,

the Debtor increased his share to 99% and George was cut out.

102.

To the extent Archer Properties owns any assets, it should be disregarded as a sham entity and those assets should be turned over to the bankruptcy estate.

Archer III, L.L.L.P.

103.

Defendant Archer III, L.L.L.P. ("Archer III") was created in 2007. Since at least 2014, it has been identified as being owned by numerous other Menser Entities, the Debtor himself, Mrs. Menser, George, and other entities and people not otherwise known to be associated with the Debtor, all in differing minority percentage amounts. Archer I GP is also named as the general partner of this entity.

104.

To the extent Archer III owns any assets, it should be disregarded as a sham entity and those assets should be turned over to the bankruptcy estate.

Archer VI, L.L.L.P.

105.

Finally, Defendant Archer VI, L.L.L.P. ("Archer VI") was established in 2012. Similar to Archer III, it purports to involve numerous outside entities and persons with the Debtor and George, and Stonewall serving as general partner. By the beginning of 2017, according to tax returns, the Debtor and Stonewall held all of the interests in this

partnership.  Archer VI also has its principal office at the Debtor's Office.

106.

At least as of Archer VI's 2017 tax year, it held investments reported to be worth $56,698.  To the extent Archer VI still owns these investments or any other assets, it should be disregarded as a sham and those assets should be turned over to the Plaintiff for the bankruptcy estate.

### 100 Oakmont Partners, L.L.L.P.

107.

Defendant Oakmont Partners, L.L.L.P. ("Oakmont") was formed on or about January 1, 2006 with the Debtor holding most of the ownership, 96%, but naming Mrs. Menser as the general partner.  Between 2014 and 2016, the percentage ownership interests were shared somewhat equally between the Debtor, Mrs. Menser, and the other Family members, but by the end of 2018, the vast majority of the interests had been transferred to Mrs. Menser who then held 96%.

108.

On information and belief, Oakmont was created to hold title to the Debtor's and Mrs. Menser's personal vacation home on St. Simons Island, located at 100 Oakmont Street, St. Simons Island, Georgia 31522 (beginning May 12, 2006) (the "Beach House").

109.

Despite the fact that this sham entity was named on the deed to the Beach House, the Debtor himself made mortgage payments, just as he did with his Residence and other properties he titled in others' names.  The Plaintiff is currently aware of transfers totaling $66,964.68 that the Debtor made to or for the benefit of Oakmont for no consideration in the two-year period preceding the Petition Date, as follows:

- Debtor issued his Suntrust check number 5855 on February 7, 2017 to Suntrust Mortgage in the amount of $3,795.42 with the memo line for "100 Oakmont ST 0037654175";

- Debtor issued his Suntrust check number 5858 on February 16, 2017 to Oakmont in the amount of $6,200.00;

- Debtor issued his Suntrust check number 5734 on April 7, 2017 to Suntrust Bank in theamount of $2,056.40 with the memo line for "Loan 21248100 100 Oakmont Line of Cr";

- Debtor issued his Suntrust check number 7014 on April 19, 2017 to 100 Oakmont in the amount of $2,100.00;

- Debtor issued his Suntrust check number 7038 on May 8, 2017 to 100 Oakmont in the     amount of $1,300.00;

- Debtor issued his Suntrust check number 7070 on June 27, 2017 to 100 Oakmont in the amount of $12,600.00;

- Debtor issued his Suntrust check number 7088 on August 1, 2017 to 100 Oakmont in the amount of $6,500.00;

- Debtor issued his Suntrust check number 7143 on an unknown date in 2017 to 100 Oakmont in the amount of $4,300.00;

- Debtor issued his Suntrust check number 5740 on October 10, 2017 to 100 Oakmont in the amount of $1,400.00;

- Debtor issued his Suntrust check number 7150 on October 16, 2017 to 100 Oakmont in the amount of $6,200.00;

- Debtor issued his Suntrust check number 7191 on November 3, 2017 to 100 Oakmont in the amount of $2,100.00;

- Debtor issued his Suntrust check number 7210 on an unknown date in 2017 to 100 Oakmont in the amount of $4,300.00;

- Debtor issued his check number 639 on January 9, 2018 to 100 Oakmont in the amount of $5,800.00;

- Debtor issued his Suntrust check number 6997 on March 27, 2018 to 100 Oakmont in the amount of $6,300.00; and

- Debtor issued his check number 619 on June 4, 2018 to 100 Oakmont in the amount of $2,012.86;

(collectively, the "Oakmont Transfers").  The Oakmont Transfers are avoidable transfers pursuant to 11 U.S.C. §548 which should be the Plaintiff is entitled to recover under 11 U.S.C. §550 for the bankruptcy estate.

## 110.

The Debtor put Oakmont in a voluntary Chapter 11 bankruptcy case on December 1, 2018, Case No. 18-70167 (Bankr. N.D. Ga.), but the case was dismissed on July 20, 2019 on a motion of the United States Trustee, on the grounds of failure to prosecute in a manner that could lead to confirmation and consummation of a plan.  Shortly after the dismissal, the bank holding the mortgage foreclosed on the Beach House.  To the extent Oakmont currently has assets, the separate entity should be disregarded as a sham entity and those assets should be turned over to the bankruptcy estate.

**Travel Concepts, LLLP**

111.

Defendant Travel Concepts, LLLP ("Travel Concepts") was formed in 2008 with Menser & Co. as general partner, the Debtor as the majority owner (70%), and with Charles III and Debtor's then business partner Dayna Lawson holding 10% each. As with most of the Menser Entities, these percentages changed over time. As the beginning of 2017 the Debtor held 64% of the membership shares of Travel Concepts and the Debtor's company, Menser & Co., P.C. held 1% of the shares of Travel Concepts.

112.

Travel Concepts sold a hotel property on or about February 23, 2017 for net proceeds of $1,432,920.05 (the "TC Proceeds"). The Debtor should have been entitled to at least 65% of those proceeds, but on information and belief, only received a total of $612,000 which he diverted to Menser Entities and Family for no consideration. In two disbursements on April 3 and April 18, 2017, the Debtor transferred $430,000 of the TC Proceeds in transactions that ultimately resulted in Mrs. Menser and Sarah's ownership in 214 Townsend, and in 1266 MMR's ownership of the Residence.[8]

113.

In addition, on March 15, 2017, the Debtor caused Travel Concepts to issue

---

[8]      As is explained *infra.* the Debtor cause Travel Concepts to write him checks for $187,000 and $300,000; of this $487,000, there is proof that he shortly thereafter forwarded $430,000 of those funds.

checks directly to others from the TC Proceeds for no consideration:

i) On March 15, 2017, Travel Concepts issued check number 000442 to MFP in the amount of $25,000;

ii) On March 31, 2017, Travel Concepts issued check number 000437 to Mrs. Menser in the amount of $25,000;  and

iii) on April 3, 2017, Travel Concepts issued check number 000481 to the Family Trust in the amount of $75,000.

(the "TC Transfers").  These transfers are avoidable pursuant to 11 U.S.C. §548 and the Plaintiff is entitled to recover the value of these transfers for the bankruptcy estate.

114.

It is currently unknown whether Travel Concepts ever distributed the Debtor's remaining interest in the TC Proceeds.  To the extent Travel Concepts is currently holds those funds or other assets, the separate entity should be disregarded as a sham entity and those assets should be turned over to the bankruptcy estate.

**1266 MOORES MILL ROAD, LLC**

115.

Defendant 1266 Moores Mill Road, LLC ("1266 MMR") was created in 2013.  Despite the Debtor's continuing acts of control over and financial contributions to 1266 MMR, detailed below, Mrs. Menser is listed in the 1266 MMR operating agreement as holding a 99% interest in that entity.  1266 MMR's principal office is the Debtor's Office, and the Debtor signed the Articles of Organization, identifying himself as a "Member Manager."

116.

The Debtor listed the property 4102 Brookview Drive property as his residence in his Bankruptcy Petition.  The Residence is located in the Wildwood neighborhood of Buckhead in Atlanta, a popular and affluent area in which the average home price is over $1 million.  The neighborhood is located in a prestigious school district and the Menser's home is mere miles from the elite Bobby Jones and Cross Creek golf courses.

117.

The Debtor did not identify any interest in the Residence in his Schedules, but did report monthly expenses in his Amended Schedule J for mortgage payments, real estate taxes, and home maintenance, repairs and upkeep, and identified Mrs. Menser as a co-debtor on the mortgage for the Residence.

118.

The Residence is, on paper, owned by 1266 MMR, but 1266 MMR was originally created solely for the purpose of purchasing and holding another piece of property located at 1266 Moores Mill Road NW, Atlanta, Georgia 30327 ("1266 Moores Mill"), the purchase and maintenance of 1266 Moores Mill was funded in whole or in part by the Debtor through various Menser Entities and Mrs.  Menser.

119.

The proceeds from the sale of 1266 Moores Mill Road and the Debtor's

interest therein led to the eventual funding and purchase of the Residence, as described hereinafter.

<u>Background Facts Related to 1266 Moores Mill</u>

120.

Background details regarding funding from the Debtor that enabled the purchase and sale of 1266 Moores Mill are relevant to understanding the Debtor's fraudulent intent through the maneuvering of his various sham entities, ultimately leading to his concealed interest in his own home, an unencumbered valuable piece of real estate that is not listed as an asset of the bankruptcy estate.

121.

Beginning in 2001, on information and belief, hundreds of thousands of dollars coming from sources and accounts controlled by the Debtor made their way into the accounts of Menser Entities including MFP II and PJMFP.

122.

In April 2010, the Debtor apparently transferred $170,000.00 to MFP II via two wire transfers.

123.

In that same month, the Debtor arranged to transfer the $170,000 from MFP II to an account with an entity in Switzerland, Safe Wealth Services, SA – that entity specialized in holding funds in various currencies, including U.S. Dollars, for

international customers (the "Swiss Account")—while he was also arranging for transfers of funds to that account from PJMFP.

124.

On or about July 20, 2013, Mrs. Menser signed a contract to purchase 1266 Moores Mill.

125.

In August 2013, on information and belief, the Debtor apparently made efforts to obtain financing for the purchase of 1266 Moores Mill but was unsuccessful.

126.

On August 13, 2013, the Debtor caused the wire transfer of money parked into the Swiss Account in the amount of $247,716.20 to a PNC Bank account of MFP II.

127.

On September 9, 2013, $247,000.00 of the MFP II PNC funds were transferred to an escrow account for the closing on the purchase of 1266 Moores Mill.[9]

128.

The Debtor also caused two other transfers on or about the same time to fund the purchase of 1266 Moores Mill:

---

[9]   The General Ledger for MFP II obtained from the Debtor describes this transaction as "Loan for Purchase of 1266 Moores Mill Rd" and "Loan to PJM to purchase 1266 Moores Mill Rd;" and the General Ledger for 1266 MMR LLC describes this transaction as "Record Wire Transfers to purchase 1266. Another accounting document described as the "Cash By Day" Report for MFP II for 2013 produced by Debtor Menser describes this transaction as "1266 Moores Mills – Loan."

i)      PJMFP transferred $99,000 from its Wells Fargo account; and

ii)     Stonewall II transferred $5,000 from its Wells Fargo account.

129.

On September 6, 2013, the Debtor created 1266 MMR, clearly for the sole purpose of purchasing and holding title to 1266 Moores Mill.

130.

On September 10, 2013, 1266 MMR closed on the purchase of 1266 Moores Mill for a price of $340,000.  Thus, as discussed below, at least $170,000 originally transferred from the Debtor for the purchase of 1266 Moores Mill was a transfer for the benefit of 1266 MMR and/or Mrs. Menser for which the Debtor received no consideration, and was done with the intent to hinder, delay or defraud the Debtor's creditors while the Debtor was insolvent or undercapitalized. There is no evidence of any loan documents from any other party to the Debtor for the transfer of funds for the purchase of 1266 Moores Mill.

131.

Following closing, the closing attorney transmitted excess funds to 1266 MMR in the amount of $12,759.14, and in turn, 1266 MMR returned $5,000 to Stonewall II, such that its involvement in the purchase was inconsequential.

132.

For the next three years, 1266 MMR held the property, but during that time

the Debtor made transfers of his own money to pay for insurance, repairs and other expenses related to 1266 Moores Mill, for the benefit of 1266 MMR, in the total amount of not less than $23,069.45. While a number of these payments were made more than 4 years prior to this bankruptcy, at a minimum they are evidence that Debtor retained a "secret interest" in 1266 Moores Mill. Of these transfers, an amount of at least $6,602.60 was transferred by the Debtor within the four-year period preceding the Filing Date (the "1266 Moores Mill Transfer").

133.

After ostensibly owning the property for three years (during which time the Debtor was making payments for the maintenance of the property for its benefit) 1266 MMR sold 1266 Moores Mill to a third party on January 5, 2016 for $550,000. The sales contract for this sale was signed by both Mrs. Menser and the Debtor as representatives of 1266 MMR.

134.

The $517,210 proceeds of that sale were transmitted to 1266 MMR, after which those funds were shuffled through a new bank account used for only a month, and ended up in a 1266 MMR account with Fidelity Bank (account no. ending 0492) for which Mrs. Menser and the Debtor were signatories.

135.

Within a week or so of the sale of 1266 Moores Mill, the sales proceeds

were divvied up between the Debtor, Mrs. Menser, and PJMFP, as follows:

        i)      On January 7, 2016, 1266 MMR wrote a check to the Debtor for $125,000;

        ii)     On January 13, 2016, 1266 MMR wrote a check to PJMFP for $158,420; and

        iii)    On January 13, 2016, 1266 MMR wrote a check to Mrs. Menser for $158,420.

136.

PJMFP was not a member of MMR LLC, and it had only contributed $99,000 toward the purchase of 1266 Moores Mill, such that there does not appear to be justification for it receiving an additional $59,420 from the sales proceeds.

137.

There is similarly no explanation for the distribution of $158,420 to Mrs. Menser, nor the $125,000 payment to the Debtor (let alone for the failure to make any payment to MFP II, which may have lent $247,000 to MMR LLC to purchase 1266 Moores Mill) —although Mrs. Menser and PJMFP continued to be part of the network of persons and accounts through which the Debtor moved money around to fund his various real estate investments.  All in all, as of February 2016, money flowing from the purchase and sale of 1266 Moores Mill -- which originated with $170,000 directly traced to the Debtor (and arguably additional money through his sham entities) – ended up spread out between and among the Debtor, Mrs. Menser, and PJMFP.

138.

The transfer of $158,420 to Mrs. Menser, $59,420 to PJMFP, and the failure of Mrs. Menser and 1266 MMR to return the remainder of the proceeds of the sale of 1266 Moores Mill to the Debtor are all fraudulent transfers which should be avoided as to Mrs. Menser, PJFMP and 1266 MMR, and the proceeds of same should be returned to the Debtor's Estate.

<u>Transfers Directly Related to the Residence</u>

139.

The purchase of the Residence by 1266 MMR was funded by a mortgage, the Debtor directly, and the Debtor through Travel Concepts.

140.

On May 27, 2016, Debtor transferred $105,000 by wire transfer from his Fidelity Bank Account as a partial down payment for the purchase of the Residence (the "Debtor's Residence Transfer").[10]

141.

Also on May 27, 2016, Debtor caused Travel Concepts (majority owned by Debtor) to transfer $16,000 by wire transfer as the other part of the down payment on the purchase of the Residence, using funds that he would have otherwise been entitled to receive as a distribution as the 64% owner of Travel Concepts (the "TC Residence

---

[10]    This account had a balance of less than $500 prior to May 2016. Between May 23 and May 27, funds totaling approximately $107,000 were moved into the account, obviously to use for funding for the purchase of the Residence.

Transfer").

142.

The remainder of the purchase price for the Residence was funded by a mortgage with First Community National Bank ("FCNB") in the amount of $577,443.90. In association with this loan, the Debtor:

i)    Signed the Note as a purported "authorized member" of 1266 MMR;

ii)    As a purported "authorized member" of 1266 MMR, signed a security deed granting FNCB a security interest in the Residence, as well as an assignment of leases, rents and profits; and

iii)    Executed a personal guaranty to FNCB.

143.

On May 31, 2016, 1266 MMR purchased the Residence for the price of $712,000.

144.

The Debtor received no consideration for his transfers to fund this purchase for the benefit of 1266 MMR.

145.

One year later, on May 22, 2017, for no discernable reason, 1266 MMR transferred the Residence to Mrs. Menser for no consideration.

146.

Approximately 2 ½ years later, on October 18, 2019, and again with no apparent explanation, Mrs. Menser transferred the Residence back to 1266 MMR for no consideration.[11]

147.

From the date 1266 MMR purchased the Residence, the Debtor has made numerous payments on the mortgage, for property insurance, and for repairs and maintenance for the benefit of 1266 MMR and/or Mrs. Menser as follows:

i)    Debtor made transfers to FNCB on the mortgage for the Residence totaling at least $21,771.

ii)    Debtor made transfers to Foremost Insurance Company and others for insurance, maintenance, and repairs related to the Residence totaling at least $13,027.04

(collectively, the "Residence Upkeep Transfers").

148.

On or about November 12, 2019, Mrs. Menser issued a check in the amount of $287,085.76 to pay off the then current balance on the promissory note secured by the Deed to Secure Debt on the Residence; thereafter, the lender, FNCB, executed documents to cancel the Deed to Secure Debt. Thus, currently the Residence appears to be unencumbered; the fair market value of the Residence is approximately

---

[11]    On that same date, Mrs. Menser, as the purported "Manager" of 1266 MMR, apparently signed a promissory note for $285,993.43 to _____, the balance then remaining on the mortgage on the Residence, and also executed a Deed to Secure Debt on the Residence to secure the repayment of that promissory note.

$768,000, per Zillow.

<center>149.</center>

The 1266 Moores Mill Transfers, the Debtor's Residence Transfer, the

Travel Concepts Residence Transfer, and the Residence Upkeep Transfers (collectively

referred to as the "Residence Transfers") are avoidable transfers under 11 U.S.C. §544

and O.C.G.A. §18-2-74 et seq., and the Trustee is entitled to collect the value of the

money transferred from PJFMP, 1266 MMR and Mrs. Menser as the entities for whose

benefit the transfers were made under 11 U.S.C. §550(a). As such, a constructive trust

should be placed on the Residence.

<center>150.</center>

Additionally, the Residence and any other assets held by 1266 MMR

should be turned over to the Plaintiff for the bankruptcy estate as that entity is a sham

entity and alter ego for the Debtor, which should be disregarded.

<center>**ETO, LP**</center>

<center>151.</center>

Defendant ETO, LP ("ETO") was created on March 21, 1996. The limited

partnership agreement from 2006 identifies the Debtor and Mrs. Menser as equal limited

partners, holding 47.75% each. Menser & Co held 0.50 % as general partner. Ownership

was shifted at least beginning 2008 and to the present, such that the Debtor held 94%

ownership, with the remainder scattered between other Family members and Menser

Entities.

<div align="center">152.</div>

In the most recent information in the Plaintiff's possession, ETO's 2017 tax return, the company had approximately $64,000 in income from "cancellation of debt" and assets of almost $100,000 in "trade notes/accounts receivable". ETO's assets should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity which should be disregarded, and in the event that ETO is found to be a valid company, the Debtor owns 94% of same, and thus the Trustee is entitled to 94% of its assets.

<div align="center">**Bibb 185 LLLP**</div>

<div align="center">153.</div>

Defendant Bibb 185 LLLP ("Bibb 185") was created in 2001. Bibb 185 is one of only a few Menser Entities that appears to include ownership by third parties, however, Stonewall is its only general partner and Mrs. Menser was the majority limited partner at least during the period between 2014-2016, holding 48.98%. No other owner has held more than 10% individually. Thus, all fingers point to the Debtor, again, as begin the controlling master behind this entity. The partnership application was signed by Debtor on behalf of his accounting firm, and the partnership certificate is likewise signed by the Debtor as general partner for Stonewall.

<div align="center">154.</div>

To the extent Bibb 185 currently holds any assets, those assets should be

turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity and alter ego for the Debtor which should be disregarded.

**Positive Ventures, Inc.**

155.

Defendant Positive Ventures, Inc. ("Positive Ventures") was created on January 1, 2003.  As of 2009, the Debtor held 75% of this company's shares, with the remainder held by an outside partner Kathy L. Williamson.  This structure appears to have been altered – between 2014 and 2017, Positive Ventures' tax returns showed the Debtor holding 95% and Ms. Williamson only 5%.  As with most of the other Menser entities, Positive Ventures' principal office was the Debtor's Office.  While it appears Ms. Williamson may have started this corporation, somewhere around 2009 or sooner Debtor stepped in and at present owns the bulk of the company, and is both the CEO and CFO.

156.

On information and belief, Positive Ventures currently owns 50% of an office building in North Georgia located at 4004 Mundy Mill Road, Oakwood, GA 30566.  That interest and any other assets of Positive Ventures should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity which should be disregarded.

**Pointer Investments, Inc.**

157.

Defendant Pointer Investments, Inc. ("Pointer") was established in 2004 in the

names of  George, Mrs. Menser and Ashley Connell.  Currently, George is named as the CEO, CFO and Secretary of this corporation.

### 158.

To the extent that Pointer owns any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity which should be disregarded.

### Lodge America, LLC

### 159.

Defendant Lodge America, LLC ("Lodge") was created in 2008 with the Debtor and Dayna Lawson as members.  Between 2014 and 2016, the Debtor held 65% of the company's interest, Ms. Lawson held 19%, and Charles III was added as a member with a 16% interest.  The ownership structure, on paper, shifted again in 2017 when Ms. Lawson's share was increased to 50% and the Debtor's was allegedly reduced to 34%, just when Lodge was selling the hotels.

### 160.

Based on Lodge's 2017 tax return, it was involved in the Debtor's hotel line of business.  Lodge sold numerous assets in 2017 and experienced a net loss.  To the extent Lodge currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity which should be disregarded.

### Bluffs At Lanier , L.L.L.P.
### 161.

Defendant Bluffs At Lanier, L.L.L.P. ("Bluffs") was created in 2007.  Between at least 2014 and 2017, Bluffs was held 99% by Stonewall II as limited partner, and 1% by Menser & Co. as general partner.  As was discussed above, Stonewall II is another sham, such that Bluffs is *de facto* owned by the Debtor.  Stonewall is its registered agent and its registered office is the Debtor's Office.

<div align="center">162.</div>

According to the website for the Georgia Secretary of State, Bluffs is inactive but has not officially been dissolved.  To the extent the company currently holds any assets, those assets should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity which should be disregarded.

<div align="center">**Other Menser Entities**</div>

<div align="center">163.</div>

Between 1992 and 2008, the Debtor created numerous other entities, presumptively for more of his wheeling and dealing, but which have since been administratively dissolved or are, for other reasons, not named as defendants herein.  However, their existence is further evidence of the extent to which the Debtor went in abusing the use of business forms to shield himself from liability to creditors over time and to hide his assets.

<div align="center">**Lot 710, LLC**</div>

<div align="center">164.</div>

Defendant Lot 710, LLC ("Lot 710") was created at the end of 2012 with the Debtor and Mrs. Menser holding 47.5% interests each, and with Charles III, George, and Sarah each holding nominal 1% interests.  By 2017, 99% of the interest in Lot 710 had been shifted to Mrs. Menser with Debtor only holding 1%.  Lot 710 was administratively dissolved in 2018, such that it is not a defendant, but transfers were made in the four-year period preceding the petition Date relative to Lot 710 that benefitted its owners, as follows.

165.

In 1992 the Debtor entered into a loan to fund the purchase of real property in Rabun County, Ga., Land Lot 75 of the 13th District as set out in the Deed to Secure Debt filed in Book 213, Page 491 in the real property records for Rabun County, Georgia (the "Rabun Property").  Despite the Debtor being responsible for the loan, the Rabun Property was titled in the name of Mrs. Menser.

166.

On or about November 11, 2012, Mrs. Menser transferred title of the Rabun Property to Lot 710.  Clearly then, Lot 710 was created for the sole purpose of holding this property.

167.

Despite the Rabun Property being titled in the name of Lot 710 (and Mrs. Menser prior to that), in the four-year period preceding the Petition Date, the Debtor paid

expenses related to the property as well as mortgage payments for the loan for which he

remained responsible in the total amount of at least $38,934.23, as follows:

- On February 21, 2017, the Debtor issued Suntrust check number 5861 to PNC Bank in the  amount of $4,122.33 for "Interest";

- On March 4, 2017, the Debtor issued Suntrust check number 6879 to Georgia Power Company in the amount of $1,000.00 with the memo line "Lot 710 Burton Mtn Rd Lot        Assessmen [sic]";

- On March 4, 2017, the Debtor issued Suntrust check number 6880 to Georgia Power Company in the amount of $1,050.00 with the memo line "Lot 710 Mtn Rd Annual Lease";

- On March 17, 2017, the Debtor issued Suntrust check number 5867 to PNC in the amount of $4,122.33 for "Interest";

- On March 27, 2017, the Debtor issued Suntrust check number 6891 to Rabun County Tax Commissioners in the amount of $2,063.27 with the memo line "Parcel LB15005L";

- On April 21, 2017, the Debtor issued Suntrust check number 5701 to PNC Bank in the amount of $4,122.33 for "Interest";

- On May 5, 2017, the Debtor issued Suntrust check number 5704 to PNC Bank in the amount        of $4,122.33 for "Interest";

- On June 22, 2017, the Debtor issued Suntrust check number 5708 to PNC Bank in the amount of $3,247.11 for "Interest";

- On July 21, 2017, the Debtor issued Suntrust check number 5873 to PNC Bank in the amount of $4,400.00 for "Interest";

- On August 14, 2017, the Debtor issued Suntrust check number 5875 to PNC Bank in the  amount of $4,122.33 for "Interest";

- On August 16, 2017, the Debtor issued Suntrust check number 7113 to PNC Bank in the  amount of $4,122.33;

• On March 6, 2018, the Debtor issued Suntrust check number 6990 to Rabun Boat House in      the amount of $2,439.87 for an invoice;

(the "Rabun Transfers").   The Rabun Transfers were made for the benefit of Mrs. Menser, Charles III, George, and Sarah, to the extent of their percentage interests in Lot 710 at the time and are avoidable by the Plaintiff.

168.

On October 13, 2017, Lot 710 sold the Rabun Property for $1.4 million at a short sale, at a time when Lot 710 was owned 95% by Mrs. Menser.  There were no proceeds from the short sale that did not go to closing costs or to the security deed on the Rabun Property held by PNC.

### Menser & Co.

169.

Menser & Co., PC is a professional corporation created by the Debtor in 1992, for his personal accounting services.  As mentioned above, the principal office of this PC is the Debtor's Office, but is also named as the principal office of the majority of the other Menser Entities.  The Debtor has always held 100% of this company and it is the only entity he identified in his Schedules as having any value; albeit, he alleged that value to be only $247.

170.

To the extent Menser & Co., PC currently holds any assets or has any value, those

assets and that value should be turned over to the Plaintiff for the bankruptcy estate as the entity is a sham entity and an alter ego of the Debtor which should be disregarded.

## Building 1600 LLC

171.

Building 1600 LLC ("Building 1600") was created in 1996.  The original Operating Agreement for Building 1600 named Clara Menser, the Debtor's moth, as the 100% member, but the Debtor was the manager, president, and secretary.  In tax returns for 2013 and 2014, ownership is shown to have shifted to 99% Debtor and 1% Menser & Co.  On information and belief, the sole purpose of Building 1600 was always to hold ownership in the Debtor's Office property.

172.

Building 1600 itself filed a Chapter 11 bankruptcy on December 31, 2018 in the Bankruptcy Court for the Northern District of Georgia under Case No. 18-71813-jwc, which is still pending.  Notably, the bankruptcy schedules for Building 1600 identify another shift in ownership, reducing the Debtor's share to 49% and shifting most of the remaining interest, 50%, to Mrs. Menser.  Building 1600 did not list the Debtor as a creditor in that case, even though the Debtor repeatedly paid Building 1600's mortgage payments from his personal bank account.

## Highland Systems, Inc.

173.

Highland Systems, Inc. was incorporated in Georgia in 1992. At least as early as 2014 (the first year for which the Plaintiff has corporate tax returns), the Debtor and Mrs. Menser were fifty-fifty owners of this entity. As of the last registration with the Georgia Secretary of State's office, the Debtor was named as CEO and CFO. The company was administratively dissolved on August 26, 2019.

### ES&G, Inc.

174.

ES&G, Inc. was incorporated in 1996 and at least between 2015 and 2017 was purportedly owned fifty-fifty by the Debtor and Mrs. Menser. This company was administratively dissolved on September 9, 2018.

### SADC, LLC

175.

SADC, LLC ("SADC") was created on January 1, 2005 (essentially the same date that the Debtor created Bluffs, Archer I, Archer Properties and Damascus). ES&G, Inc. was its sole member at that time, but by 2011 and through at least 2017 ownership had been shifted to the Debtor and Mrs. Menser as equal limited partners, with Menser & Co. serving as general partner. SADC was administratively dissolved on September 7, 2018.

### CWC Manager, Inc.

176.

Defendant CWC Manager, Inc. ("CWC") was incorporated in 2011, its office being the Debtor's Office. The only information the Plaintiff currently has about this corporation is a 2014 tax return in which it is reported that the Debtor and George held the shares of CWC 50/50. CWC was administratively dissolved in 2017.

### 2440 Howell Mill, LLC

### 177.

Defendant 2440 Howell Mill, LLC was also created at the end of 2012, with primary ownership being allotted to Mrs. Menser. Nevertheless, the company's principal office was the Debtor's Office. The company was administratively dissolved in 2015.

### OTHER

### 178.

The Debtor additionally listed the following entities in his Schedules as being entities in which he has an interest, but indicated $0 as the value of each and fails to identify his particular percentage ownership interest. Each of these entities were dissolved pre-petition: Carrollton Village, LLC (dissolved September 7, 2018), Campus Quad Carrollton I, LLC (dissolved August 24, 2017), St. Mary's Hotel, LLC (dissolved September 7, 2018), and Lodge Atlanta, LLC (dissolved September 7, 2018). Not disclosed by the Debtor, but also entities in which he had held interests that were dissolved pre-petition are Campus Quad Carrolton II, LLC and Carrollton Village II,

LLC.

## FACTS RELATED TO MRS. MENSER

### 179.

The Debtor is an accountant by profession, and has a lifetime of experience in business and finance, with special sophistication in real estate investments. On the Plaintiff's current information and belief, at least since the 1980s the Debtor has developed, managed, bought and sold and/or invested in dozens of single-asset real estate projects.

### 180.

Mrs. Menser, in contrast has a background in education and as an elementary school teacher.

### 181.

Mrs. Menser holds or held assets nominally titled in her name but used and controlled by the Debtor including, but not limited to, the Residence (as set forth in detail *supra*), the 1401 Garmon Property, the 1266 Moores Mill property, the real property located at 214 Townsend Place, ownership interests in numerous entities, a valuable coin collection, and certain cash and/or investment accounts (collectively, "Mrs. Menser's Nominal Assets"). In addition, the Debtor made numerous avoidable transfers to or for the benefit of Mrs. Menser in the four-year period preceding the Petition Date.

### The Menser's Prior Residence

182.

The Debtor and Mrs. Menser's prior residence was located at 1401 Garmon Ferry Road, Atlanta, Georgia 30327 (the "Prior Residence").  Like their current Residence, the Debtor made payments for the mortgage and other house-related expenses while not having title in the property himself.  The Debtor was liable on the mortgage for the Prior Residence but transferred title to Mrs. Menser in 1990.  Despite that transfer, he continued to make interest payments to State Bank on the mortgage directly from his SunTrust bank account (account number ending 1006) within the four years preceding the Petition Date totaling at least $31,977.26.  To the Plaintiff's current knowledge, those payments include the following:

- On March 10, 2016, the Debtor issued checked number 5590 in the amount of $3,739.98 to        State Bank for interest;

- On July 19, 2016, the Debtor issued check number 5657 in the amount of $5,801.60 to State        Bank for interest;

- On October 17, 2016, the Debtor issued check number 5672 in the amount of $ 6,224.58 to        State Bank for interest;

- On December 8, 2016, the Debtor issued check number 5685 in the amount of $5,060.65 to        State Bank for interest; and

- On January 24, 2017, the Debtor issued check number 173 in the amount of $11,150.45 to        State Bank for interest.

(collectively, the "Prior Residence Transfers").  The Prior Residence was sold on March 3, 2017 for $1.17 million, and on information and belief, the Debtor received none of the

proceeds.

<div align="center">182.</div>

The Prior Residence Transfers are avoidable transfers pursuant to 11 U.S.C. §544 and O.C.G.A. §18-2-74, and the Trustee is entitled to recover the value of the money transferred from Mrs. Menser as the person for whose benefit the transfers were made.

<div align="center">**214 Townsend Place**</div>

<div align="center">183.</div>

Mrs. Menser currently holds title in 99% and Sarah Connell holds title in 1% of the real property located at 214 Townsend Place NW, Atlanta, Georgia 30327 ("214 Townsend Place"), purchased with funds of at least $318,930.32 that originated with the Debtor, as is hereafter described.

<div align="center">184.</div>

The Debtor's funds that were invested in 214 Townsend Place made a journey through multiple accounts of Mrs. Menser and numerous entities, including Travel Concepts, PJMFP, MFP, and the Family Trust.

<u>Debtor's Transfer of $75,000 to MFP Then to and for the Benefit of Mrs. Menser</u>

<div align="center">185.</div>

As is set out above, in 2017 the Debtor held not less than a 50% ownership interest in Travel Concepts and on or about February 23, 2017, Travel Concepts sold a

hotel property, resulting in net proceeds of approximately $1.44 million.

186.

On or about April 3, 2017, Travel Concepts issued a check payable to Debtor in the amount of $187,000.00, as a partial distribution to him for his portion of the net proceeds of the hotel sale.

187.

Two days later, on April 5, 2017, the Debtor endorsed the $187,000 Travel Concepts check over to MFP and the check was deposited into that partnership's Fidelity bank account.

188.

Two months later, on June 6, 2017, MFP issued a check in the amount of $75,000 from its Fidelity account to Mrs. Menser's Ameritrade account #7335 ("Mrs. Menser's Ameritrade Account").  The funds used for this transfer are directly traceable to the $187,000 distribution to Debtor deposited into the MFP Fidelity account (for reasons set forth below, this $75,000 transfer is hereinafter referred to as the "$75,000 Townsend Transfer").

189.

At the time of the $75,000 Townsend Transfer, and, at all other times relevant to this Complaint, Mrs. Menser had no interest in Travel Concepts, nor, upon information and belief, was the Debtor indebted to her.

190.

The $75,000 Townsend Transfer is avoidable pursuant to 11 U.S.C. §548, and the Trustee is entitled to collect the value of the money transferred to MFP as transferee and also Mrs. Menser as immediate transferee or as the person for whose benefit the transfer was made under 11 U.S.C. §550(a). Sarah was also a beneficiary of the $75,000 Townsend Transfer, as is set forth below.

### Debtor's Transfer of $243,930.42 To UBS For The Benefit of Mrs. Menser and PJMFP

191.

PJMFP held a credit line account with UBS, account number 5V 01626 (the "PJMFP UBS Acct"). As of at least April 1, 2017, extensions of credit on this account led to a loan balance of $243,459.45 (the "PJMFP Loan"). The Debtor was not liable on this account nor is there evidence that he personally guaranteed it. However, Mrs. Menser did sign a guaranty of this credit line and provided collateral by pledging the funds and securities in her investment account.

192.

In addition to the $187,000 distribution that resulted in the $75,000 Townsend Transfer to Mrs. Menser, on or about April 17, 2017, Travel Concepts issued another distribution check to the Debtor in the amount of $300,000.00.

193.

Two days later, on or about April 19, 2017, Debtor used this $300,000

check from Travel Concepts to purchase two cashier's checks from IberiaBank, one of

which was made payable to UBS in the amount of $243,900.00.  On or about the next

day, that cashier's check was transferred to UBS to substantially pay down the balance

of the PJMFP Loan.  The Debtor's notations in the his Quickbook statements state out

right that the $243,900.00 was purchased using part of the $300,000 distribution the

Debtor had received from Travel Concepts.

<div align="center">194.</div>

The next day, on April 20, 2017, the Debtor additionally made a direct

payment of $30.32 from his personal Fidelity bank account to pay off the balance of the

PJMFP Loan in full.  For the purposes of this Complaint, this payment and the payment

described in paragraphs 192-194 are together referred to as the "UBS Loan Transfers".

<div align="center">195.</div>

Based on UBS' response to Plaintiff's subpoena requesting all

documentation of accounts held by the Debtor and his related entities and family, it is

Plaintiff's informed understanding that while numerous Menser Entities and Family

held UBS accounts, the Debtor did not.

<div align="center">196.</div>

At the time of the UBS Loan Transfers, Mrs. Menser held an 87.414%

interest in the PJMFP.

<div align="center">197.</div>

The UBS Loan had been personally guaranteed by Mrs. Menser, and had been secured by assets in her personal UBS Account No. 24493 ("Mrs. Menser's UBS Account"). Thus, the UBS Loan Transfers benefitted the PJMFP, but also benefitted Mrs. Menser by first extinguishing the debt of that partnership in which she held the primary interest, and second by extinguishing her liability under the guaranty and freeing up the assets in her UBS account.

198.

The UBS Loan Transfers are avoidable transfers pursuant to 11 U.S.C. §548, and the Trustee is entitled to recover the value of the money transferred from UBS as the immediate transferee, and from PJMFP and/or from Mrs. Menser as the persons for whose benefit the transfers were made. Sarah was also a beneficiary of the UBS Loan Transfer as is set forth below.

### Mrs. Menser's Purchase of 214 Townsend Place with the $318,930.32 the Debtor Transferred to Her or for Her Benefit

199.

To summarize, by June 6, 2017, $75,000 of funds originating with the Debtor were sitting in Mrs. Menser's Ameritrade account, and funds totaling $243,930.32 had been transferred by the Debtor for the benefit of Mrs. Menser and/or PJMFP, including the benefit of removing the security interest on Mrs. Menser's UBS Account.

200.

Once Mrs. Menser's UBS Account was freed up, on June 9, 2017, she moved funds and securities with a total value of not less than $312,849.62 from this UBS Account to an account that she maintained with Ameritrade. This cash plus securities represented substantially all of the funds in Mrs. Menser's UBS Account.

201.

On October 27, 2017, Mrs. Menser entered into a contract to purchase 214 Townsend Place.

202.

On December 5, 2017, the purchase of 214 Townsend Place was closed for a purchase price of $437,500.00. To cover this purchase price and additional costs of sale, Mrs. Menser used a wire transfer to move funds in the amount of $460,000.00 from Mrs. Menser's Ameritrade Account to the escrow account of the closing attorneys. Thus, a substantial amount of the funds used to purchase 214 Townsend Place--at least $318,930.32—can be directly traced to the Debtor's funds.

203.

214 Townsend Place is owned 99% by Mrs. Menser and 1% by Sarah, her daughter. There is no mortgage on the property, and 2019 tax records indicate a tax fair market value of $663,400. Currently, Sarah is using 214 Townsend Place as her residence.

204.

Moreover, Mrs. Menser has been able to accumulate large sums of funds in her Ameritrade Account because the Debtor has been paying her mortgages and personal expenses with his assets, and thus Mrs. Menser's Ameritrade Account should be turned over to the Debtor's Estate.

### Interest In Menser Entities Nominally Titled in Mrs. Menser's Name

205.

The Debtor has used Mrs. Menser to nominally hold ownership interests in his Entities.  Mrs. Menser is named as holding full or partial interest in at least the following Menser Entities, at the following current percentages:

- MFP - 50% general partner

- MFP II – 49.75%

- PJMFP – 88.414%

- Stonewall II – 26.3 %

- 1266 MMR – 99%.

These interests are properly property of the bankruptcy estate and should be turned over to the Plaintiff. On information and belief, Mrs. Menser has not made any capital contributions to any of the Menser Entities for her alleged interest in same.

206.

Mrs. Menser also held nominal title in ETO at its inception, but her interest was transferred in 2008.

207.

Mrs. Menser held a 48.98% majority interest in Bibb 185 between 2014 and 2016, but that interest was reduced to 0 in 2017.

208.

Likewise, Mrs. Menser held a 18.2% interest in Archer III by 2016, which was reduced to 0 in 2017.

209.

Mrs. Menser also held nominal interest in these other Menser Entities, entities that have since been dissolved:  SAD (50%), 2440 Howell Mill (90%), and ES&G (50%).

**Mrs. Menser's Nominal Interests In Gold Coins**

210.

According to documentation obtained by Plaintiff, the Debtor has purchased valuable gold coins but has nominally held them in the name of Mrs. Menser.  As of April 24, 2018, the most recent date for which the Plaintiff has information, the Debtor maintained an inventory of gold coins in Mrs. Menser's name at least as follows:

1 OZ $50 Gold Liberty

60 uncirculated coins (in 3 sleeves of 20 each)

6 circulated coins (in 1 sleeve of 6)

1924 Uncirculated PCGS M564 Liberty $20

Three boxes of 12 each (36 total)

One box of 11

<u>$50 Liberty Gold Eagle</u>

120 coins (in 6 sleeves of 20 each)

7 coins (1 sleeve of 7)

<u>1 OZ Gold Maple Leaf 2011 (Canadian) $550 pieces</u>

6 coins (in 1 sleeve)

<u>Carson City Silver $1</u>

1 uncirculated #83494349

(the "Coins").  It appears that the 60 uncirculated 1 ounce $50 Gold Liberty coins were sold in December of 2018 for an unknown amount, according to an e-mail from the Debtor to a representative of David Hall Rare Coins ("DHRC"), the rare coin dealer with whom Debtor bought and sold his coins.

211.   The evidence shows that the Coins were actually purchased by the Debtor, not by Mrs. Menser.  For example, all of the communications produced by DHRC in response to Plaintiff's subpoena comes from the Debtor and it was the Debtor who provided instructions to DHRC regarding selling coins.  In one document, in handwritten notes on an inventory of the Coins addressed to Van Simmons, the president and partner of DHRC, the Debtor asked about some of the Coins, including a note that "I [the Debtor] do not believe <u>I</u> have bot [sic] any coins from anyone other than you."

212.

In addition, the Debtor's general ledger includes numerous entries between December 2008 and January 2016 evidencing the "purchase of Gold Coins".

213.

The Debtor is *de facto* owner of the Coins and the Coins and the proceeds thereof should be turned over to the Trustee.

**Mrs. Menser's Nominal Interests In Accounts In Her Name**

214.

Mrs. Menser, at the Debtor's direction and demand, maintains numerous bank and investment accounts nominally titled in her name and/or in the name of Menser Entities in which she is designated as the majority or sole owner.  Behind the scenes, the Debtor freely uses and controls these accounts, diverting any compensation and/or gain to which he is entitled into the accounts in order to hide it from his creditors.   For example, the Debtor has paid his personal expenses from numerous corporate accounts, including Building 1600, LLC and MFP II, while diverting his assets into paying for residences nominally held by entities controlled by Mrs. Menser or held in the name of Mrs. Menser, such as the 1401 Garmon Property, 100 Oakmont, Lot 710 and 1401 Brookview Drive Property.

215.

Mrs. Menser's stated interests in the Menser Entities, Mrs. Menser's

interest in the Coins, and Mrs. Menser's interest in accounts, in addition to any other nominal interests Mrs Menser holds in assets that the Plaintiff identifies in discovery, are collectively hereinafter referred to as "Mrs. Menser's Nominal Assets."

**Additional Avoidable Transfers To Or For The Benefit Of Mrs. Menser**

216.

As set forth above, the Debtor made the following transfers to or for the benefit of Mrs. Menser that are avoidable by the Plaintiff: the Travel Concepts Transfers, the Residence Transfer, the Rabun Transfers, the Prior Residence Transfer, the $75,000 Townsend Transfer, and the UBS Loan Transfers. All of these transfers are avoidable transfers pursuant to 11 U.S.C. §548 and the Plaintiff is entitled to recover the value thereof from Mrs. Menser.

217.

In addition, on current information, the Debtor made cash transfers to Mrs. Menser in the 19-month period preceding the Petition Date in the total amount of at least $37,612.45 as follows:

- On February 2, 2017, the Debtor issued a Suntrust check number 6823 to Mrs. Menser in the amount of $1,000.00;
- On July 6, 2017, the Debtor issued a Suntrust check number 7084 to Mrs. Menser in the amount of $1,000.00;
- On July 11, 2017, the Debtor issued a Fidelity check number 182 to Mrs. Menser in the amount of $400.00;
- On July 27, 2017, the Debtor deposited a check made out to him and "TOD Phyllis J. Menser" in the amount of $10,712.45 into Phyllis Menser's bank account;

- On August 8, 2017, the Debtor issued Suntrust check number 7109 to Mrs. Menser in the amount of $1,000.00;

- On August 13, 2017, the Debtor issued Suntrust check number 5877 to Mrs. Menser in the amount of $1,000.00;

- On August 18, 2017, the Debtor issued Suntrust check number 5876 to Mrs. Menser in the amount of $1,000.00;

- On October 14, 2017, the Debtor issued Suntrust check number 7172 to Mrs. Menser in the amount of $5,000.00;

- On October 17, 2017, the Debtor issued Suntrust check number 7174 to Mrs. Menser in the amount of $5,000.00;

- On January 12, 2018, the Debtor issued Suntrust check number 5814 to Mrs. Menser in the amount of $2,500.00 (with a note for "loan repayment");

- On March 5, 2018, the Debtor issued check number 5615 to Mrs. Menser in the amount of $5,000.00;

- On March 18, 2018, the Debtor issued check number 605 to Mrs. Menser in the amount of $1,000.00;

- On April 18, 2018, the Debtor issued Suntrust check number 5824 to Mrs. Menser in the amount of $500.00;

- On April 26, 2018, the Debtor issued Suntrust check number 7011 to Mrs. Menser in the amount of $500.00;

- On April 30, 2018, the Debtor issued Suntrust check number 5826 to Mrs. Menser in the amount of $500.00;

- On May 31, 2018, the Debtor issued Suntrust check number 5615 to Mrs. Menser in the amount of $500.00;

- On July 16, 2018 (merely two months prepetition), the Debtor issued Suntrust check number 5838 to Mrs. Menser in the amount of $1,000.00 with a note for "repay

loan". (the "Mrs. Menser Cash Transfers").

<div align="center">218.</div>

Recall that the Debtor declared that he had only $200.00 in cash on September 19, 2018, the date he filed his bankruptcy petition, and that he was making no income from his accounting business. The Mrs. Menser Cash Transfers are avoidable transfers pursuant to 11 U.S.C. §548 – of those, the transfers via check number 5814 on January 12, 2018 and vis check number 5838 on July 16, 2018, if they were in fact payments on a loan, were also avoidable preferences to an insider pursuant to 11 U.S.C. §547. The Plaintiff is entitled to recover from Mrs. Menser the value of the $37,612.45 transferred.

<div align="center">

## THE DEBTOR'S OTHER FAMILY MEMBERS

219.

</div>

Just like he has done with Mrs. Menser, the Debtor has engaged in a pattern and practice of transferring or assigning to his other family members – with their tacit approval and participation –  money, property, and business interests to which he would and should be entitled so that he essentially owns nothing. Yet the Debtor retains control over, and use of, all assets nominally titled in the names of Sarah, George, and Charles III – they too are simply straw men behind which the Debtor hides from his creditors.

<div align="center">

### Charles D. Menser, III

220.

</div>

While Charles III has represented through his attorney that he had no

<div align="center"></div>

involvement in any of his father's business, there is ample evidence that, at the very least, he did hold accounts with cryptocurrency investment companies after his father's failed attempts to open such accounts in his own name.  In 2017 alone, the Debtor transferred at least $37,500.00 to such accounts in Charles III's name, in addition to transferring at least $25,000 to Charles III directly, for no consideration, as is detailed in the following paragraphs.

221.

In April and May 2017, the Debtor began the process of opening a cryptocurrency account with cryptocurrency company Abra[12], via Synapse Financial Technologies, Inc. ("Synapse")[13] and also with Kraken[14] via Synapse.  It does not appear that any of these accounts were ultimately activated, or, if they were, were not used for any transactions.

222.

Synapse is, among other things, a brokerage company acting on behalf of companies who offer cryptocurrency accounts to investors.  As relevant to this Complaint, Synapse customers include Abra and Kraken.

223.

---

[12]     On information and belief, Abra is the d/b/a for Plutus Financial, Inc. and offers an app allowing customers to deposit, buy and sell cryptocurrencies.  *See* www.abra.com.  Abra was a customer of Synapse.
[13]     On information and belief, Synapse is a banking platform/broker that offers, among other things, "crypto-wallets" that enable companies to provide cryptocurrency products to their customers.  *See* www.synapsefi.com.
[14]     On information and belief, Kraken is the tradename for Payward, Inc. which offers an online cryptocurrency exchange.  *See* www.kraken.com.  Kraken was also a customer of Synapse.

After the Debtor's apparent failures, on or about May 14, 2017, a Synapse account was opened for Charles III with an initial deposit of $1,000.00 (the "Crypto Account").

224.

After the opening deposit, it appears that all significant deposits to this account came from the Debtor.

225.

As discussed above, the Debtor diverted money from the Travel Concepts hotel sale proceeds to MFP, among others.  Specifically, on March 17, 2017 he caused Travel Concepts to transfer $25,000 -- to which he was entitled -- directly to MFP. And, on April 3, 2017, he endorsed over to MFP a $187,000 check he had received from Travel Concepts.

226.

In May 2017, the Debtor then re-directed a total of $58,500 of the TC Proceeds from MFP to Charles III, both by investments in the Crypto Account, and also by direct payment to Charles III:

- On May 16, 2017, the Debtor caused MFP to wire transfer $8,500.00 to Evolve for the benefit of the Crypto Account;

- On May 24, 2017, the Debtor caused MFP to wire transfer $25,000 to Evolve for the benefit of the Crypto Account; and

- On May 31, 2017, the Debtor caused MFP to wire transfer $25,000 to Charles III's and Connie's joint ETrade account number 7213.

227.

In addition, a few months later, on September 6, 2017, the Debtor directly transferred $4,000 from his Fidelity Bank account to Evolve for the benefit of the Crypto Account.

228.

The transfers described in paragraphs 220-226 are collectively referred to as the "Charles III Transfers". The Charles III Transfers are avoidable transfers pursuant to 11 U.S.C. §548 and the Plaintiff is entitled to recover the value of those transfers from Charles III, and at least as to the May 31, 2017 transfer, also from Connie.

229.

The Debtor has also used Charles III to nominally hold ownership interests in his Entities. Charles III was named as holding partial interests in at least the following Menser Entities at some point in their existence: Stonewall II, Travel Concepts (prior to 2017), Lodge America, and Lot 710. In addition, Charles III was named as nominal owner of Charles D. Menser, III Family Partnership, LLLP ("CDMFP"). CDMFP was created in November 1998. Tax returns between 2014 and 2017 identify Charles III as the 99% limited partner, but the general partner is Debtor's accounting firm Menser & Co. As 2017, according to tax returns, CDMFP had no income and no assets. All of Charles III's interests in these entities are properly property of the bankruptcy estate and should be turned over to the Plaintiff.

## George Connell

### 230.

The Debtor has used George to hold nominal ownership interests in his Entities. George was named as holding full or partial interest in at least the following Menser Entities: Pointer, Damascus 36, Archer, Archer III, Archer VI, CWC Manager, and Lot 710. These interests are properly property of the bankruptcy estate and should be turned over to the Plaintiff.

### 231.

As set forth above in paragraph ___, Archer's 2016 tax return indicates that the Debtor held 50% of the interests in that company and George held 50%. However, the company's 2017 returns show that the Debtor held only 35.2% and George held 64.8 %. Thus, sometime in 2017, the Debtor transferred 14.8% of his membership interest in Archer to George for no known consideration (the "Archer Membership Interest Transfer"). This is an avoidable transfer pursuant to 11 U.S.C. §548 and the Plaintiff is entitled to recover the value of the transfer from George.

## Sarah Connell

### 232.

Sarah was named as holding full or partial interest in at least Lot 710, LLC, in addition to very minor named holdings in other Menser Entities as discussed *infra*.

### 233.

Sarah also holds title to 1% of the real property she uses as her residence, 214 Townsend Place NW, Atlanta, Georgia 30327 ("Sarah's Home").  This property is held 99% by Mrs. Menser, although funds of at almost $320,000 of the Debtor's own money were used to purchase that property. Sarah's interest in Sarah's Home is properly property of the bankruptcy estate and should be turned over to the Plaintiff, as the Debtor's assets funded the purchase of Sarah's Home.

## TURNOVER OF DEBTOR ASSETS

### Cash Transfers

234.

In the years prior to bankruptcy, the Debtor repeatedly concealed his assets from his creditors by operating in cash.

235.

The Debtor wrote checks to himself, or to cash, in the amount of several hundred thousand dollars in the two years prior to bankruptcy ("Cash Transfers"). True and correct copies of some of the checks evidencing the Cash Transfers are attached hereto as **Exhibit 1**.

236.

The Debtor has refused to identify the current location of the funds transferred by the Cash Transfers, or the proceeds of same. The funds from the Cash Transfers were not disclosed on Debtor's Schedules.

237.

The Debtor should be required to immediately turn over any cash that he is holding, or any proceeds of same, to the Trustee pursuant to 11 U.S.C. §542.

238.

To the extent that the Debtor has transferred any of the Cash from the Cash Transfers to any other person or entity without receiving adequate consideration in return, same should be avoided pursuant to, inter alia, 11 U.S.C. §548.

**CryptoCurrency**

239.

In the years prior to bankruptcy, the Debtor purchased CryptoCurrency separate and apart from the Cryptocurrency that he purchased for CDM III.

240.

The Debtor listed a value of the CryptoCurrency that he currently holds as of April 22, 2019 in the amount of $44,636.78, pursuant to the spreadsheet produced by the Debtor attached hereto as **Exhibit 2**.   The CryptoCurrency was not declared on Debtor's Schedules.

241.

The Debtor should be required to immediately turn over the CryptoCurrency that he is holding, or any proceeds of same, to the Trustee pursuant to 11 U.S.C. §542.

242.

To the extent that the Debtor has transferred any of CryptoCurrency to any other person or entity without receiving adequate consideration in return, or any of the CryptoCurrency is held in the name of any other person or entity while being controlled by the Debtor, that transfer should be avoided pursuant to, inter alia, 11 U.S.C. §548.

**Furs and Jewelry**

243.

From July 2, 2013 until at least July 9, 2018, the Debtor was the named insured on a Nationwide insurance policy no. 7710IM166273 ("Furs and Jewelry Policy") for furs in the insured amount of $8,500.00 and jewelry in the insured amount of $92,824 ("Furs and Jewelry"). A true and correct copy of some of the insurance declarations for the Furs and Jewelry is attached hereto as **Exhibit 3**.

244.

The Debtor repeatedly made insurance payments on the  Furs and Jewelry Policy, some of which are attached hereto as **Exhibit 4**.  The Debtor did not list the Furs or Jewelry on his bankruptcy schedules.

245.

The Debtor should be required to immediately turn over the Furs and Jewelry, or any proceeds of same, to the Trustee pursuant to 11 U.S.C. §542.

246.

To the extent that the Debtor has transferred any of the Furs or Jewelry to any other person or entity without receiving adequate consideration in return, or any of the Furs or Jewelry is held in the name of any other person or entity while being controlled by the Debtor, that transfer should be avoided pursuant to, inter alia, 11 U.S.C. §548.

## COUNT I
## DECLARATORY JUDGMENT THAT MENSER ENTITY DEFENDANTS ARE MERE SHAM ENTITIES

247.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through Paragraph 246 herein and the same are incorporated in Count I by this reference.

248.

Pursuant to Bankruptcy Rule 7001(2) and (9), the Plaintiff may seek a declaratory judgment determining the validity, priority, and extent of interests in property.

249.

The Menser Entities and the Menser Trust are sham entities that are mere instrumentalities of the Debtor, and that are not used to conduct legitimate business affairs of their own, but to perpetrate the Debtor's fraud upon his creditors.

250.

There is such a unity of interest and ownership that the separate personalities of the Menser Entities and the Debtor do not exist.

251.

Plaintiff seeks a declaratory judgment that the Menser Entities should be disregarded as mere sham entities, with their assets to be turned over to the Plaintiff as Trustee for the Debtor's bankruptcy estate.

## COUNT II

### TURNOVER OF ESTATE PROPERTY HELD BY MENSER ENTITY DEFENDANTS

252.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 251. herein and the same are incorporated in Count II by this reference.

253.

Because the assets held by the Menser Entity Defendants, including the Menser Family Trust, including but not limited to all real property and investment and bank accounts described in this Complaint, are in reality owned and controlled by the Debtor, they are therefore property of the estate under 11 U.S.C. §541, and as such as subject to turnover pursuant to 11 U.S.C. §542.

254.

Plaintiff is entitled to an order and judgment against the Menser Entity Defendants, including the Menser Family Trust, requiring them to turn over the those assets or their value to the Plaintiff.

## COUNT III

### ALTERNATIVE DECLARATORY JUDGMENT THAT DEBTOR IS THE SOLE OWNER OF ALL STOCK, PARTNERSHIP INTERESTS, AND MEMBERSHIP INTERESTS

## IN THE MENSER ENTITY DEFENDANTS

255.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 255.

herein and the same are incorporated in Count III by this reference.

256.

Should the Court find that the Menser Entity Defendants are not mere sham

entities that should be disregarded, Plaintiff pleads in the alternative for a declaratory

judgment that the Debtor is the sole owner of the partnership interests, membership

interests, or stock of each of those entities, and any proceeds or distributions attributable

to those interests or stock.

257.

Despite the ownership identified on annual Secretary of State registrations or tax

returns, as shown in this Complaint, the Debtor has exercised complete control over the

Menser Entity Defendants, directed the use of their assets, and acted as *de facto* sole

owner of each.  The transfers of portions or all of the Debtor's interests in some of these

entities in the year before the Petition Date  was an evident maneuver to further hinder,

delay, and defraud the Debtor's creditors.

258.

Pursuant to the Court's equitable powers under 11 U.S.C. §§ 105 and 541, the

Plaintiff seeks a declaratory judgment that the Debtor is the sole owner of the

partnership interests, membership interests, or stock of each of the Menser Entity

Defendants as well as any proceeds or distributions attributable to those interests or stock, and that such interests or stock and any proceeds or distributions attributable thereto are thus property of the bankruptcy estate pursuant to 11 U.S.C. §541.

### COUNT IV
### AVOIDANCE AND RECOVERY OF FAMILY TRUST TRANSFERS
### PURSUANT TO 11 U.S.C. §§ 548 AND 550
259.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 258. herein and the same are incorporated in Count IV by this reference.

260.

During the two-year period preceding the Petition Date, the Debtor made the Family Trust Transfers to the Family Trust in the amount of $11,500.00. *See* para. 68.

261.

At the time of the Family Trust Transfers, numerous creditors held claims against the Debtor. For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.). In 2017, BC35, LLC filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June 2018 judgment. During the same time period, the Debtor was sued for breach of contract in Cobb County Superior Court which resulted in a $3 million consent judgment against him in May 2018. In his bankruptcy schedules, the Debtor lists 35 creditors with claims totaling more than $2.7 million.

262.

Debtor made the Family Trust Transfers with actual intent to hinder, delay, or

defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without

limitation, the following:

(a)    The Family Trust Transfers were made to and for the benefit of the Family Trust,
which was a sham trust created to conceal assets of the Debtor;

(b)    Through the Family Trust, the Debtor made the Family Trust Transfers, yet
maintained control of his funds while protecting those funds from his creditors;

(c)    Family Trust provided no consideration to the Debtor for the Family Trust
Transfers;

(d)    The Family Trust Transfers enabled Debtor to remove or conceal his own assets
by converting them into assets outside the reach of his creditors; and

(e)    In the Debtor's sworn Schedules, he states that he has no exempt assets, such that
the Family Trust Transfers, in conjunction with the other transfers set forth in this
Complaint were, necessarily, transfers of substantially all of the Debtor's assets.


263.

The Debtor made the Family Trust Transfers without receiving a reasonably

equivalent value in exchange for the Family Trust Transfers and at the time of the

transfers, Debtor

(a)    was insolvent or became insolvent as a result of the transfers (*see* paragraphs 41-

54);

(b)    was engaged in business or a transaction or was about to engage in a business or a
transaction for which any property remaining with the Debtor was unreasonably small

capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

264.

The Family Trust Transfers made in the two-year period preceding the Petition Date are voidable pursuant to 11 U.S.C. §548. Defendant Family Trust is the initial transferee such that pursuant to 11 U.S.C. §550(a), the Plaintiff is entitled to recover the value of these transfers from the Family Trust in the amount of $11,500.00 (or amounts to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

## COUNT V

### AVOIDANCE AND RECOVERY OF THE AUGUSTA TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND O.C.G.A. §11-2-74

265.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 264. herein and the same are incorporated in Count V by this reference.

266.

During the four-year period preceding the Petition Date, the Debtor made the Augusta Transfers to Archer and in part to Damascus for the benefit of Archer in the total amount of $28,939.83.  *See*  paragraph 94.

267.

At the time of the Augusta Transfers, numerous creditors held claims against the Debtor.  For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June 2018 judgment.  During the same time period, the Debtor was sued for breach of contract in Cobb County Superior Court which resulted in a $3 million consent judgment against him in May 2018.  In his bankruptcy schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

268.

Debtor made the Augusta Transfers with actual intent to hinder, delay, or defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without limitation, the following:

(a)    The Augusta Transfers were made to and for the benefit of Archer and Damascus which were sham strawman entities created to conceal assets of the Debtor;

(b)    Through Archer and Damascus, the Debtor made the Augusta Transfers, yet maintained control of his funds while protecting those funds and property from his creditors;

(c)    Neither Archer nor Damascus provided consideration to the Debtor for the Augusta Transfers;

(d)    The Augusta Transfers enabled Debtor to remove or conceal his own assets by converting them into assets outside the reach of his creditors; and

(e)    In the Debtor's sworn Schedules he states that he has no exempt assets, such that

the Augusta Transfers, in conjunction with the other transfers set forth in this Complaint were, necessarily, transfers of substantially all of the Debtor's assets.

269.

The Debtor made the Augusta Transfers without receiving a reasonably

equivalent value in exchange for the Augusta Transfers and at the time of the transfers,

Debtor

(a)     was insolvent or became insolvent as a result of the transfers;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

270.

The Trustee has the standing of a creditor holding a judgment against the Debtor

(11 U.S.C. §544(a)) and the Augusta Transfers are voidable under  O.C.G.A. §18-2-74

(a) and (b) as transfers avoidable by creditors sharing the statutory standing of the Trustee

(11 U.S.C. §544(b)).   The Augusta Transfers are voidable pursuant to 11 U.S.C. §544

and the Georgia Uniform Avoidable Transactions Act codified at O.C.G.A. §18-2-70 et

seq.  Defendant Archer is the initial transferee, except in the instance of the April 18,

2017 transfer in the amount of $6,389.83, Damascus is the initial transferee and Augusta

is the subsequent transferee and the entity for whose benefit the transfer was made, such

that the Plaintiff is entitled to recover the value of the transfers from Archer in an amount

of at least $28,939.83 and from Damascus in the amount of $6,389.83 (or amounts to be

determined with more certainty at trial), as well as pre-judgment interest from the date of

the filing of this Complaint.

## COUNT VI

## CONSTRUCTIVE TRUST ON AUGUSTA PROPERTY

271

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1

through 270 herein and the same are incorporated in Count VI by this reference.

272.

As set forth herein, the Augusta Transfers totaled not less than $28,939.83.  Of

these funds, $15,000 was used directly to purchase the Augusta Property, and the

remainder was used either to make payments on the mortgage for that Property or

otherwise for the benefit of the owner of that property, Defendant Archer Augusta.

273.

The Augusta Transfers set forth in Count V above are voidable fraudulent

conveyances pursuant to O.C.G.A. §18-2-74 *et seq.* as they were made with the intent to

hinder, delay, and defraud the Debtor's creditors.

274.

In addition, the Augusta Property is in reality property of the Debtor, as he

merely shifted it from Damascus to Archer Augusta to realize cash on a loan for the

transfers.

275.

Plaintiff is entitled to have a constructive trust imposed on the Augusta Property which is 100% owned by Archer Augusta to the extent of the Debtor's interest in the Augusta Property and, *inter alia*, the fraudulently transferred funds which contributed to the purchase of and mortgage and other expenses related to this property.

276.

As described herein, Archer received and benefited from the Augusta Transfers under circumstances such that Archer Augusta could not, and cannot enjoy any beneficial interest in the transferred assets without violating established principles of equity, from the fraud associated with the Augusta Transfers.  The Augusta Property, as the asset acquired and maintained by the proceeds from the Augusta Transfers can, and should, be impressed with a constructive trust in favor of Plaintiff to, *inter alia*, facilitate the recovery of the Augusta Transfers, which were made in violation of the rights of Debtor's creditors.

## COUNT VII

### AVOIDANCE AND RECOVERY OF OAKMONT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548 AND 550

277.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 277. herein and the same are incorporated in Count VII by this reference.

278.

During the two-year period preceding the Petition Date, the Debtor made the

Oakmont Transfers to Oakmont in the total amount of $66,964.68.

279.

At the time of the Oakmont Transfers, numerous creditors held claims against the

Debtor.  For example, claims filed in his bankruptcy case include debts originating in

2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank)

and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against the

Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted

in a June 2018 judgment.  During the same time period, the Debtor was sued for breach

of contract in Cobb County Superior Court which resulted in a $3 million consent

judgment against him in May 2018.  In his bankruptcy schedules, the Debtor lists 35

creditors with claims totally more than $2.7 million.

280.

Debtor made the Oakmont Transfers with actual intent to hinder, delay, or

defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without

limitation, the following:

(a)    The Oakmont Transfers were made to Oakmont which was a sham strawman
entity created to conceal assets of the Debtor;

(b)    The Debtor made the Oakmont Transfers, enabling him to enjoy the benefits of
the Beach House titled in the name of Oakmont, yet maintained control of his funds and
property while protecting those funds and property from his creditors, namely the Beach

House;

(c)     Oakmont provided no consideration to the Debtor for the Oakmont Transfers;

(d)     The Oakmont Transfers enabled Debtor to remove or conceal his own assets by converting them into assets outside the reach of his creditors; and

(e)     In the Debtor's sworn Schedules he states that he has no exempt assets, such that the Oakmont Transfers, in conjunction with the other transfers set forth in this Complaint were, necessarily, transfers of substantially all of the Debtor's assets.

281.

The Debtor made the Oakmont Transfers without receiving a reasonably equivalent value in exchange for the Oakmont Transfers and at the time of the transfers, Debtor

(a)     was insolvent or became insolvent as a result of the transfers;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

282.

The Oakmont Transfers made in the two-year period preceding the Petition Date are voidable pursuant to 11 U.S.C. §548. Defendant Oakmont is the initial transferee, and to the extent that Mrs. Menser was the majority owner of Oakmont which in turn owned the Beach House, she was the person for whose benefit the transfers were made, such that pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the transfers

from Defendants Oakmont and Mrs. Menser in the total amount of at least $66,964.68 (or

amounts to be determined with more certainty at trial), as well as pre-judgment interest

from the date of the filing of this Complaint.

## COUNT VIII

### AVOIDANCE AND RECOVERY OF TC TRANSFERS
### PURSUANT TO 11 U.S.C. §§ 548 AND 550

283.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 282.

herein and the same are incorporated in Count VIII by this reference.

284.

During the two-year period preceding the Petition Date, the Debtor made the TC

Transfers to MFP in the amount of $25,000.00, to Mrs. Menser in the amount of

$25,000, and to the Family Trust in the amount of $75,000.00.

285.

At the time of the TC Transfers, numerous creditors held claims against the Debtor.

For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35,

LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013

(Branch Banking & Trust Co.).   In 2017, BC35, LLC filed suit against the Debtor to

collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June

2018 judgment.  During the same time period, the Debtor was sued for breach of contract

in Cobb County Superior Court which resulted in a $3 million consent judgment against

him in May 2018.  In his bankruptcy schedules, the Debtor lists 35 creditors with claims

totally more than $2.7 million.

286.

Debtor made the TC Transfers with actual intent to hinder, delay, or defraud

Debtor's creditors. Evidence of Debtor's actual intent includes, without limitation, the

following:

(a)    The TC Transfers were made to MFP and the Family Trust which are sham
entities, and also to Mrs. Menser, all strawman transactions undertaken to conceal assets
of the Debtor;

(b)    The Debtor made the TC Transfers, yet maintained control of his funds and
property while protecting those funds and property from his creditors;

(c)    Neither MFP, Mrs. Menser, nor the Family Trust provided consideration to the
Debtor for the TC Transfers;

(d)    The TC Transfers enabled Debtor to remove or conceal his own assets,
specifically his distributions from the lucrative multi-million dollar sale of a hotel by
Travel Concepts, by converting them into assets outside the reach of his creditors; and

(e)    in the Debtor's sworn Schedules he states that he has no exempt assets, such that
the TC Transfers, in conjunction with the other transfers set forth in this Complaint
were, necessarily, transfers of substantially all of the Debtor's assets; and

287.

The Debtor made the TC Transfers without receiving a reasonably equivalent

value in exchange for the TC Transfers and at the time of the transfers, Debtor

(a)    was insolvent or became insolvent as a result of the transfers;

(b)    was engaged in business or a transaction or was about to engage in a business or a
transaction for which any property remaining with the Debtor was unreasonably small

capital; or

(c)   intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

288.

The TC Transfers made in the two-year period preceding the Petition Date are voidable pursuant to 11 U.S.C. §548. Defendants MFP, Mrs. Menser, and the Family Trust are the initial transferees, such that pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the transfers from them in the total amount of at least $125,000.00 (or amounts to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

## COUNT IX

## AVOIDANCE AND RECOVERY OF THE RESIDENCE TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND O.C.G.A. §11-2-74

289.

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1 through 289 and the same are incorporated in Count IX by this reference.

290.

During the four-year period prior to the Filing Date, the Debtor made the 1266 Moores Mill Transfers, the Debtor's Residence Transfer, the Travel Concepts Residence Transfer, and the Residence Upkeep Transfers (collectively, the "Residence Transfers") for the benefit of 1266 MMR and Mrs. Menser..

291.

At the time of the Residence Transfers, numerous creditors held claims against the Debtor. For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.). In 2017, BC35, LLC filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June 2018 judgment. During the same time period, the Debtor was sued for breach of contract in Cobb County Superior Court which resulted in a $3 million consent judgment against him in May 2018. In his bankruptcy schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

292.

Debtor made the Residence Transfers with actual intent to hinder, delay, or defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without limitation, the following:

(a)    The Residence Transfers were made for the benefit of 1266 MMR and Mrs. Menser,    both insiders;

(b)    Through various alter ego Menser Entities, Debtor made the Residence Transfers, yet    maintained control of his funds and the investment thereof in the Residence, while  protecting the funds and that property from his creditors;

(c)    The Residence Transfers were concealed as the Debtor used miscellaneous sham Menser Entities in a complex scheme to direct his funds to 1266 MMR to enable the    investment in the Residence;

(d)    in the Debtor's sworn Schedules he states that he has no exempt assets, such that

the    Residence Transfers, in conjunction with the other transfers set forth in this Complaint    were, necessarily transfers of    substantially all of the Debtor's assets; and

(e)    The Residence Transfers enabled Debtor to remove or conceal his own assets, including his entitlement to distributions from the TC Proceeds,  by converting them  into assets outside the reach of his creditors, namely the Residence.

293.

The Debtor made the Residence Transfers without receiving a reasonably equivalent value in exchange for the Residence Transfers and at the time of the transfers, Debtor

(a)    was insolvent or became insolvent as a result of the transfers;

(b)    was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)    intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

294.

The Residence Transfers are voidable pursuant to 11 U.S.C. §544 and O.C.G.A. §18-2-74 *et seq.*.  Defendant 1266 MMR and Mrs. Menser are the persons for whose benefit the Residence Transfers were made, such that the Plaintiff is entitled to recover the value of those transfers from each pursuant to 11 U.S.C. §§550(a)(1) in the total amount of at least $162,400.64 (to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

**COUNT X**

## CONSTRUCTIVE TRUST ON THE RESIDENCE

295.

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1 through 294 herein and the same are incorporated in Count X by this reference.

296.

As set forth herein, the Residence Transfers totaled at least $162,400.00.  Of these funds, $121,000.00 was used directly to purchase the Residence.  Of the funds, at least $34,798.04 was used to pay the mortgage, insurance, maintenance and repairs for the Residence, which enabled Defendants 1266 MMR and/or Mrs. Menser to purchase and maintain ongoing ownership of the Residence, and to acquire equity therein.

297.

The Residence Transfers set forth in Count IX above are voidable fraudulent conveyances pursuant to O.C.G.A. §18-2-74 et seq. as they were made with the intent to hinder, delay, and defraud the Debtor's creditors. Plaintiff is entitled to have a constructive trust imposed on the Residence which is 100% owned by sham entity 1266 MMR (itself owned 99% by Mrs. Menser), to the extent of, *inter alia*, the fraudulently transferred funds which contributed to the purchase and upkeep of this property, as well as contributing to the acquisition of equity in the property by way of mortgage payments made.

298.

As described herein, MMR LLC and Mrs. Menser benefited from the Residence

Transfers under circumstances such that MMR LLC and Mrs. Menser could not, and

cannot enjoy any beneficial interest in the transferred assets without violating

established principles of equity, from the fraud associated with the Residence Transfers.

The Residence, as the asset acquired and maintained by the proceeds from the

Residence Transfers can, and should, be impressed with a constructive trust in favor of

Plaintiff to facilitate the recovery of the Residence Transfers, which were transferred in

violation of the rights of Debtor's creditors.

## COUNT XI

### AVOIDANCE AND RECOVERY OF THE RABUN TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND O.C.G.A. §11-2-74

299.

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1

through 298 herein and the same are incorporated in Count XI by this reference.

300.

During the four-year period prior to the Filing Date, the Debtor made the Rabun

Transfers for the benefit of Mrs. Menser, Charles III, George, and Sarah.

301.

At the time of the Rabun Transfers, numerous creditors held claims against the

Debtor.  For example, claims filed in his bankruptcy case include debts originating in

2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank)

and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against the

Debtor to collect on a guaranty of an unpaid debt of over a million dollars which

resulted in a June 2018 judgment.  During the same time period, the Debtor was sued

for breach of contract in Cobb County Superior Court which resulted in a $3 million

consent judgment against him in May 2018.  In his bankruptcy schedules, the Debtor

lists 35 creditors with claims totally more than $2.7 million.

<div align="center">302.</div>

Debtor made the Rabun Transfers with actual intent to hinder, delay, or defraud

Debtor's creditors.  Evidence of Debtor's actual intent includes, without limitation, the

following:

(a)     The Rabun Transfers were made for the benefit of the Debtor's family members,
all insiders;

(b)     Through a sham entity, Lot 710, Debtor made the Rabun Transfers, yet
maintained   control of his funds and the investment in the Lake House, while protecting
the     funds and property from his creditors;

(c)     The Rabun Transfers were concealed as the Debtor used a sham Menser Entity in
a       scheme to own, maintain, and enjoy the benefits of the Lake House;

(d)     in the Debtor's sworn Schedules he states that he has no exempt assets, such that
the     Rabun Transfers, in conjunction with the other transfers set forth in this
Complaint    were, necessarily transfers of    substantially all of the Debtor's assets; and

(e)     The Rabun Transfers enabled Debtor to remove or conceal his own assets by
        converting them into assets outside the reach of his creditors, namely the Lake
House.

<div align="center">303.</div>

<div align="center">-103</div>

The Debtor made the Rabun Transfers without receiving a reasonably equivalent value

in exchange for the Rabun Transfers and at the time of the transfers, Debtor

(a)    was insolvent or became insolvent as a result of the transfers;

(b)    was engaged in business or a transaction or was about to engage in a business or a
transaction for which any property remaining with the Debtor was unreasonably small
capital; or

(c)    intended to incur, or believed or reasonably should have believed that he would incur
debts beyond his ability to pay as they became due.

304.

The Rabun Transfers are voidable pursuant to 11 U.S.C. §544 and O.C.G.A. §18-

2-74 *et seq.*. Defendants Mrs. Menser, Charles III, George, and Sarah are the persons

for whose benefit the Rabun Transfers were made, such that the Plaintiff is entitled to

recover the value of those transfers from each pursuant to 11 U.S.C. §§550(a)(1) in the

total amount of at least $38,934,23 (to be determined with more certainty at trial), as

well as pre-judgment interest from the date of the filing of this Complaint.

## COUNT XII

## AVOIDANCE AND RECOVERY OF THE PRIOR RESIDENCE TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND O.C.G.A. §11-2-74

305.

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs through

305 herein and the same are incorporated in Count XII by this reference.

306.

-104

During the four-year period prior to the Filing Date, the Debtor made the Prior

Residence Transfers for the benefit of Mrs. Menser.

307.

At the time of the Prior Residence Transfers, numerous creditors held claims

against the Debtor.  For example, claims filed in his bankruptcy case include debts

originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First

Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed

suit against the Debtor to collect on a guaranty of an unpaid debt of over a million

dollars which resulted in a June 2018 judgment.  During the same time period, the

Debtor was sued for breach of contract in Cobb County Superior Court which resulted

in a $3 million consent judgment against him in May 2018.  In his bankruptcy

schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

308.

Debtor made the Prior Residence Transfers with actual intent to hinder, delay, or

defraud Debtor's creditors.  Evidence of Debtor's actual intent includes, without

limitation, the following:

(a)     The Prior Residence Transfers were made for the benefit of the Mrs. Menser, an
        insider;

(b)     The Prior Residence Transfers were concealed as the Debtor used Mrs. Menser in
a       scheme to own, maintain, and enjoy the benefits of the Prior Residence while
keeping        that property out of reach of his creditors, and at a time he was a defendant
in two        lawsuits by creditors;

-105

(c)     In the Debtor's sworn Schedules he states that he has no exempt assets, such that the     Prior Residence Transfers, in conjunction with the other transfers set forth in this Complaint were, necessarily transfers of     substantially all of the Debtor's assets; and

(d)     The Prior Residence Transfers enabled Debtor to remove or conceal his own assets by     converting them into assets outside the reach of his creditors, namely the Prior  Residence.

309.

The Debtor made the Prior Residence Transfers without receiving a reasonably

equivalent

value in exchange for the Prior Residence Transfers and at the time of the transfers,

Debtor:

(a)     was insolvent or became insolvent as a result of the transfers;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

310.

The Prior Residence Transfers are voidable pursuant to 11 U.S.C. §544 and

O.C.G.A. §18-2-74 *et seq.*.  Defendant Mrs. Menser is the person for whose benefit the

Prior Residence Transfers were made, such that the Plaintiff is entitled to recover the

value of those transfers from her pursuant to 11 U.S.C. §§550(a)(1) in the total amount

of at least $31,977.26 (to be determined with more certainty at trial), as well as pre-

judgment interest from the date of the filing of this Complaint.

## COUNT XIII

### AVOIDANCE AND RECOVERY OF $75,000 TOWNSEND TRANSFER PURSUANT TO 11 U.S.C. §§ 548 AND 550

311.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 310. herein and the same are incorporated in Count XIII by this reference.

312.

During the two-year period preceding the Petition Date, the Debtor made the $75,000 Townsend Transfer to MFP and subsequently to or for the benefit of Mrs. Menser and for the benefit of Sarah.

313.

At the time of the $75,000 Townsend Transfer, numerous creditors held claims against the Debtor.  For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June 2018 judgment.  During the same time period, the Debtor was sued for breach of contract in Cobb County Superior Court which resulted in a $3 million consent judgment against him in May 2018.  In his bankruptcy schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

314.

Debtor made the $75,000 Townsend Transfer with actual intent to hinder, delay,

or defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without

limitation, the following:

(a)     The $75,000 Townsend Transfer was made initially to sham entity MFP, and
subsequently to Mrs. Menser and for her and Sarah's benefit – of all these defendants
are insiders;

(b)     The Debtor made the $75,000 Townsend Transfer, yet maintained control of his
funds and property while protecting those funds and property from his creditors;

(c)     Neither MFP, Mrs. Menser or Sarah provided consideration to the Debtor for the
$75,000 Townsend Transfer;

(d)     The $75,000 Townsend Transfer enabled Debtor to remove or conceal his own
assets, specifically his distributions from the lucrative multi-million dollar sale of a
hotel by Travel Concepts, by converting them into assets outside the reach of his
creditors through a sham entity in a scheme to direct his funds to Mrs. Menser in order
to make his secret investment in 214 Townsend Place; and

(e)     in the Debtor's sworn Schedules he states that he has no exempt assets, such that
the $75,000 Townsend Transfers, in conjunction with the other transfers set forth in this
Complaint was, necessarily, a transfer of substantially all of the Debtor's assets.

315.

The Debtor made the $75,000 Townsend Transfer without receiving a reasonably

equivalent value in exchange for the $75,000 Townsend Transfer and at the time of the

transfer, Debtor

(a)     was insolvent or became insolvent as a result of the transfer;

(b)     was engaged in business or a transaction or was about to engage in a business or a
transaction for which any property remaining with the Debtor was unreasonably small

capital; or

(c)    intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

316.

The $75,000 Townsend Transfer made in the two-year period preceding the Petition Date is voidable pursuant to 11 U.S.C. §548. Defendants MFP is the initial transferee, and Mrs. Menser is the subsequent transferee and the person for whose benefit the transfer was made; in addition, Sarah is a person for whose benefit the transfer was made.  Thus, pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the transfer from these Defendants in the total amount of $75,000.00 (or an amount to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

**COUNT XIV**

**AVOIDANCE AND RECOVERY OF UBS LOAN TRANSFERS
PURSUANT TO 11 U.S.C. §§ 548 AND 550**

317.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 316 herein and the same are incorporated in Count XIV by this reference.

318.

During the two-year period preceding the Petition Date, the Debtor made the UBS Loan Transfers to UBS and for the benefit of PJMFP, Mrs. Menser, and Sarah.

319.

-109

At the time of the UBS Loan Transfers, numerous creditors held claims against the Debtor.  For example, claims filed in his bankruptcy case include debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which resulted in a June 2018 judgment.  During the same time period, the Debtor was sued for breach of contract in Cobb County Superior Court which resulted in a $3 million consent judgment against him in May 2018.  In his bankruptcy schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

320.

Debtor made the UBS Loan Transfers with actual intent to hinder, delay, or defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without limitation, the following:

(a)     The UBS Loan Transfers were made for the benefit of sham entity PJMFP, Mrs. Menser, and Sarah -- all of these defendants were insiders of the Debtor;

(b)     The Debtor made the UBS Loan Transfers, yet maintained control of his funds and property while protecting those funds and property from his creditors;

(c)     Neither PJMFP, Mrs. Menser, or Sarah provided consideration to the Debtor for the UBS Loan Transfers;

(d)     The UBS Loan Transfers enabled Debtor to remove or conceal his own assets, specifically his distributions from the lucrative multi-million dollar sale of a hotel by Travel Concepts, by converting them into assets outside the reach of his creditors through miscellaneous sham Menser Entities and Mrs. Menser in a complex scheme to direct his funds to Mrs. Menser in order to make his secret investment in 214 Townsend

Place; and

(e)     in the Debtor's sworn Schedules he states that he has no exempt assets, such that the TC Transfers, in conjunction with the other transfers set forth in this Complaint were, necessarily, transfers of substantially all of the Debtor's assets; and

321.

The Debtor made the UBS Loan Transfers without receiving a reasonably

equivalent value in exchange for the UBS Loan Transfers and at the time of the transfer,

Debtor

(a)     was insolvent or became insolvent as a result of the transfers;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

322.

The Debtor's transfers to UBS were for obligations of another entity.  UBS knew

or should have known that the transfers were fraudulent as the Debtor had no liability

on the PJMFP UBS Account.

323.

To the extent that UBS accepted payments from the Debtor based upon a debt

owed by another, UBS did not act in good faith.  Rather, UBS had knowledge of the

source of the payments as they were rendered.

324.

The UBS Loan Transfers made in the two-year period preceding the Petition Date are voidable pursuant to 11 U.S.C. §548. Defendant UBS is the initial transferee, and PJMFP, Mrs. Menser, and Sarah are the persons for whose benefit the transfers were made, such that pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the transfers from these Defendants in the total amount of $243,930.32 (or an amount to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

## COUNT XV

## CONSTRUCTIVE TRUST ON 214 TOWNSEND PLACE

325.

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1 through 325 herein and the same are incorporated in Count XIV by this reference.

326.

As set forth herein, the $75,000 Townsend Transfer was made to MFP and subsequently to Mrs. Menser, and the UBS Loan Transfers totaling $243,930.32 were used to pay off the loan of PJMFP, which was guaranteed by Mrs. Menser and secured by her assets.  All of these transfers originated from the Debtor's share of the TC Proceeds yet enabled Mrs. Menser and Sarah Connell to use those funds to purchase 214 Townsend Place in their names.

327.

The $75,000 Townsend Transfer set forth in Count XII and the UBS Loan Transfers set forth in Count XIII are voidable fraudulent conveyances pursuant to 11 U.S.C. §548 and O.C.G.A. § 18-2-70 et seq. as they were made with the intent to hinder, delay, and defraud the Debtor's creditors. Plaintiff is entitled to have a constructive trust imposed on 214 Townsend Place which is 99% owned by Mrs. Menser and 1% owned by Sarah Connell to the extent of at least the fraudulently transferred funds which contributed to the purchase of this property.

328.

As described herein, Mrs. Menser and Sarah benefitted from these fraudulent conveyances under circumstances such that they could not, and cannot enjoy any beneficial interest in the transferred assets without violating established principles of equity, from the fraud associated with the $75,000 Townsend Transfer and the UBS Loan Transfers.  214 Townsend Place, as the asset acquired and maintained by the proceeds from those transfers can, and should, be impressed with a constructive trust in favor of Plaintiff to facilitate the recovery of all of these Transfers, which were transferred in violation of the rights of Debtor's creditors.

**COUNT XVI**
**DECLARATORY JUDGMENT THAT ALL ASSETS NOMINALLY TITLED IN MRS. MENSER'S NAME ARE *DE FACTO* PROPERTY OF THE DEBTOR**

329.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 328.

herein and the same are incorporated in Count XVI by this reference.

330.

Mrs. Menser holds title to Mrs. Menser's Nominal Assets, as defined in detail in

this Complaint.

331.

In reality, Mrs. Menser's title to these assets is a façade. While she maintains a

bare, nominal title to these assets, the Debtor exercises complete dominion and control

over them, and enjoys a secret equitable interest in them, and *de facto* legal title.

332.

With regard to cash and investment accounts, the Coins, Mrs. Menser's

Ameitrade Account and the Menser Entities in which Mrs. Menser is named as an

owner, Debtor was at all times behind the scenes manipulating, controlling, and using

the funds in those accounts, investments (including the Coin investments), and the

entities despite their being titled in the names of Mrs. Menser -- all instrumentalities to

carry out his own personal and business affairs.

333.

Accordingly, pursuant to the Court's equitable powers under 11 U.S.C. §105,

Plaintiff seeks a declaratory judgment that Mrs. Menser's Nominal Assets are actually

interests in property held by the Debtor, and are therefore property of the bankruptcy

estate pursuant to 11 U.S.C. §541 and must be turned over to the Trustee pursuant to 11

U.S.C. §542.

<div align="center">

**COUNT XVII**
**AVOIDANCE AND RECOVERY OF MRS. MENSER CASH TRANSFERS**
**PURSUANT TO 11 U.S.C. §§ 547, 548 AND 550**
334.

</div>

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1. through 333.

herein and the same are incorporated in Count XVI by this reference.

<div align="center">

335.

</div>

During the two-year period preceding the Petition Date, the Debtor made the

Mrs. Menser Cash Transfers to Mrs. Menser in the total amount of $25,500.00.  Of

those transfers, transfers totalling $3,500.00 were made within the one-year period

preceding the Petition Date and identified by the Debtor as being payments on a "loan".

<div align="center">

336.

</div>

At the time of the Mrs. Menser Cash Transfers, numerous creditors held claims

against the Debtor.  For example, claims filed in his bankruptcy case include debts

originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First

Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed

suit against the Debtor to collect on a guaranty of an unpaid debt of over a million

dollars which resulted in a June 2018 judgment.  During the same time period, the

Debtor was sued for breach of contract in Cobb County Superior Court which resulted

in a $3 million consent judgment against him in May 2018.  In his bankruptcy

schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

337.

Debtor made the Mrs. Menser Cash Transfers with actual intent to hinder, delay, or defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without limitation, the following:

(a)     The Mrs. Menser Cash Transfers were made to Mrs. Menser, an insider;

(b)     The Debtor made the Mrs. Menser Cash Transfers, yet maintained control of his funds and property, while protecting those funds and property from his creditors;

(c)     Mrs. Menser provided no consideration to the Debtor for the Mrs. Menser Cash Transfers;

(d)     The Mrs. Menser Cash Transfers enabled Debtor to remove or conceal his own assets by converting them into assets outside the reach of his creditors through Mrs. Menser; and

(e)     in the Debtor's sworn Schedules he states that he has no exempt assets, such that the Mrs. Menser Cash Transfers, in conjunction with the other transfers set forth in this Complaint were, necessarily, transfers of substantially all of the Debtor's assets.

338.

The Debtor made the Mrs. Menser Cash Transfers without receiving a reasonably equivalent value in exchange for the Mrs. Menser Cash Transfers and at the time of the transfers, Debtor

(a)     was insolvent or became insolvent as a result of the transfers;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

### 338.

The Debtor identified some of the Mrs. Menser Cash Transfers, totaling $3,500.00, as being payments on a "loan". To the extent these payments were in fact payments on a loan from Mrs. Menser, they were payments to a creditor who was an insider within the one-year period preceding the Petition Date, on account of antecedent debt that enabled Mrs. Menser to receive more than a creditor would receive if the case was one under Chapter 7 and the transfer had not been made.

### 339.

The Mrs. Menser Cash Transfers made in the two-year period preceding the Petition Date are voidable pursuant to 11 U.S.C. §548. Of these, the transfers totaling $3,500.00 that were identified as being based on a "loan" are also avoidable preferences pursuant to 11 U.S.C. §547. Mrs. Menser is the initial transferee of the Mrs. Menser Cash Transfers such that pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the transfers from Mrs. Menser in the total amount of at least $25,500.00 (or an amount to be determined with more certainty at trial), as well as pre-judgment interest from the date of the filing of this Complaint.

### COUNT XVIII

### TURNOVER OF ESTATE PROPERTY HELD BY MRS. MENSER

### 340.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 339 herein and the same are incorporated in Count XVII by this reference.

341.

Because Mrs. Menser's Nominal Assets are in reality owned and controlled by the Debtor, they are therefore property of the estate under 11 U.S.C. §541, and as such as subject to turnover pursuant to 11 U.S.C. §542.

342.

Plaintiff is entitled to an order and judgment against Mrs. Menser requiring her to turn over the Mrs. Menser Nominal Assets or their value to the Plaintiff, and provide Plaintiff with an accounting of the same.

## COUNT XIX
## AVOIDANCE AND RECOVERY OF CHARLES III TRANSFERS PURSUANT TO 11 U.S.C. §§ 548 AND 550
343.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 342 herein and the same are incorporated in Count XIX by this reference.

344.

During the two-year period preceding the Petition Date, the Debtor made the Charles III Transfers for the benefit of Charles III, and at least in part, for the benefit of Connie as well.

345.

At the time of the Charles III Transfers, numerous creditors held claims against

the Debtor.  For example, claims filed in his bankruptcy case include debts originating

in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and First Landmark

Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC filed suit against

the Debtor to collect on a guaranty of an unpaid debt of over a million dollars which

resulted in a June 2018 judgment.  During the same time period, the Debtor was sued

for breach of contract in Cobb County Superior Court which resulted in a $3 million

consent judgment against him in May 2018.  In his bankruptcy schedules, the Debtor

lists 35 creditors with claims totally more than $2.7 million.

346.

Debtor made the Charles III Transfers with actual intent to hinder, delay, or

defraud Debtor's creditors. Evidence of Debtor's actual intent includes, without

limitation, the following:

(a)    The Charles III Transfers were made for the benefit of Charles III and Connie,
insiders of the Debtor;

(b)    The Debtor made the Charles III Transfers, yet maintained control of his funds
and property, including the cryptocurrency investments, while protecting those funds
and property from his creditors;

(c)    Neither Charles III nor Connie provided consideration to the Debtor for the
Charles III Transfers;

(d)    The Charles III Transfers enabled Debtor to remove or conceal his own assets by
converting them into secret cryptocurrency investments outside the reach of his
creditors; and

(e)    In the Debtor's sworn Schedules he states that he has no exempt assets, such that
the Charles III Transfers, in conjunction with the other transfers set forth in this

Complaint were, necessarily, transfers of substantially all of the Debtor's assets.

347.

The Debtor made the Charles III Transfers without receiving a reasonably

equivalent value in exchange for the Charles III Transfers and at the time of the

transfers, Debtor

(a)    was insolvent or became insolvent as a result of the transfers;

(b)    was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)    intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

348.

The Charles III Transfers made in the two-year period preceding the Petition

Date are voidable pursuant to 11 U.S.C. §548. Defendant Charles III is the initial or

subsequent transferee, and at least to the extent of the $25,000 transfer directly to the

ETrade account as detailed above, Connie was also a transferee or beneficiary.  As

such, pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the value of the

transfers from Charles III and Connie in the total amount of at least $62,500.00 (or an

amount to be determined with more certainty at trial), as well as pre-judgment interest

from the date of the filing of this Complaint.

**COUNT XX**

## DECLARATORY JUDGMENT THAT ALL INTEREST IN MENSER ENTITIES NOMINALLY TITLED IN CHARLES D. MENSER III'S NAME ARE *DE FACTO* PROPERTY OF THE DEBTOR

349.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 348. herein and the same are incorporated in Count XX by this reference.

350.

Charles III currently is named as holding title to interests in the following Menser Entities, as set forth in this Complaint:  Stonewall II, Lodge America, Lot 710, and the CDMFP.

351.

In reality, Charles III's ownership interest in these entities is a façade.  While he maintains a bare, nominal title to ownership interests in these entities, the Debtor exercises complete dominion and control over them, and enjoys a secret equitable interest in them, and *de facto* legal title.

352.

The Debtor is at all times behind the scenes manipulating, controlling, and using the funds and other assets belonging to these entities as instrumentalities to carry out his own personal and business affairs, despite their being titled in the name of Charles III.

353.

Accordingly, pursuant to the Court's equitable powers under 11 U.S.C. §105, Plaintiff seeks a declaratory judgment that Charles III's interest in Stonewall II, Lodge America, Lot 710, and the CDMFP are actually interests in property held by the Debtor, and are therefore property of the bankruptcy estate pursuant to 11 U.S.C. §541.

## COUNT XXI

## TURNOVER OF ESTATE PROPERTY HELD BY CHARLES III

354.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 353. herein and the same are incorporated in Count XXI by this reference.

355.

Because Charles III's interests in Stonewall II, Lodge America, Lot 710, and the CDMFP are in reality owned and controlled by the Debtor, they are therefore property of the estate under 11 U.S.C. §541, and as such as subject to turnover pursuant to 11 U.S.C. §542.

356.

Plaintiff is entitled to an order and judgment against Charles III requiring him to turn over the his interests in those entities or their value to the Plaintiff, and provide Plaintiff with an accounting of the same.

## COUNT XXII
## AVOIDANCE AND RECOVERY OF ARCHER MEMBERSHIP INTEREST TRANSFER
## PURSUANT TO 11 U.S.C. §§ 548 AND 550

357.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 356.

herein and the same are incorporated in Count XXII by this reference.

358.

During the two-year period preceding the Petition Date, the Debtor made the

Archer Membership Interest Transfer to George.

359.

At the time of the Archer Membership Interest Transfer, numerous creditors held

claims against the Debtor.  For example, claims filed in his bankruptcy case include

debts originating in 2012 (BC35, LLC, Microtel Inns & Suites Franchising, Inc., and

First Landmark Bank) and 2013 (Branch Banking & Trust Co.).  In 2017, BC35, LLC

filed suit against the Debtor to collect on a guaranty of an unpaid debt of over a million

dollars which resulted in a June 2018 judgment.  During the same time period, the

Debtor was sued for breach of contract in Cobb County Superior Court which resulted

in a $3 million consent judgment against him in May 2018.  In his bankruptcy

schedules, the Debtor lists 35 creditors with claims totally more than $2.7 million.

360.

Debtor made the Archer Membership Interest Transfer with actual intent to

hinder, delay, or defraud Debtor's creditors. Evidence of Debtor's actual intent

includes, without limitation, the following:

(a)    The Archer Membership Interest Transfer was made to George, an insider of the

-123-

Debtor;

(b)     The Debtor made the Archer Membership Interest Transfer, yet maintained control of the interest transferred, while protecting it from his creditors, particularly those that were actively pursuing litigation against him in 2017;

(c)     George provided no consideration to the Debtor for the Archer Membership Interest Transfer;

(d)     The Archer Membership Interest Transfer enabled Debtor to remove or conceal his own assets by converting them into assets outside the reach of his creditors; and

(e)     In the Debtor's sworn Schedules he states that he has no exempt assets, such that the Archer Membership Interest Transfer, in conjunction with the other transfers set forth in this Complaint was, necessarily, a transfer of substantially all of the Debtor's assets.

361.

The Debtor made the Archer Membership Interest Transfer without receiving a reasonably equivalent value in exchange for the Archer Membership Interest Transfer and at the time of the transfer, Debtor

(a)     was insolvent or became insolvent as a result of the transfer;

(b)     was engaged in business or a transaction or was about to engage in a business or a transaction for which any property remaining with the Debtor was unreasonably small capital; or

(c)     intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

362.

The Archer Membership Interest Transfer made in the two-year period preceding the Petition Date is voidable pursuant to 11 U.S.C. §548. Defendant George Connell is

the initial transferee such that pursuant to 11 U.S.C. §550 the Plaintiff is entitled to recover the 14.8% interest transferred or the value thereof from him in an amount to be determined with more certainty at trial, as well as pre-judgment interest from the date of the filing of this Complaint.

## COUNT XXIII

### DECLARATORY JUDGMENT THAT ALL INTEREST IN MENSER ENTITIES NOMINALLY TITLED IN GEORGE CONNELL'S  NAME ARE *DE FACTO* PROPERTY OF THE DEBTOR

### 363.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 363. herein and the same are incorporated in Count XXIII by this reference.

### 364.

George currently is named as holding title to interests in at least the following Menser Entities, as set forth in this Complaint:  Pointer, Damascus, Archer Augusta Archer, Archer III, Archer VI, CWC Manager, and Lot 710.

### 365.

In reality, George's ownership interest in these entities is a façade.  While he maintains a bare, nominal title to ownership interests in these entities, the Debtor exercises complete dominion and control over them, and enjoys a secret equitable interest in them, and *de facto* legal title.

### 366.

The Debtor is at all times behind the scenes manipulating, controlling, and using

the funds and other assets belonging to these entities as instrumentalities to carry out his

own personal and business affairs, despite their being titled in the name of George.

367.

Accordingly, pursuant to the Court's equitable powers under 11 U.S.C. §105,

Plaintiff seeks a declaratory judgment that George's interest in at least Pointer,

Damascus, Archer, Archer Augusta, Archer III, Archer VI, CWC Manager, and Lot 710

are actually interests in property held by the Debtor, and are therefore property of the

bankruptcy estate pursuant to 11 U.S.C. §541

## COUNT XXIV

## TURNOVER OF ESTATE PROPERTY HELD BY GEORGE

368.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 367.

herein and the same are incorporated in Count XXIII by this reference.

369.

Because George's interests in Pointer, Damascus, Archer, Archer Augusta,

Archer III, Archer VI, CWC Manager, and Lot 710 are in reality owned and controlled

by the Debtor, they are therefore property of the estate under 11 U.S.C. §541, and as

such as subject to turnover pursuant to 11 U.S.C. §542.

370.

Plaintiff is entitled to an order and judgment against George requiring him to turn over his interests in those entities or their value to the Plaintiff, and provide Plaintiff with an accounting of the same.

## COUNT XXV

## DECLARATORY JUDGMENT THAT ALL INTERESTS IN MENSER ENTITIES NOMINALLY TITLED IN SARAH CONNELL'S  NAME ARE *DE FACTO* PROPERTY OF THE DEBTOR

371.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 370. herein and the same are incorporated in Count XXV by this reference.

372.

Sarah currently is named as holding title to interests in Lot 710 in addition to minor named holdings in other Menser Entities, as is set forth in this Complaint.

373.

In reality, Saarah's ownership interest in these entities is a façade.  While she maintains a bare, nominal title to ownership interests in these entities, the Debtor exercises complete dominion and control over them, and enjoys a secret equitable interest in them, and *de facto* legal title.

374.

The Debtor is at all times behind the scenes manipulating, controlling, and using the funds and other assets belonging to these entities as instrumentalities to carry out his own personal and business affairs, despite their being titled in the name of Sarah.

375.

Accordingly, pursuant to the Court's equitable powers under 11 U.S.C. §105, Plaintiff seeks a declaratory judgment that Sarah's interest in Lot 710 and other Menser Entities as set out in this Complaint are actually interests in property held by the Debtor, and are therefore property of the bankruptcy estate pursuant to 11 U.S.C. §541

## COUNT XXVI

## TURNOVER OF ESTATE PROPERTY HELD BY SARAH

376.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 375. herein and the same are incorporated in Count XXVI by this reference.

377.

Because Sarah's interests in Lot 710 and other Menser Entities, as set out above, are in reality owned and controlled by the Debtor, they are therefore property of the estate under 11 U.S.C. §541, and as such as subject to turnover pursuant to 11 U.S.C. §542.

378.

Plaintiff is entitled to an order and judgment against Sarah requiring her to turn

over her interests in those entities or their value to the Plaintiff, and provide Plaintiff

with an accounting of the same.

## COUNT XXVII
## ACCOUNTING AS TO ALL DEFENDANTS
379.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 378

herein and the same are incorporated in Count XXVII by this reference.

380.

The Debtor, with the assistance of his Family as strawmen and numerous trusts

involving them, has created a complex network of business entities for the purpose of

placing his assets beyond the reach of his creditors.

381.

Plaintiff is entitled to a full and complete accounting, for the 7 years preceding

the Filing Date to the present, of any and all of the Debtor's assets, Mrs. Menser's

assets, the assets of George, Charles III, and Sarah, and the assets of each of the Menser

Entities.

## COUNT XXVIII
## DEBTOR TURNOVER OF ESTATE ASSETS
382.

Plaintiff reaffirms and realleges all matters set forth in paragraphs 1 through 381

herein and the same are incorporated in Count XXVIII by this reference.

383.

All Debtor's assets are property of the estate pursuant to 11 U.S.C. §541.  Only the

Trustee may exercise control over property of the estate.  11 U.S.C. §323.  All property

of the estate is subject to turnover to the Trustee pursuant to 11 U.S.C. §542.

<p style="text-align:center">384.</p>

The Debtor should be required to turn over the CryptoCurrency, the funds from

the Cash Transfers and Furs and Jewelry, or the proceeds of same to the Trustee

pursuant to 11 U.S.C. §542.

<p style="text-align:center">385.</p>

To the extent that the Debtor has transferred, nominally or otherwise, title to the

CryptoCurrency, funds from the Cash Transfers and the Furs and Jewelry to any other

person or entity for less than adequate consideration, that transfer should be avoided

pursuant to O.C.G.A. §§ 18-2-74, 18-2-75, 28 U.S.C. § 3304, or other applicable law,

11 U.S.C. § 544, and/or 11 U.S.C. § 548(a)(1)(A) and/or (B).

## COUNT XXIX

### CONSTRUCTIVE TRUST ON THE ASSETS OF THE MENSER ENTITIES, PHYLLIS MENSER AND THE MENSER FAMILY TRUST

<p style="text-align:center">386.</p>

Plaintiff hereby reaffirms and realleges all matters set forth in Paragraphs 1

through 386 herein and the same are incorporated in Count X by this reference.

<p style="text-align:center">387.</p>

As set forth herein, the assets of the Menser Entities, Mrs. Menser and the

Menser Family Trust have been used by the Debtor for his own personal purposes, and

<p style="text-align:center">-130</p>

the Debtor has repeatedly transferred his own personal assets to the Menser Entities, the

Menser Family Trust and Mrs. Menser.

<div align="center">388.</div>

The above referenced transfers are voidable fraudulent conveyances pursuant to

O.C.G.A. §18-2-74 et seq. as they were made with the intent to hinder, delay, and

defraud the Debtor's creditors. Plaintiff is entitled to have a constructive trust imposed

on the assets of Mrs. Menser, the Menser Entities and the Menser Family Trust.

<div align="center">389.</div>

As described herein, the assets of the Menser Entities, Mrs. Menser and the

Menser Family Trust can, and should, be impressed with a constructive trust in favor of

Plaintiff to facilitate the recovery of the transfer of Debtor's assets to and through them,

which were transferred in violation of the rights of Debtor's creditors.

WHEREFORE, Plaintiff prays that this Court enter an Order against Defendants

awarding Plaintiff the following relief:

(a)      Ordering the Defendants to turn over the above-referenced assets and Estate

property to the Trustee pursuant to 11 U.S.C. § 542 and/or 11 U.S.C. § 550;

(b)      Avoiding the above-referenced transfers pursuant to under O.C.G.A. §§ 18-2-

74, 18-2-75, 28 U.S.C. § 3304, or other applicable law, 11 U.S.C. § 544, and/or 11

U.S.C. § 548(a)(1)(A) and/or (B);

(c)      Ordering Defendants to provide an accounting, from December 18, 2013 to

<div align="center">-131-</div>

present, of any and all of the Debtor's assets, Mrs. Menser's assets, the assets of

George, Charles III, and Sarah, and the assets of each of the Menser Entities;

(d)    Ordering that the assets nominally held by Mrs. Menser are property of the

Debtor's Estate and requiring same to be turned over to the Trustee;

(e)    Ordering that the nominal interests held by Mrs. Menser, George, Charles III, and

Sarah in any of the Menser Entities is property of the Debtor's estate and requiring

same to be turned over to the Trustee;

(f)    Ordering that any nominal assets held by the Menser Entities, including those

held by the Menser Family Trust, are property of the Debtor's estate and should be

turned over to the Trustee;

(g)    Punitive Damages against the Defendants;

(h)    Reasonable attorneys' fees, costs, and expenses incurred in this action, including

under the Bankruptcy Code;

(i)    All costs be cast upon Defendants;

(j)    Imposition of a constructive trust as to the above-referenced assets to be paid to

the Debtor's Estate, and

(k)    For such other and further relief as is just and proper.

This 18th day of December, 2020.

ROGERS LAW OFFICES
*/s/ Beth E. Rogers*
Beth E. Rogers, Georgia Bar No. 612092
James F. F. Carroll, Georgia Bar No. 940350
100 Peachtree Street, Suite 1950
Atlanta, Georgia 30303
770-685-6320 phone
678-990-9959 fax
brogers@berlawoffice.com
*Attorneys for Plaintiff*

Exhibit 1

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000434
64-203/610

DATE MARCH 2, 2017

PAY TO THE ORDER OF  CHARLES D. MENSER         $ 250,000 00

Two Hundred Fifty Thousand & NO/100  C         DOLLARS

⑈000434⑈ ⑆061020317⑆ ⬛0809⑈

*Handwritten notes (right):*
Iberia
3-2-17
Seq 2523757
RT 265270413

252270413 IBERIABANK 3258888888247448 83822817

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000435
64-203/610

DATE March 2, 2017

PAY TO THE ORDER OF  Charles D Messe, Jr         $ 250,000 00

Two Thousand Fifty Thousand & NO/100  C         DOLLARS

⑈000435⑈ ⑆061020317⑆ ⬛0809⑈

*Handwritten notes (right):*
Iberia
3-2-17
Seq 2523763
RT 265270413

252270413 IBERIABANK 3258888888247468 83822817

Page 14 of 32



0164     1700.00     10/21/2016

0166     5700.00     11/21/2016

0164     1700.00     10/21/2016

0627     5000.00     12/20/2016

0626     1900.00     11/9/2016

0627     5000.00     12/20/2016

0626     1900.00     11/9/2016

0167     300.00     1/4/2017

0166     5700.00     11/21/2016

0167     300.00     1/4/2017

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000449
64-2031/610

DATE  9/12/2017

PAY TO THE
ORDER OF   Charles D. Menser, Jr.                                              $  **10,802.52

Ten Thousand Eight Hundred Two and 52/100************************************************************  DOLLARS

Charles D. Menser, Jr.

Iberia
9-13-17
Seq 6811983
RT 265270413

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000450
64-2031/610

DATE  9/12/2017

PAY TO THE
ORDER OF   Charles D. Menser, Jr.                                              $  **16,000.00

Sixteen Thousand and 00/100****************************************************************************  DOLLARS

Charles D. Menser, Jr.

Iberia
9-13-17
Seq 6411629
RT 265270413

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000451
64-2031/610

DATE    9/12/2017

PAY TO THE
ORDER OF    Charles D. Menser, Jr.    $  **1,500.00

One Thousand Five Hundred and 00/100********************************************************    DOLLARS

Charles D. Menser, Jr.

Memo

⑈000451⑈  ⑆061020317⑈    0809⑈

*Iberia*
*9-13-17*
*Seq 3811716*
*RT 265270413*

---



>265270413< 20170913
IBERIABANK
32504  19

IBERIABANK   >265270413> 32504 19 09/13/17

---

TRAVEL CONCEPTS, LLLP
4422 NORTHEAST EXPRESSWAY
DORAVILLE, GA 30340

000452
64-2031/610

DATE    9/12/2017

PAY TO THE
ORDER OF    Dayna G. Lawson    $  **17,500.00

Seventeen Thousand Five Hundred and 00/100********************************************************    DOLLARS

Dayna G. Lawson

Memo

⑈000452⑈  ⑆061020317⑈    0809⑈

*Suntrust*
*9-13-17*
*Seq 76135120*
*RT 063102152*

---



0633    1000.00    6/20/2017

0634    4095.09    6/27/2017

0633    1000.00    6/20/2017

0636    5000.00    6/27/2017

0635    67251.82    6/27/2017

0636    5000.00    6/27/2017

0635    67251.82    6/27/2017

0182    400.00    7/14/2017

0634    4095.09    6/27/2017

0182    400.00    7/14/2017



0183     1500.00     8/11/2017

0637     4000.00     8/29/2017

0183     1500.00     8/11/2017

0638     1644.65     9/15/2017

0184     200.00     8/14/2017

0638     1644.65     9/15/2017

0184     200.00     8/14/2017

0185     2500.00     11/14/2017

0637     4000.00     8/29/2017

0185     2500.00     11/14/2017



0186    1000.00    11/29/2017

0187    2200.00    12/1/2017

0186    1000.00    11/29/2017

0190    200.00    12/1/2017

0188    500.00    11/30/2017

0190    200.00    12/1/2017

0188    500.00    11/30/2017

0189    3064.22    12/4/2017

0187    2200.00    12/1/2017

0189    3064.22    12/4/2017

Page 21 of 32



0191    600.00    12/4/2017

0193    106.42    12/7/2017

0191    600.00    12/4/2017

0195    148.24    12/20/2017

23338    1000.00    12/5/2017

0195    148.24    12/20/2017

23338    1000.00    12/5/2017

0196    1770.00    12/21/2017

0193    106.42    12/7/2017

0196    1770.00    12/21/2017

P2018-175  002784



0197        20000.00        12/22/2017

0640        1000.00        1/9/2018

0197        20000.00        12/22/2017

0639        5800.00        1/10/2018

0198        1300.00        1/9/2018

0639        5800.00        1/10/2018

0198        1300.00        1/9/2018

0199        300.00        1/23/2018

0640        1000.00        1/9/2018

0199        300.00        1/23/2018



Charles D. Menser, Jr
8966 Cumberland Parkway
Building 1900, Suite 150
Atlanta, GA 30339
200

1/24 2018

PAY TO THE ORDER OF  Charles D. Menser, Jr    $ 1,150.00
One-thousand one-hundred and fifty dollars and 00/100 DOLLARS

Fidelity Bank
Atlanta, Georgia
VOID AFTER 90 DAYS

FOR  Transfer of Funds

0200      1150.00      1/25/2018

2280918317

0642      1000.00      1/30/2018

0200      1150.00      1/25/2018

Charles D. Menser, Jr
2855 Cumberland Parkway
Building 1900, Suite 150
Atlanta, GA 30339
645

FEB 1 2018

PAY TO THE ORDER OF  CASH    $ 300.00
THREE-HUNDRED & NO/100    DOLLARS

Fidelity Bank
Atlanta, Georgia
VOID AFTER 90 DAYS

FOR  OFFICE EXPENSE

0645      300.00      2/1/2018

Charles D. Menser, Jr
2855 Cumberland Parkway
Building 1900, Suite 150
Atlanta, GA 30339
641

1/26 2018

PAY TO THE ORDER OF  Lalon M. Haygood    $ 350.00
three-hundred fifty dollars and 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Office Expense

0641      350.00      1/26/2018

Cash On-Us Check
300.00
2/1/2018   15:03
Online

0645      300.00      2/1/2018

0641      350.00      1/26/2018

Charles D. Menser, Jr
2855 Cumberland Parkway
Building 1900, Suite 150
Atlanta, GA 30339
644

2-1 2018

PAY TO THE ORDER OF  Charles D. Menser, Jr    $ 100.00
one-hundred dollars & 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia
VOID AFTER 90 DAYS

FOR  Transfer Funds

0644      100.00      2/2/2018

Charles D. Menser, Jr
2855 Cumberland Parkway
Building 1900, Suite 150
Atlanta, GA 30339
642

1/26 18

PAY TO THE ORDER OF  Phyllis J. Menser    $ 1,000.00
one-thousand dollars and 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia
VOID AFTER 90 DAYS

FOR

0642      1000.00      1/30/2018

0644      100.00      2/2/2018

P2018-175  002786



0646    250.00    2/5/2018

0643    943.77    2/9/2018

0646    250.00    2/5/2018

23954    300.00    2/16/2018

23817    350.00    2/6/2018

23954    300.00    2/16/2018

23817    350.00    2/6/2018

0647    387.50    2/20/2018

0643    943.77    2/9/2018

0647    387.50    2/20/2018



Page 25 of 32

NAME CHARLES D. MENSER, Jr    23956

ADDRESS

ACCOUNT NO. 8867    FEB 17, 2018

Pay to the Order of CASH    $ 800.00

Three thousand 8/100    Dollars

FIDELITY BANK

BLDG 1600

For PROMISSORY NOTE

:06 110 2400:

23956    300.00    2/20/2018

0649    100.00    2/22/2018

23956    300.00    2/20/2018

Charles D. Menser, Jr    601
5555 Cumberland Parkway
Building 1600, Suite 150
Atlanta, GA 30339    2-22 on 18

PAY TO THE ORDER OF Charles D. Menser, Jr.    $ 350.00

three hundred fifty dollars & 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia    VOID AFTER 90 DAYS

FOR Transfer Funds

:06 110 2400:    886 - 7    0601

0601    350.00    2/23/2018

Charles D. Menser, Jr    648
Building 1600, Suite 150
Atlanta, GA 30339    2/20 on 18

PAY TO THE ORDER OF Lalon M Haygood    $ 195.00

one-hundred ninety-five dollars and 0/100 DOLLARS

Fidelity Bank
Atlanta, Georgia    VOID AFTER 90 DAYS

FOR office Expense

:06 110 2400:    886 7    0648

0648    195.00    2/21/2018

0601    350.00    2/23/2018

0648    195.00    2/21/2018

Charles D. Menser, Jr    650
5555 Cumberland Parkway
Building 1600, Suite 150
Atlanta, GA 30339    2-22 on 18

PAY TO THE ORDER OF Charles D. Menser, Jr    $ 1,100.00

one thousand one hundred dollars & 0/100 DOLLARS

Fidelity Bank
Atlanta, Georgia    VOID AFTER 90 DAYS

FOR Transfer Funds

:06 110 2400:    886 7    0650

0650    1100.00    2/23/2018

Charles D. Menser, Jr    649
5555 Cumberland Parkway
Building 1600, Suite 150
Atlanta, GA 30339    2-21 on 18

PAY TO THE ORDER OF L Montania Haygood    $ 100.00

one-hundred dollars & 0/100 DOLLARS

Fidelity Bank
Atlanta, Georgia    VOID AFTER 90 DAYS

FOR office Expense

:06 110 2400:    886 7    0649

0649    100.00    2/22/2018

0650    1100.00    2/23/2018

Page 26 of 32



Charles D. Menser, Jr
2055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

602

2-23 20 18

PAY TO THE
ORDER OF Lalon M Haygood    | $ 165.00

One hundred sixty five dollars and 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR Office Expense

⑆061102400⑆    886  7⁜    0602

0602    165.00    2/26/2018

0604    1000.00    3/7/2018

0602    165.00    2/26/2018

605

Charles D. Menser, Jr
2055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

March 8, 2018

PAY TO THE
ORDER OF Phyllis J. Menser    | $ 1,000.00

One thousand + 00/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

⑆061102400⑆    886  7⁜    0605

0605    1000.00    3/21/2018

Charles D. Menser, Jr
2055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

603

March 5, 2018

PAY TO THE
ORDER OF Phyllis J. Menser    | $ 5,000.00

Five Thousand + No/100

Fidelity Bank
Atlanta, Georgia

⑆061102400⑆    886  7⁜    0603

0603    5000.00    3/7/2018

1763

0605    1000.00    3/21/2018

22809106893

0603    5000.00    3/7/2018

Charles D. Menser, Jr
2055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

606

4-5 20 18

PAY TO THE
ORDER OF Charles D. Menser, Jr.    $ 125.00

One-hundred twenty-five dollars 0/100 DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR Office Expense

⑆061102400⑆    886  7⁜    0606

0606    125.00    4/5/2018

Charles D. Menser, Jr
2055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

604

March 6, 2018

PAY TO THE
ORDER OF Dawna Lawson    | $ 1,000.00

One Thousand + No/100

Fidelity Bank
Atlanta, Georgia

FOR Accounting

⑆061102400⑆    886  7⁜    0604

0604    1000.00    3/7/2018

0606    125.00    4/5/2018



Page 27 of 32

Charles D. Menser, Jr
9850 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

607

April 13 2018

PAY TO THE
ORDER OF  Charles D. Menser, Jr    $ 2,000.00

Two Thousand and No/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Trans Funds

VOID AFTER 60 DAYS

0607    2000.00    4/13/2018

Seq: 241
Batch: 086853
Date: 04/16/18

For Deposit Only
acct#

Credited To The Account Of
The Within Named Payee
Endorsement Guaranteed
Bank of America, N.A.

0609    200.00    4/17/2018

0607    2000.00    4/13/2018

Charles D. Menser, Jr
9255 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

610

April 21 2018

PAY TO THE
ORDER OF  Cash    $ 1,500.00

One Thousand Five Hundred and No/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Repairs Bldg 1600

VOID AFTER 60 DAYS

0610    1500.00    4/23/2018

Charles D. Menser, Jr
9255 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

608

April 13 2018

PAY TO THE
ORDER OF  Charles D. Menser, Jr    $ 500.00

Five Hundred and No/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Office Expenses

VOID AFTER 60 DAYS

0608    500.00    4/13/2018

Cash On-Us Check
1,500.00
8867
.5955/1104/22
.4/23/2018    10:48
Online

0610    1500.00    4/23/2018

Cash On-Us Check
500.00
8867
.5955/1104/13
4/13/2018

0608    500.00    4/13/2018

Charles D. Menser, Jr
9855 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

612

4/28 2018

PAY TO THE
ORDER OF  Charles D. Menser, Jr.    $ 3,000.00

three thousand dollars & 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Transfer funds

VOID AFTER 60 DAYS

0612    3000.00    5/1/2018

Charles D. Menser, Jr
9255 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

609

4/16 2018

PAY TO THE
ORDER OF  Nona Massey    $ 200.00

two-hundred dollars + 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

FOR  Accounting Services

VOID AFTER 60 DAYS

0609    200.00    4/17/2018

For Deposit Only

0612    3000.00    5/1/2018

P2018-175  002790



Charles D. Menser, Jr
2355 Cumberland Parkway
Building 1800, Suite 100
Atlanta, GA 30339

Invoice 12012-2841
ID: 480585

811

April 23, 2018

PAY TO THE ORDER OF  AccuQuest  $ 620 00

Six Hundred Twenty 00/100  DOLLARS

Fidelity Bank
Atlanta, Georgia

For  Hearing-Aid Pymt

0611  620.00  5/1/2018

0614  900.00  5/15/2018

PAY TO THE ORDER OF
PAY TO THE ORDER OF
FOR DEPOSIT ONLY
AccuQuest Hearing Centers
7224467939

Fidelity Bank
Atlanta, Georgia

0611  620.00  5/1/2018

Charles D. Menser, Jr
2355 Cumberland Parkway
Building 1800, Suite 100
Atlanta, GA 30339

615

5/17 2018

PAY TO THE ORDER OF  Charles D. Menser, Jr.  $ 1100,00

one-thousand one-hundred dollars a 0/100  DOLLARS

Fidelity Bank
Atlanta, Georgia

For  Transfer Funds

0615  1100.00  5/18/2018

NAME  Charles Menser Jr  RCAB  24391

ADDRESS

ACCOUNT NO. 1908867  May 5, 2018

Pay to the Order of  Cash  $ 200 00

two hundred  Dollars

FIDELITY BANK
Atlanta, GA

For  Office Expense

24391  200.00  5/7/2018

0615  1100.00  5/18/2018

Cash On-Us Check
8867   200.00
5577/1103/8
5/7/2018   10:52
Online

24391  200.00  5/7/2018

Charles D. Menser, Jr
2355 Cumberland Parkway
Building 1800, Suite 100
Atlanta, GA 30339

652

5/21 2018

PAY TO THE ORDER OF  Charles D. Menser, Jr.  $ 200.00

two-hundred dollars a 0/100  DOLLARS

Fidelity Bank
Atlanta, Georgia

For  Office Expense

0652  200.00  5/21/2018

Charles D. Menser, Jr
2355 Cumberland Parkway
Building 1800, Suite 100
Atlanta, GA 30339

614

5/14 2018

PAY TO THE ORDER OF  Charles D. Menser, Jr.  $ 900.00

nine-hundred dollars a 0/100  DOLLARS

Fidelity Bank
Atlanta, Georgia

For  Transfer Funds

0614  900.00  5/15/2018

Cash On-Us Check
Online
5/21/2018  11:42

0652  200.00  5/21/2018



Charles D. Menser, Jr
5055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

651

5/21 20 18

PAY TO THE ORDER OF Charles D. Menser, Jr    $ 500.00

Five hundred dollars + 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

VOID AFTER 90 DAYS

FOR Transfer Funds

0651    500.00    5/22/2018

0619    2012.86    6/6/2018

0651    500.00    5/22/2018

Charles D. Menser, Jr
5055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

676

JUNE 19 20 18

PAY TO THE ORDER OF Phyllis J. Menser    $ 700.00

Seven Hundred + NO/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

VOID AFTER 90 DAYS

FOR

0676    700.00    6/21/2018

Charles D. Menser, Jr
5055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

616

May 29 20 18

PAY TO THE ORDER OF CASH    $ 500.00

Five Hundred + XX/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

VOID AFTER 90 DAYS

FOR OFFICE-EXPENSE

0616    500.00    5/29/2018

0676    700.00    6/21/2018

0616    500.00    5/29/2018

Charles D. Menser, Jr
5055 Cumberland Parkway
Building 1800, Suite 150
Atlanta, GA 30339

701

6/20 20 18

PAY TO THE ORDER OF L Montana Haygood    $ 200.00

two-hundred dollars + 0/100    DOLLARS

Fidelity Bank
Atlanta, Georgia

VOID AFTER 90 DAYS

FOR

0701    200.00    6/21/2018

0619    2012.86    6/6/2018

0701    200.00    6/21/2018

P2018-175  002792

Page 30 of 32



| 0617 | 100.00 | 6/22/2018 |
| 0623 | 200.00 | 7/18/2018 |
| 0617 | 100.00 | 6/22/2018 |
| 0653 | 100.00 | 7/20/2018 |
| 0678 | 100.00 | 7/6/2018 |
| 0653 | 100.00 | 7/20/2018 |
| 0678 | 100.00 | 7/6/2018 |
| 0625 | 10.08 | 7/23/2018 |
| 0623 | 200.00 | 7/18/2018 |
| 0625 | 10.08 | 7/23/2018 |



0655    300.00    7/23/2018

0659    200.00    7/30/2018

0655    300.00    7/23/2018

0657    160.02    7/30/2018

0658    100.00    7/26/2018

0657    160.02    7/30/2018

0658    100.00    7/26/2018

0656    139.95    7/30/2018

0659    200.00    7/30/2018

0656    139.95    7/30/2018



24862        100.00        7/30/2018



24862        100.00        7/30/2018

P2018-175  002795

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

'

COPY REFERENCE: 20190114000510      SS
01/15/19 16:03:04 155 WEB JOBT9011516020
0028280360  20170626      07
1000.00          ████████1006      000005

---

**CHARLES D MENSER, JR**
2255 Cumberland Parkway
Building 1800 Suite 150
Atlanta, GA 30339

5709
64-10/610

JUNE 26 20 17

PAY TO THE
ORDER OF ___CASH_____ $ 1,000 ⁰⁰

ONE THOUSAND & NO/100 _____ DOLLARS 🔒

SUNTRUST BANK
Atlanta Georgia

VOID AFTER 90 DAYS

FOR _____

⑈061000104⑈ ████████ ⑈1006⑈⑈    5709

MONARCH

ON US WITHDRAWAL
Bus. Date 26-Jun-2017 AM
1,000.00 CASH
1,000.00 TOTAL
Transaction Date: 26-Jun-2017 15:14:50
312111006
220
047901 187119 6
50

```
STSC
SUBPOENA SERVICES
FL-ORLANDO-7136
'

COPY REFERENCE: 20190114000510     SS
01/15/19 16:03:14 341 WEB JOBT9011516021
0074307365  20171211     07
900.00        ████████1006     000005
```

**CHARLES D MENSER, JR**
2255 Cumberland Parkway
Building 1600 Suite 150
Atlanta, GA 30339

Known (Kw)
VGKW 146

5753
64-10/610

12-9  20 17

PAY TO THE ORDER OF _CASH_                    $ 900⁰⁰

_NINE HUNDRED & ⁿᵈ/100_                    DOLLARS

**SUNTRUST BANK**
Atlanta Georgia

BROOKVIEW DR

VOID AFTER 90 DAYS

FOR _REPAIRS_

⑆061000104⑆ ████████1006⑈  5753

MONARCH

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136
ᐟ

COPY REFERENCE: 20190114000510     SS
01/15/19 16:03:14 360 WEB JOBT9011516021
0075388804  20171226      07
350.00              1006      000005

CHARLES D MENSER, JR                                  5762
2255 Cumberland Parkway                              64-10/610
Building 1600 Suite 150
Atlanta, GA 30339

Dec 23 20 17

PAY TO THE
ORDER OF   CASH                                   $ 350 00

Three Hundred Fifty & No/100              DOLLARS

SUNTRUST BANK
Atlanta Georgia                          VOID AFTER 90 DAYS

FOR  Repairs @ Brookview Dr

⑈061000104⑈        1006⑆     5762

MONARCH

ON US WITHDRAWAL
Bus. Date 26Dec.2017 AM
350.00 CASH
350.00 TOTAL
Transaction Date: 23Dec.2017 13:12:45
150
012111006
112
042408 166762 2

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136
,

COPY REFERENCE: 20190114000510     SS
01/15/19 16:03:23 366 WEB JOBT9011516021
0076220525   20171227        07
500.00              ▮▮▮▮▮.1006     000006

CHARLES D MENSER, JR
2255 CUMBERLAND PARKWAY
BUILDING 1600, SUITE 150
ATLANTA, GA 30337

SUNTRUST BANK
ATLANTA, GEORGIA
8410-810
64-10/610

6936

Dec 27, 2017

PAY TO THE
ORDER OF   *CASH*

$ *500* ⁴⁰

FIVE HUNDRED & NO/100

DOLLARS

VOID AFTER 90 DAYS

MEMO   TRAVEL - CHOADA RECBK

AUTHORIZED SIGNATURE

⑈006936⑈ ⑈061000104⑈ ▮▮▮▮▮1006⑈

150
8812111006
4  221 SLP AVRS
1104?904 052469 4
Transaction Date: 27Dec,2017 16:33:59

ON US WITHDRAWAL     $
Eus. Date 27Dec.2017 4H
500.09 CASH
500.00 TOTAL

```
STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

COPY REFERENCE: 20190114000510     SS
01/15/19 16:03:23 373 WEB  JOBT9011516021
0077287004   20180102        07
300.00                  1006      000005
```

CHARLES D MENSER, JR                                          5764
2255 Cumberland Parkway                                      64-10/610
Building 1600 Suite 150
Atlanta, GA 30339

JAN 1 20 18

PAY TO THE
ORDER OF   CASH                                        $ 300 00

Three Hundred & No/100                              DOLLARS

SUNTRUST BANK
Atlanta Georgia

VOID AFTER 90 DAYS

FOR

⑆061000104⑆   1006⑈   5764

MONARCH

150
31211006
227
1047901 187119 6
Transaction Date: 23Jan2018

ON US WITHDRAWAL
Bus. Date 23Jan2018 AM
300.00 CASH
300.00 TOTAL
14:14:09

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

COPY REFERENCE: 20190114000510     SS
01/15/19 16:03:24 469 WEB JOBT9011516021
0029226333   20180511      07
300.00         ████████1006      000005

CHARLES D MENSER, JR
2255 Cumberland Parkway
Building 1600 Suite 150
Atlanta, GA 30339

5827

64-10/610

MAy 11 20 18

PAY TO THE
ORDER OF  CASH                          $ 300 00

Three Hundred & no/100                          DOLLARS

SUNTRUST BANK
Atlanta Georgia

VOID AFTER 90 DAYS

FOR

⑈061000104⑈ ████1006⑈  5827

MONARCH

ON US WITHDRAWAL
Bus. Date 11May2018 AM
300.00 CASH
300.00 TOTAL
15:33:49

:50
712111006
180
0479 02 182361 2
Transaction Date: 11May2018

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

COPY REFERENCE: 20190114000510      SS
01/15/19 16:03:24 496 WEB JOBT9011516021
0077047294   20180717      07
200.00              ▮▮▮▮▮1006      000004



Exhibit 2

1

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CDMJR Cryptocurrencies | | | | | | | | | | | | | | | | | | |
| 2 | | Coinbase | | | | Binance | | | | KeepKey | | | | Trezor | | | | | Columns E+H+M+Q = $ |
| 3 | Coin | Quanity | Date | Price | Coinbase Total Value | Quantity | Date | Price | Binance Total Value | Quantity | Date | Price | Keep Key Total Value | Quantity | Date | Price | Trezor Total Value | Total Coins (all wallets) | Total Coin Value (all wallets) |
| 4 | Bitcoin (BTC) | | 2019-04-22 | $5,311.57 | $ - | 0.00000798 | 2019-04-22 | $ 5,311.570 | $ 0.04 | 3.88538632 | 2019-04-22 | $ 5,311.57 | $ 20,637.50 | 4.088 | 2019-04-22 | $ 5,311.57 | $ 21,713.70 | 7.973 | $ 42,351.24 |
| 5 | Etherium (ETH) | 0.09989734 | 2019-04-22 | $171.44 | $ 17.13 | | 2019-04-22 | $ 171.440 | | 5.2956 | 2019-04-22 | $ 171.44 | $ 907.88 | 1.9022653 | 2019-04-22 | $ 171.44 | $ 326.12 | 7.298 | $ 1,251.13 |
| 6 | BitcoinCash (BCH) | - | 2019-04-22 | $291.38 | - | | 2019-04-22 | $ 291.380 | | 0.18837 | 2019-04-22 | $ 291.38 | $ 54.89 | - | 2019-04-22 | $ 291.38 | - | 0.188 | $ 346.27 |
| 7 | Litecoin (LTC) | 4.0032 | 2019-04-22 | $76.97 | $ 308.13 | - | 2019-04-22 | $ 76.970 | | | 2019-04-22 | $ 76.97 | | | 2019-04-22 | $ 76.97 | - | 4.003 | $ 385.10 |
| 8 | OmiseGo (OMG) | | 2019-04-22 | $1.85000 | | | 2019-04-22 | $ 1.85000 | | 0.3989 | 2019-04-22 | $ 1.8500 | $ 0.74 | - | 2019-04-22 | $ 1.85000 | | 0.399 | $ 0.73797 |
| 9 | EthLend (LEND) | | 2019-04-22 | $0.01111 | | 5710.984 | 2019-04-22 | $ 0.01111 | $ 63.42 | - | 2019-04-22 | $ 0.0111 | | | 2019-04-22 | $ 0.01111 | - | 5710.984 | $ 63.42048 |
| 10 | Cardano (ADA) | - | 2019-04-22 | $0.07581 | | 952.047 | 2019-04-22 | $ 0.07581 | $ 72.17 | | 2019-04-22 | $ 0.0758 | | - | 2019-04-22 | $ 0.07581 | - | 952.047 | $ 72.17183 |
| 11 | Raiden Network Token (RDN) | - | 2019-04-22 | $0.32749 | | 99.9 | 2019-04-22 | $ 0.32749 | $ 32.72 | | 2019-04-22 | $ 0.3275 | | | 2019-04-22 | $ 0.32749 | | 99.900 | $ 32.71665 |
| 12 | Streamr DATAcoin (DATA) | | 2019-04-22 | $0.02433 | | 2320.677 | 2019-04-22 | $ 0.02433 | $ 56.47 | | 2019-04-22 | $ 0.0243 | | - | 2019-04-22 | $ 0.02433 | - | 2320.677 | $ 56.46903 |
| 13 | Basic Attention Coin (BAT) | | 2019-04-22 | $0.42178 | | 183.816 | 2019-04-22 | $ 0.42178 | $ 77.53 | | 2019-04-22 | $ 0.4218 | | | 2019-04-22 | $ 0.42178 | | | $ 77.52918 |
| 14 | | | | | | | | | | | | | | | | | | | $ 77.52918 |
| 15 | Total | | | | $ 325.25 | | | | $ 302.35 | | | | | | | | | | |
| 16 | | | | | | | | | | | | | $ 21,601.00 | | | | $ 22,039.82 | | |
| 17 | | | | | | | | | | | | | | | | | GRAND TOTAL all coins | | $ 44,636.78 |

Exhibit 3

| Billing Account Number | Dunning Code Type | Transaction Date (Receipt) | Receipt Amount |
|---|---|---|---|
| 7791730659 | Direct Billed | Tuesday, July 2, 2013 | ($103.71) |
| 7791730659 | Direct Billed | Friday, July 19, 2013 | ($103.71) |
| 7791730659 | Direct Billed | Friday, August 30, 2013 | ($103.71) |
| 7791730659 | Direct Billed | Thursday, October 3, 2013 | ($103.70) |
| 7791730659 | Direct Billed | Tuesday, October 29, 2013 | ($103.71) |
| 7791730659 | Direct Billed | Wednesday, December 4, 2013 | ($103.70) |
| 7791730659 | Direct Billed | Monday, January 6, 2014 | ($101.42) |
| 7791730659 | Direct Billed | Friday, February 7, 2014 | ($106.42) |
| 7791730659 | Direct Billed | Friday, February 21, 2014 | ($116.43) |
| 7791730659 | Direct Billed | Wednesday, April 9, 2014 | ($116.41) |
| 7791730659 | Direct Billed | Friday, May 9, 2014 | ($115.17) |
| 7791730659 | Direct Billed | Tuesday, June 10, 2014 | ($230.32) |
| 7791730659 | Direct Billed | Thursday, August 7, 2014 | ($115.16) |
| 7791730659 | Direct Billed | Monday, September 8, 2014 | ($101.42) |
| 7791730659 | Direct Billed | Thursday, October 16, 2014 | ($101.42) |
| 7791730659 | Direct Billed | Monday, October 27, 2014 | ($111.42) |
| 7791730659 | Direct Billed | Thursday, November 20, 2014 | ($101.41) |
| 7791730659 | Direct Billed | Wednesday, January 7, 2015 | ($101.42) |
| 7791730659 | Direct Billed | Wednesday, February 4, 2015 | ($116.42) |
| 7791730659 | Direct Billed | Friday, March 13, 2015 | ($106.42) |
| 7791730659 | Direct Billed | Wednesday, March 25, 2015 | ($116.42) |
| 7791730659 | Direct Billed | Monday, May 4, 2015 | ($106.42) |
| 7791730659 | Direct Billed | Thursday, May 28, 2015 | ($106.41) |
| 7791730659 | Direct Billed | Wednesday, June 24, 2015 | ($106.42) |
| 7791730659 | Direct Billed | Wednesday, August 12, 2015 | ($106.42) |
| 7791730659 | Direct Billed | Wednesday, September 16, 2015 | ($116.42) |
| 7791730659 | Direct Billed | Tuesday, October 6, 2015 | ($116.41) |
| 7791730659 | Direct Billed | Tuesday, October 27, 2015 | ($106.42) |
| 7791730659 | Direct Billed | Wednesday, November 25, 2015 | ($116.42) |
| 7791730659 | Direct Billed | Friday, January 8, 2016 | ($101.42) |
| 7791730659 | Direct Billed | Tuesday, February 2, 2016 | ($121.42) |
| 7791730659 | Direct Billed | Thursday, March 3, 2016 | ($101.42) |

| | | | |
|---|---|---|---|
| 7791730659 | Direct Billed | Friday, March 18, 2016 | ($111.42) |
| 7791730659 | Direct Billed | Tuesday, April 26, 2016 | ($106.42) |
| 7791730659 | Direct Billed | Friday, June 3, 2016 | ($106.41) |
| 7791730659 | Direct Billed | Tuesday, July 12, 2016 | ($106.42) |
| 7791730659 | Direct Billed | Thursday, August 11, 2016 | ($121.41) |
| 7791730659 | Direct Billed | Monday, September 12, 2016 | ($121.41) |
| 7791730659 | Direct Billed | Tuesday, October 18, 2016 | ($121.42) |
| 7791730659 | Direct Billed | Friday, November 18, 2016 | ($121.42) |
| 7791730659 | Direct Billed | Friday, December 16, 2016 | ($121.41) |
| 7791730659 | Direct Billed | Thursday, January 19, 2017 | ($121.42) |
| 7791730659 | Direct Billed | Monday, March 6, 2017 | ($101.42) |
| 7791730659 | Direct Billed | Thursday, March 23, 2017 | ($121.41) |
| 7791730659 | Direct Billed | Wednesday, April 19, 2017 | ($106.41) |
| 7791730659 | Direct Billed | Tuesday, May 9, 2017 | ($106.41) |
| 7791730659 | Direct Billed | Wednesday, June 28, 2017 | ($106.41) |
| 7791730659 | Direct Billed | Friday, July 7, 2017 | ($121.42) |
| 7791730659 | Direct Billed | Monday, August 21, 2017 | ($106.41) |
| 7791730659 | Direct Billed | Wednesday, September 20, 2017 | ($106.42) |
| 7791730659 | Direct Billed | Monday, October 16, 2017 | ($106.41) |
| 7791730659 | Direct Billed | Wednesday, December 6, 2017 | ($106.42) |
| 7791730659 | Direct Billed | Friday, December 22, 2017 | ($95.41) |
| 7791730659 | Direct Billed | Monday, February 5, 2018 | ($83.58) |
| 7791730659 | Direct Billed | Friday, February 23, 2018 | ($103.58) |
| 7791730659 | Direct Billed | Thursday, March 29, 2018 | ($88.58) |
| 7791730659 | Direct Billed | Tuesday, April 24, 2018 | ($103.58) |
| 7791730659 | Direct Billed | Tuesday, June 5, 2018 | ($88.59) |
| 7791730659 | Direct Billed | Monday, July 9, 2018 | ($88.58) |

NW 2020-07-10 000332



### VALUABLES PLUS CUSTOMER NOTICE

| Policy Number | Date Prepared |
|---|---|
| 77 1O IM 166273 | JAN 23, 2017 |
| | |

CLEWIS ENTERPRISES, INC.
BLDG 1600 STE 200
2255 CUMBERLAND PKWY
ATLANTA GA 30339

**How to Contact Us**

**Nationwide Representative:**
CLEWIS ENTERPRISES, INC.
AGENT NUMBER : OO28915
678-426-0000

CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515

7935500034 2015

---

**See back of your statement for important phone numbers and other information about your insurance.**

**Note:**
Enclosed is your Valuables Plus Insurance Policy and Declarations for property described on the Declarations.

Please read it carefully.  There has been a lapse in coverage from JAN 17, 2017 to JAN 18, 2017.

Thank you for insuring with Nationwide.

─────── RETAIN THIS PORTION FOR YOUR RECORDS ───────

---

**At Nationwide, customer service is a top priority. Whether you are a long time customer or new, we want you to know the high value we place on your business. We consider it a privilege to serve you.**

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**

**\*\*\*\*\*\*\*\*\*\*THIS IS NOT A BILL\*\*\*\*\*\*\*\*\*\***

## NATIONWIDE 24-HOUR CLAIM NUMBER 1-800-421-3535

**For Questions About Your Insurance, Call Your Nationwide Agent:** CLEWIS ENTERPRISES, INC.
678-426-0000

AGENT NUMBER   28915

**For Hearing Impaired:** TTY 1-800-622-2421

**Nationwide Regional Office:** 1-877-669-6877


**Nationwide®**
is on your side

# VALUABLES PLUS POLICY
## DECLARATIONS
Non-Assessable

Page 1 of 2

These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your Valuables Plus Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached Schedule.

**Policy Number:**
77 10 IM 166273

**Issued:**
JAN 23, 2017

**Policyholder:**
(Named Insured)
CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515

**Policy Period From:**
JAN 18, 2017 to JAN 18, 2018 but only if the required premium for this period has been paid, and only for annual renewal periods if premiums are paid as required. Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

## PROPERTY INSURED



| Personal Property Class | Total Amount Of Insurance | Deductible | Premium |
|---|---|---|---|
| FURS | $ 8,500 | NONE | $ 47.00 |
| JEWELRY | $ 92,824 | $250 | $ 1,170.00 |
| **Annual Total Premium** | | | $ 1,217.00 |

\* The deductible amount shown above for each class of property insured applies to all property in that class unless a separate deductible amount is indicated for a specific item described below.

There are no changes in the items insured.

Please see prior "Valuables Plus Items Insured" for details.

## FORMS and ENDORSEMENTS MADE PART OF POLICY

| | |
|---|---|
| CL-227 (Ed. 7-01) | Amendatory Endorsement |
| IM-90-A | Valuables Plus Policy |
| IM-175-A (Ed. 1.0) | Valuables Plus Personal Articles Coverage |
| IM-175-5-A (Ed. 1.0) | Special Jewelry Deductible |
| Cas.6811 | Amendatory Endorsement - Benefits |

**Issued By:** NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
Home Office – Columbus, Ohio

**Countersigned At:** GAINESVILLE, FL                    **By:** CLEWIS ENTERPRISES, INC.

Prior Declaration Issued: NOV 30, 2016

I5300-A

7935500034202A

─ **VALUABLES PLUS POLICY DECLARATIONS** ─

Page 2 of 2

## IMPORTANT PHONE NUMBERS

Nationwide 24-Hour Claims Number: 1-800-421-3535

For QUESTIONS About Your Policy, Call Your NATIONWIDE AGENT: CLEWIS ENTERPRISES, INC.
678-426-0000

For Hearing Impaired: TTY 1-800-622-2421

Nationwide Regional Office: 1-877-669-6877



## VALUABLES PLUS CUSTOMER NOTICE

| Policy Number<br>77 1O IM 166273 | Date Prepared<br>APR O3, 2017 |
|---|---|
| | |

CLEWIS ENTERPRISES, INC.
BLDG 1600 STE 200
2255 CUMBERLAND PKWY
ATLANTA GA 30339

**How to Contact Us**

**Nationwide Representative:**
CLEWIS ENTERPRISES, INC.
AGENT NUMBER : OO28915
678-426-0000

CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515



**See back of your statement for important phone numbers and other information about your insurance.**

**Note:**
The enclosed Declarations confirm change(s) made to your Valuables Plus Insurance Policy.
Please read it carefully.  Thank you for insuring with Nationwide.

———— RETAIN THIS PORTION FOR YOUR RECORDS ————

At Nationwide, customer service is a top priority. Whether you are a long time customer or new, we want you to know the high value we place on your business. We consider it a privilege to serve you.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**

**\*\*\*\*\*\*\*\*\*\*THIS IS NOT A BILL\*\*\*\*\*\*\*\*\*\***

# NATIONWIDE 24-HOUR CLAIM NUMBER 1-800-421-3535

**For Questions About Your Insurance, Call Your Nationwide Agent:** CLEWIS ENTERPRISES, INC.
678-426-0000

AGENT NUMBER   28915

**For Hearing Impaired:** TTY 1-800-622-2421

**Nationwide Regional Office:** 1-877-669-6877



**Nationwide®**
is on your side

**VALUABLES PLUS POLICY
DECLARATIONS**
Non-Assessable

Page 1 of 2

These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your Valuables Plus Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached Schedule.

**Policy Number:**
77 10 IM 166273

**Issued:**
APR 03, 2017

**Policyholder:**
(Named Insured)
CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515

**Policy Period From:**
JAN 18, 2017 to JAN 18, 2018 but only if the required premium for this period has been paid, and only for annual renewal periods if premiums are paid as required. Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

**Change Effective Date:**
MAR 30, 2017
This revised Declarations reflects recent changes made to your Insurance Policy.

## PROPERTY INSURED

| Personal Property Class | Total Amount Of Insurance | Deductible | Premium |
|---|---|---|---|
| FURS | $       8,500 | NONE | $       47.00 |
| JEWELRY | $      92,824 | $250 | $    1,170.00 |
| **Annual Total Premium** | | | $    1,217.00 |

\* The deductible amount shown above for each class of property insured applies to all property in that class unless a separate deductible amount is indicated for a specific item described below.

There are no changes in the items insured.

Please see prior "Valuables Plus Items Insured" for details.

## FORMS and ENDORSEMENTS MADE PART OF POLICY

| | |
|---|---|
| CL-227 (Ed. 7-01) | Amendatory Endorsement |
| IM-90-A | Valuables Plus Policy |
| IM-175-A (Ed. 1.0) | Valuables Plus Personal Articles Coverage |
| IM-175-5-A (Ed. 1.0) | Special Jewelry Deductible |
| Cas.6811 | Amendatory Endorsement - Benefits |

**Issued By:** NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
          Home Office – Columbus, Ohio
**Countersigned At:** GAINESVILLE, FL          **By:** CLEWIS ENTERPRISES, INC.
Prior Declaration Issued: JAN 23, 2017

I5300-A

7965900680027

## VALUABLES PLUS POLICY DECLARATIONS

Page 2 of 2

### IMPORTANT PHONE NUMBERS

Nationwide 24-Hour Claims Number: 1-800-421-3535

For QUESTIONS About Your Policy, Call Your NATIONWIDE AGENT: CLEWIS ENTERPRISES, INC.
678-426-0000

For Hearing Impaired: TTY 1-800-622-2421

Nationwide Regional Office: 1-877-669-6877



## VALUABLES PLUS CUSTOMER NOTICE

| Policy Number<br>77 1O IM 166273 | Date Prepared<br>NOV 30, 2016 |
|---|---|
| | |

CLEWIS ENTERPRISES, INC.
BLDG 1600 STE 200
2255 CUMBERLAND PKWY
ATLANTA GA 30339

**How to Contact Us**

**Nationwide Representative:**
CLEWIS ENTERPRISES, INC.
AGENT NUMBER : OO28915
678-426-0000

CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515



**See back of your statement for important phone numbers and other information about your insurance.**

**Note:**
Enclosed is your Valuables Plus Policy Renewal Declarations for property described on the Declarations.

Please read it carefully.  The bill for your renewal premium will be sent separately.  To maintain uninterrupted coverage, please pay your premium bill when it arrives.  Thank you for insuring with Nationwide.

**Total Billed To NATIONWIDE BILLING ACCOUNT**                                    $  1,217.00

——— RETAIN THIS PORTION FOR YOUR RECORDS———

At Nationwide, customer service is a top priority. Whether you are a long time customer or new, we want you to know the high value we place on your business. We consider it a privilege to serve you.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**

**\*\*\*\*\*\*\*\*\*\*THIS IS NOT A BILL\*\*\*\*\*\*\*\*\*\***

## NATIONWIDE 24-HOUR CLAIM NUMBER 1-800-421-3535

**For Questions About Your Insurance, Call Your Nationwide Agent:** CLEWIS ENTERPRISES, INC.
678-426-0000

AGENT NUMBER   28915

**For Hearing Impaired:** TTY 1-800-622-2421

**Nationwide Regional Office:** 1-877-669-6877



# VALUABLES PLUS POLICY DECLARATIONS
## Non-Assessable

Page 1 of 2

These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your Valuables Plus Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached Schedule.

**Policy Number:**
77 10 IM 166273

**Issued:**
NOV 30, 2016

**Policyholder:**
(Named Insured)
CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515

7915000054602 3

**Policy Period From:**
DEC 30, 2016 to DEC 30, 2017 but only if the required premium for this period has been paid, and only for annual renewal periods if premiums are paid as required. Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.



## PROPERTY INSURED

| Personal Property Class | Total Amount Of Insurance | Deductible | Premium |
|---|---|---|---|
| FURS | $      8,500 | NONE | $        47.00 |
| JEWELRY | $     92,824 | $250 | $     1,170.00 |
| **Annual Renewal Total Premium** | | | $     1,217.00 |

\* The deductible amount shown above for each class of property insured applies to all property in that class unless a separate deductible amount is indicated for a specific item described below.

### SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED

| Item Number-Property | Limits Of Liability | Description |
|---|---|---|
| ITEM #102 FURS | $      8,500 | ONE NATURAL RANCH MINK FULL LENGTH COAT, ALL FEMALE SKINS, ORIGIN- DENMARK. |
| ITEM #204 JEWELRY | $     12,000 | 1 18KWG NECKLACE IN FANCY ROCK DESIGN,MT W/12SEMI -PREC STONES,WT108.11C, W/ 186 RD-CT MULTI-COLOR SAPP,WT 7.69C, 32AMETH,WT1.10C,204DIA WT 4.10CAR |
| ITEM #207 JEWELRY | $     16,974 | GENTS ROLEX WATCH STYLE #R182488 OYSTER PERPETUAL  DAY-DATE 18K BARK FINISH BEZEL 31 JEWEL CHRONOME TER MVMNT SYNTH. CRYSTAL W/ CLASP PRESIDENT BRACE |
| ITEM #208 JEWELRY | $     63,850 | ONE MARQUISE CUT DIAMOND RING 4.83CTS COLOR J CLA  RITY S13, ON EITHER SIDE IS ONE TRILLION |

I5300-A

## ─── VALUABLES PLUS POLICY DECLARATIONS ───

Page 2 of 2

**SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED**

| Item Number-Property | Limits Of Liability | Description |
|---|---|---|
| | | CUT DIAM  OND BOTH WGT 1CT C |
| | | J,CLAR S11 ON 18KT YGOLD BAND |

## FORMS and ENDORSEMENTS MADE PART OF POLICY

| | |
|---|---|
| CL-227 (Ed. 7-O1) | Amendatory Endorsement |
| IM-90-A | Valuables Plus Policy |
| IM-175-A (Ed. 1.O) | Valuables Plus Personal Articles Coverage |
| IM-175-5-A (Ed. 1.O) | Special Jewelry Deductible |
| Cas.6811 | Amendatory Endorsement - Benefits |

**Issued By:** NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
     **Home Office – Columbus, Ohio**

**Countersigned At:** GAINESVILLE, FL          **By:** CLEWIS ENTERPRISES, INC.

Prior Declaration Issued: DEC O1, 2015

### IMPORTANT PHONE NUMBERS

Nationwide 24-Hour Claims Number: 1-800-421-3535

**For QUESTIONS About Your Policy, Call Your NATIONWIDE AGENT: CLEWIS ENTERPRISES, INC.**
                              678-426-0000

For Hearing Impaired: TTY 1-800-622-2421

Nationwide Regional Office: 1-877-669-6877



**Nationwide®**
is on your side

### VALUABLES PLUS CUSTOMER NOTICE

| Policy Number | Date Prepared |
|---|---|
| 77 10 IM 166273 | DEC 01, 2015 |
| | |

CLEWIS ENTERPRISES, INC.
BLDG 1600 STE 200
2255 CUMBERLAND PKWY
ATLANTA GA 30339

**How to Contact Us**

**Nationwide Representative:**
CLEWIS ENTERPRISES, INC.
AGENT NUMBER : 0028915
678-426-0000

CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515



**See back of your statement for important phone numbers and other information about your insurance.**

**Note:**
Enclosed is your Valuables Plus Policy Renewal Declarations for property described on the Declarations.

Your Policy has been changed.  Please read the enclosed Policyholder Information Notice for details.  The renewal premium will be billed separately.  This statement does not guarantee coverage.  Renewal of coverage is contingent upon timely payment of all required premium amounts.  Thank you for insuring with Nationwide.

**Total Billed To NATIONWIDE BILLING ACCOUNT**                                      **$  1,217.00**

—— RETAIN THIS PORTION FOR YOUR RECORDS ——

At Nationwide, customer service is a top priority. Whether you are a long time customer or new, we want you to know the high value we place on your business. We consider it a privilege to serve you.

**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY**

**\*\*\*\*\*\*\*\*\*\*THIS IS NOT A BILL\*\*\*\*\*\*\*\*\*\***

## NATIONWIDE 24-HOUR CLAIM NUMBER 1-800-421-3535

**For Questions About Your Insurance, Call Your Nationwide Agent:** CLEWIS ENTERPRISES, INC.
678-426-0000

AGENT NUMBER   28915

**For Hearing Impaired:** TTY 1-800-622-2421

**Nationwide Regional Office:** 1-877-669-6877



# VALUABLES PLUS POLICY
## DECLARATIONS
Non-Assessable

Page 1 of 2

These Declarations are a part of the policy named above and identified by policy number below. They supersede any Declarations issued earlier. Your Valuables Plus Policy will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. Coverage is provided where a premium or limit of liability is shown for the coverage(s) below or in the attached Schedule.

**Policy Number:**
77 10 IM 166273

**Issued:**
DEC 01, 2015

**Policyholder:**
**(Named Insured)**
CHARLES D MENSER
2255 CUMBERLAND PKWY
SE STE 150
ATLANTA GA 30339-4515

**Policy Period From:**
DEC 30, 2015 to DEC 30, 2016 but only if the required premium for this period has been paid, and only for annual renewal periods if premiums are paid as required. Each period begins and ends at 12:01 A.M. standard time at the Residence Premises.

## PROPERTY INSURED

| Personal Property Class | Total Amount Of Insurance | | Deductible | Premium | |
|---|---|---|---|---|---|
| FURS | $ | 8,500 | NONE | $ | 47.00 |
| JEWELRY | $ | 92,824 | $250 | $ | 1,170.00 |
| **Annual Renewal Total Premium** | | | | $ | **1,217.00** |

* The deductible amount shown above for each class of property insured applies to all property in that class unless a separate deductible amount is indicated for a specific item described below.

### SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED

| Item Number-Property | Limits Of Liability | | Description |
|---|---|---|---|
| ITEM #102 FURS | $ | 8,500 | ONE NATURAL RANCH MINK FULL LENGTH COAT, ALL FEMALE SKINS, ORIGIN- DENMARK. |
| ITEM #204 JEWELRY | $ | 12,000 | 1 18KWG NECKLACE IN FANCY ROCK DESIGN,MT W/12SEMI -PREC STONES,WT108.11C, W/ 186 RD-CT MULTI-COLOR SAPP,WT 7.69C, 32AMETH,WT1.10C,204DIA WT 4.10CAR |
| ITEM #207 JEWELRY | $ | 16,974 | GENTS ROLEX WATCH STYLE #R182488 OYSTER PERPETUAL  DAY-DATE 18K BARK FINISH BEZEL 31 JEWEL CHRONOME TER MVMNT SYNTH. CRYSTAL W/ CLASP PRESIDENT BRACE |
| ITEM #208 JEWELRY | $ | 63,850 | ONE MARQUISE CUT DIAMOND RING 4.83CTS COLOR J CLA  RITY S13, ON EITHER SIDE IS ONE TRILLION |

I5300-A

7760400005028

─── **VALUABLES PLUS POLICY DECLARATIONS** ───

Page 2 of 2

SCHEDULE OF PERSONAL PROPERTY ITEMS INSURED

| Item Number-Property | Limits Of Liability | Description |
|---|---|---|
| | | CUT DIAM  OND BOTH WGT 1CT C |
| | | J,CLAR S11 ON 18KT YGOLD BAND |

## FORMS and ENDORSEMENTS MADE PART OF POLICY

| | |
|---|---|
| CL-227 (Ed. 7-01) | Amendatory Endorsement |
| IM-90-A | Valuables Plus Policy |
| IM-175-A (Ed. 1.0) | Valuables Plus Personal Articles Coverage |
| IM-175-5-A (Ed. 1.0) | Special Jewelry Deductible |
| Cas.6811 | Amendatory Endorsement - Benefits |

**Issued By:** NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
**Home Office – Columbus, Ohio**

**Countersigned At:** GAINESVILLE, FL            **By:** CLEWIS ENTERPRISES, INC.

Prior Declaration Issued: DEC 02, 2014

## IMPORTANT PHONE NUMBERS

Nationwide 24-Hour Claims Number: 1-800-421-3535

For QUESTIONS About Your Policy, Call Your NATIONWIDE AGENT: CLEWIS ENTERPRISES, INC.
678-426-0000

For Hearing Impaired: TTY 1-800-622-2421

Nationwide Regional Office: 1-877-669-6877

Exhibit 4

```
STSC
SUBPOENA SERVICES
FL-ORLANDO-7136
,

COPY REFERENCE: 20200213000083      SS
02/14/20 16:33:21 369 WEB JOBT214161533
0031305446  20141027       07
111.42       0000008812111006      000005
```

CHARLES D. MENSER, JR
2255 CUMBERLAND PARKWAY
BUILDING 1600, SUITE 150
ATLANTA, GA 30339

SUNTRUST
ATLANTA, GA
64-10/610

5353

10/21/2014

PAY TO THE
ORDER OF    NationwideMutual Insurance Co.

$  **111.42

One Hundred Eleven and 42/100************************************************** DOLLARS

Nationwide (7791730659)
P.O. Box 96040
Charlotte, NC 28296-0040

VOID AFTER 90 DAYS

MEMO

Policy 7710IM166273 Due 10/31/2014

AUTHORIZED SIGNATURE

PAY TO THE ORDER OF
SUNTRUST BANK
FOR DEPOSIT ONLY
CLEWIS ENTERPRISES INC.
PREMIUM ACCOUNT
1000032828441



0193          106.42          12/7/2017



0193          106.42          12/7/2017

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136
'

COPY REFERENCE: 20190114000510       SS
01/15/19 16:03:23 410 WEB JOBT9011516021
0030232385   20180205        07
83.58        0000008812111006       000007

CHARLES D. MENSER, JR.
2255 CUMBERLAND PARKWAY
BUILDING 1500, SUITE 150
ATLANTA, GA 30339

SUNTRUST BANK
Atlanta, Georgia
64-10/610

7227

2-2-2018

PAY TO THE ORDER OF  Nationwide                    $  83.58

eighty-three dollars   and  58/100                 DOLLARS

VOID AFTER 90 DAYS

MEMO  Policy # 7710lM166273
Valuables Plus

AUTHORIZED SIGNATURE

⑈006⑈

PAY TO THE ORDER OF
SUNTRUST BANK
FOR DEPOSIT ONLY
CLEWIS ENTERPRISES INC.
PREMIUM ACCOUNT
1000034282441

Suntrust-BR-2019-03-20 000470

STSC
SUBPOENA SERVICES
FL-ORLANDO-7136

COPY REFERENCE: 20200213000083      SS
02/14/20 16:49:44 814 WEB JOBT214161539
0031232558  20151006      07
116.41        0000008812111006      000006

CHARLES D MENSER, JR
2255 CUMBERLAND PARKWAY
BUILDING 1600, SUITE 150
ATLANTA, GA 30337

SUNTRUST BANK
ATLANTA, GEORGIA
6410-610
64-10/610

6392

10/1/2015

PAY TO THE
ORDER OF    NationwideMutual Insurance Co.

$  **116.41

One Hundred Sixteen and 41/100*************************************************************  DOLLARS

Nationwide (7791730659)
P.O. Box 96040
Charlotte, NC 28296-0040

VOID AFTER 90 DAYS

AUTHORIZED SIGNATURE

MEMO

Policy 7710!M166273 Due 9/30/15

PAY TO THE ORDER OF
SUNTRUST BANK
FOR DEPOSIT ONLY
CLEWIS ENTERPRISES INC.
PREMIUM ACCOUNT
1000034282441