**IT IS ORDERED as set forth below:**

**Date: October 28, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 18-65681-JWC |
| CHARLES D. MENSER, JR., | CHAPTER 7 |
| Debtor. | |
| EDWIN K. PALMER, as Chapter 7 Trustee of the Estate of Charles D. Menser, Jr., | |
| Plaintiff, | ADV. PRO. NO. 20-6280-JWC |
| v. | |
| PHYLLIS J. MENSER, et al, | |
| Defendants. | |

## <u>Memorandum Opinion and Order</u>

When Charles Menser, Jr. filed a chapter 7 bankruptcy, he claimed to own about $15,000

of assets.  The Trustee of Menser's bankruptcy estate claims he really owns substantially more.

1

The problem is the assets are held in the names of family members and dozens of entities Menser does not own.  This case is about whether and how the Trustee can recover those assets.

The Trustee's basic premise is that over many years Menser constructed a byzantine network of corporations, LLCs, trusts, and family businesses through which he constantly filtered substantial assets to hide them from his personal creditors while also maintaining control of the assets.  From this basic premise, the Trustee asserts two general theories to recover assets from this alleged network.  First, the Trustee claims legal ownership of assets held by Menser's family members and affiliated entities should be ignored to recognize Menser, and his bankruptcy estate, as the true or *de facto* owner of the assets.  Second, the Trustee seeks to avoid specific transfers as fraudulent.

Seven of thirty defendants in this case moved to dismiss the Trustee's Complaint.  They first argue the Complaint is a shotgun pleading.  They also argue claims that Menser is the *de facto* owner of their assets are really reverse veil-piercing or similar claims not recognized under Georgia law.  Several defendants also challenge some of the Trustee's specific claims for fraudulent transfers.  The Court disagrees with defendants that the Complaint, as a whole, is a shotgun pleading, but agrees that some specific counts should be dismissed as shotgun pleadings.  The Court agrees with defendants that several of the Trustee's claims are reverse veil-piercing claims, or something similar, not recognized under Georgia law and should be dismissed.  Finally, the Court disagrees that any specific fraudulent transfer claims should be dismissed.

## I.    <u>PROCEDURAL BACKGROUND</u>

Charles Menser, Jr. ("Menser" or "Debtor"), filed a chapter 7 bankruptcy case on September 19, 2018.  One of Debtor's primary creditors filed a separate adversary proceeding seeking denial of Debtor's discharge.  Debtor ultimately waived his chapter 7 discharge, which the

Court approved by order entered in the main bankruptcy case. *See* Doc. No. 260, Case No. 18-65681. Thus, Debtor will not receive a discharge in his bankruptcy case.

The chapter 7 trustee (the "Trustee") started this Adversary Proceeding by filing an initial complaint (Doc. No. 1) on December 18, 2020.[1] The initial complaint named 30 defendants and asserted 29 counts. Several defendants filed answers and/or motions to dismiss, and the Trustee filed an amended complaint (Doc. No. 22). Several defendants again filed motions to dismiss the amended complaint, and the Trustee filed a motion for leave to file a second amended complaint. The Court held a hearing on the pending motions, at which the Court made several findings and observations about the various counts, certain deficiencies in places, and whether additional allegations or amendments were necessary for certain counts. The Court then entered an order granting the Trustee's motion to file a second amended complaint and denied the pending motions to dismiss as moot, but without prejudice to the defendants' right to file motions to dismiss a second amended complaint. The Trustee filed his Second Amended Complaint (Doc. No. 61) on June 1, 2021 (the "Complaint"). The Complaint names the same 30 defendants, but it adds two counts for a total of 31 separate counts.

Three groups of defendants filed separate motions to dismiss certain counts in the Complaint:

- The "Connell Defendants" - Defendants George Connell, Archer Augusta, LLC, and Pointer Investments, Incorporated filed their Motion to Dismiss Second Amended Complaint (Doc. No. 70) (the "Connell Motion to Dismiss") seeking dismissal of counts I, II, III, V, VI, XI, XXIV, XXV, XXVIII, XXX, and XXXI against them.[2]

---

[1] The Court extended the time for the Trustee to file avoidance actions under § 546 to December 18, 2020, by Order entered in the main bankruptcy case on September 18, 2020. *See* Doc. No. 225, Case No. 18-65681.

[2] The Connell Defendants do not seek dismissal of one count against them, count XXIII, but they deny any liability.

3

- Debtor filed his Motion to Dismiss Second Amended Complaint (Doc. No. 75) (the "Debtor Motion to Dismiss") seeking dismissal of counts I, II, III, and XXVIII against him.

- The "Phyllis Menser Defendants" - Phyllis Menser, 1266 Moores Mill Road, LLC, and P.J. Menser Family Partnership, L.L.L.P. filed their Motion to Dismiss Second Amended Complaint (Doc. No. 73) (the "Phyllis Menser Motion to Dismiss," together with the Connell Motion to Dismiss and Debtor Motion to Dismiss, the "Motions to Dismiss") seeking dismissal of counts I, II, III, XVII, XIX, XXX, and XXXI against them.

The Trustee opposes all three Motions to Dismiss.

## II.   JURISDICTION

The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) and (H).

## III.   STANDARD OF REVIEW

Dismissal under Federal Rule 12(b)(6) is appropriate if the Complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This Rule normally is construed with Federal Rule 8(a), which provides the "normal" pleading standard that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 679.

4

The court restricts its inquiry to the legal feasibility of the allegations in the complaint and whether they set forth facts as opposed to labels or mere conclusory statements when considering a motion to dismiss. *See Howell v. U.S. Foods (In re Bilbo)*, 2014 WL 689097, at *3 (Bankr. N.D. Ga. Feb. 5, 2014) (citing *Iqbal*, 556 U.S. at 678). After determining which allegations in a complaint are well-pled facts and which are legal conclusions, a court must accept all well-pled facts as true and must construe those facts and the complaint in the light most favorable to the plaintiff. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1324 (11th Cir. 2017); *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338, 1339 (11th Cir. 2017).

## IV.    FACTUAL ALLEGATIONS

The facts alleged in the Complaint are accepted as true for purposes of the Motions to Dismiss. The Complaint is substantial, spanning 141 pages (not including exhibits), 398 numbered paragraphs, 31 counts, and 30 defendants. It can be divided generally into three sections. The first section spans paragraphs 1-63 and includes basic allegations about the defendants' addresses, Debtor's insolvency, and a general overview of Menser's alleged network and the scheme he employed to shield assets from creditors. The second section spans paragraphs 64-246 and provides more detailed allegations for each defendant and the specific assets and transfers the Trustee is seeking to avoid and recover. The final section covers paragraphs 247-398 and contains the 31 separate counts. The Court need not summarize all of the allegations for purposes of the pending Motions to Dismiss except to say the Trustee alleges that over many years Menser created dozens of shell entities and straw persons and orchestrated numerous asset transfers among family members and affiliated entities to shield assets from his creditors while maintaining control of the assets. The Trustee seeks to unwind the network in its entirety by having nearly all assets of the entities and individuals within the network declared assets of the estate. The Trustee also seeks to

avoid numerous specific transfers as fraudulent. Discussion of specific allegations relevant to each count follows in the applicable analysis below.

## V.      CONCLUSIONS OF LAW

The three primary questions before the Court are (1) whether the Complaint, on the whole, is a shotgun pleading, (2) whether the Complaint states viable claims to declare assets legally owned by non-debtors to be estate assets; and (3) whether certain counts adequately plead fraudulent transfer claims. The Court first addresses the shotgun pleading arguments applicable to the entire Complaint. Then the Court addresses each specific count for which dismissal is sought in the order as pled in the Complaint.

### A.      Shotgun Pleadings

The Connell and Phyllis Menser Defendants argue the Complaint should be dismissed in its entirety because it is a shotgun pleading. The Eleventh Circuit has outlined four general types of shotgun pleadings:

> Though the groupings cannot be too finely drawn, we have identified four rough types or categories of shotgun pleadings. The most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. The next most common type, at least as far as our published opinions on the subject reflect, is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. The third type of shotgun pleading is one that commits the sin of not separating into a different count each cause of action or claim for relief. Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

*See, Weiland v. Palm Beach City. Sheriff*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). The ruling in

*Wieland*, however, makes clear that committing one of the four sins alone does not condemn a

complaint to eternal damnation, and a complaint should not be dismissed as a shotgun pleading just because it is poorly drafted. Instead, the question is whether "a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count." *Id.* at 1324.

Defendants here argue the Complaint commits sins 1, 2, and 4 and should be dismissed. The Court disagrees with respect to the Complaint as a whole. The Court previously ruled the first amended complaint was a shotgun pleading because it committed the "mortal sin" of incorporating all previous allegations into each successive count. In the context of a complaint containing over 350 numbered paragraphs, 29 separate counts against 30 defendants, and the reliance in many counts on specific factual allegations appearing dozens of pages before the count, the Court found the indiscriminate incorporation of all previous paragraphs into each count to be confusing and required, in some counts, perusing over 350 paragraphs of pleadings to find perhaps 10 to 20 paragraphs relevant to that count. This repeated incorporation of previous allegations in some instances also flirted with the second sin.

Plaintiff, for the most part, repented in the second amended Complaint. For instance, count V begins at paragraph 265 and seeks to avoid specific transfers involving specific defendants and specific properties as both actual and constructive fraudulent transfers. The count incorporates paragraphs 1-63 and 83-96 instead of the previous 264 paragraphs. The incorporated paragraphs make sense because paragraphs 1-63 generally allege facts related to the alleged overall scheme and Debtor's insolvency, facts relevant to an actual and/or constructive fraudulent transfer claim, and paragraphs 83-96 allege facts related specifically to the transfers sought to be avoided in count V. For each of the subsequent fraudulent transfer claims, the Complaint uses the same general pattern of incorporating paragraphs 1-63 and the paragraphs relevant to the specific transfers in

each count.  Though several of the counts incorporate a lot of previous paragraphs, it generally makes sense where the Trustee has chosen to incorporate wider swaths of previous allegations because those counts assert much broader claims supported by a much wider set of facts than the counts asserting specific fraudulent transfers.

The Court disagrees that the Complaint as amended, on the whole, fails to "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests" or "materially increase[s] the burden of understanding the factual allegations underlying each count."  *Id.*   Indeed, each of the moving defendants have already filed answers to the Complaint.  The Court will not dismiss the entire Complaint as a shotgun pleading.  That said, the Court agrees that certain counts, specifically counts I, II, III, and XXXI continue to have attributes of a shotgun pleading, which the Court addresses in its analysis of those specific counts below.

**B.**    **Counts I, II, and III**

*1.*    *Georgia law controls*

As a preliminary matter, in the Trustee's claims in counts I, II, and III, and in subsequent counts seeking similar relief discussed below, the Trustee's general premise is that assets held in the names of non-debtors really belong to the bankruptcy estate because either the entities holding the assets are sham entities, Debtor is the *de facto* owner of the assets, or Debtor has a secret equitable interest in the assets.  At bottom, the Trustee seeks a ruling that these assets are property of the estate under § 541 despite legal title lying in the name of a non-debtor.  While federal law determines what constitutes property of the estate, state law generally determines the nature of a debtor's interest in property. *See Two Trees v. Builders Transp., Inc. (In re Builders Transp., Inc.)*, 471 F.3d 1178, 1185 (11th Cir. 2006).  In this case, Georgia law appears to govern the assets in question, and the Trustee has not asserted any law other than Georgia's applies to whether the

Debtor had an interest in the various assets at issue on the petition date.  Accordingly, the Court looks to Georgia law when analyzing the Trustee's claims seeking to declare the assets at issue property of the Debtor's estate.

> ###### 2.       *Counts I, II, and III are reverse veil-piercing claims not recognized in Georgia*

All moving defendants seek dismissal of counts I, II, and III because they are reverse veil-piercing claims, which is not recognized under Georgia law.  The Court agrees.  "Reverse veil-piercing is a doctrine where a third party attempts to pierce the corporate veil to reach assets of the corporation to satisfy an individual insider's debts. In contrast, traditional veil-piercing involves imposing personal liability on insiders for a corporation's debts or obligations." *Gordon v. Webster (In re Webster)*, 629 B.R. 654, 666 (Bankr. N.D. Ga. 2021) (citing *Piercing the Corporate Veil*, Black's Law Dictionary (11th ed. 2019)).  In *Webster*, this Court ruled Georgia law does not recognize claims for reverse veil-piercing like the ones asserted by the Trustee here.  *Id.* at 668; *see also*, *TMX Finance, LLC v. Goldsmith*, 833 S.E.2d 317, 335 (Ga. App. 2019) (recognizing reverse veil-piercing claims to be foreclosed by Georgia law).  The Trustee does not offer any authority or argument to the contrary.  Instead, the Trustee argues counts I, II, and III assert claims independent of reverse veil-piercing.  The Court addresses each count in turn.

Count I asserts the Menser Entities and the Menser Trust are "mere sham instrumentalities of the Debtor, and that are not used to conduct legitimate business affairs of their own, but to perpetrate the Debtor's fraud upon his creditors."  Compl. ¶ 249.  It states, "There is such a unity of interest and ownership that the separate personalities of the Menser Entities and the Debtor do not exist."  Compl. ¶ 250.  The count concludes by requesting a declaratory judgment that the Menser Entities "should be disregarded as mere sham entities, with their assets to be turned over to the Plaintiff . . . ."  Compl. ¶ 251.  The Court reads these allegations to be reverse veil-piercing

claims, and the Trustee offers no argument or authority to the contrary.  The Trustee argues, however, that count I states a claim independent of reverse veil-piercing because it alleges "Debtor has repeatedly transferred his assets to, and filtered his assets through, the Menser Entities and the Menser Trust, such that the Menser Entities and Menser Trust do not have any independent assets of their own, but are merely holding companies which hold assets that in reality belong to the Debtor."  Compl. ¶ 249.  The Trustee added this language to the Complaint after the Court raised concerns at the April hearing that this and similar counts were reverse veil-piercing claims, but the Court does not understand how this allegation articulates anything other than a reverse veil-piercing claim, and the Trustee offers no analysis or authority supporting his position.  The Court finds count I asserts a reverse veil-piercing claim not recognized under Georgia law.

Count II seeks turnover of assets held by the Menser Entities and the Menser Trust because they "are in reality owned and controlled by the Debtor *and/or have been transferred to the Menser Entity Defendants and the Menser Family Trust from the assets of the Debtor without the Debtor receiving any consideration in return.*"  Compl. ¶ 253 (italics in original).  As originally pled in the first two versions of the complaint, count II did not include the italicized language cited, and it was nothing more than a counterpart to count I by which the Trustee would obtain the assets held by the Menser Entities after being declared assets of the estate in count I.  Like in count I, the Trustee added the italicized language after the Court raised concerns at the April hearing about reverse veil-piercing claims.  Arguably, the added language attempts to turn the count into a fraudulent transfer claim, but the added language falls far short of asserting any viable fraudulent transfer claim.  As the Trustee cites in his response briefs, "so long as the complaint makes clear who transferred what to whom and when, a preference defendant will have enough information to mount whatever defense may be available."  *In re Oconee Regional Health Systems, Inc.*, 621 B.R.

64, 72 (Bankr. M.D. Ga. 2020) (quoting *TOUSA Homes, Inc. v. Palm Beach Newspapers, Inc. (In re TOUSA, Inc.)*, 442 B.R. 852 (Bankr. S.D. Fla. 2010)).  Count II makes no effort to make clear what was transferred, to whom it was transferred, or when it was transferred.  All it arguably does is assert a blanket fraudulent transfer claim on all assets a defendant may have without regard to how or when the assets were obtained.  This does not satisfy any standard of pleading.  Without specific transfers to be avoided, the Court reads count II to be nothing more than the recovery mechanism on the reverse veil-piercing claims of count I.

Count III requests a declaratory judgment that Debtor is the sole owner of all ownership interests in the Menser Entity Defendants and any proceeds or distributions attributable to such ownership interests.  The Trustee asserts,

> Despite the ownership identified on annual Secretary of State Registrations or tax returns, as shown in his Complaint, the Debtor has exercised complete control over the Menser Entity Defendants, directed the use of their assets, and acted as *de facto* sole owner of each.  The transfers of portions or all of the Debtor's interests in some of these entities in the year before the Petition Date was an evident maneuver to further hinder, delay, and defraud the Debtor's creditors.

Compl. ¶ 257.  The Trustee asserts this claim is not a reverse-veil piercing claim and does not rely on a finding that the Menser Entities are sham entities, but the Trustee offers no authority or analysis supporting that assertion.  Nor does the Trustee offer any authority of any kind in his response briefs that the Court can declare the Debtor to be the true owner of the Menser Entities based on "*de facto*" ownership.  While the Court found cases granting judgment in favor of a trustee on facts and theories very similar to the Trustee's claims in counts I, II, and III, the cases rely significantly on reverse veil-piercing as recognized under the controlling state law.  *See, e.g., King Louie Min. LLC (In re Comu)*, Bankruptcy No. 09–38820–SGJ–7, Adversary No. 10–03269–SGJ., 2014 WL 3339593, *51-52 (Bankr. N.D. Tex. July 8, 2014), *aff'd, Comu v. King Louie Min.*

*LLC*, 534 B.R. 689 (N.D. Tex. 2015) (applying Texas law of reverse veil-piercing).[3]  On the other hand, in cases where applicable state law did not recognize reverse veil-piercing, courts have rejected similar claims as the Trustee's.  *See Butler v. Candlewood Rd. Partners, LLC (In re Raymond)*, 529 B.R. 455 (Bankr. D. Mass. 2015).  The Court reads count III to be little more than another form of reverse veil-piercing, seeking to accomplish indirectly what counts I and II seek to accomplish directly.

Whether reverse veil-piercing claims *should* be recognized under Georgia law in cases where a debtor may have abused the corporate form is not for this Court to answer.  This Court previously concluded Georgia law does not recognize reverse veil-piercing claims, and the Trustee offers nothing in his responsive briefs to challenge that conclusion other than conclusory assertions that his claims are different.  If case law exists supporting the Trustee's position that his claims in counts I, II, and III assert claims independent of reverse veil-piercing doctrines, he failed to cite to it.  The Court reads counts I, II, and III to be reverse veil-piercing claims seeking to bring the assets

---

[3] The Court is also familiar with a few cases applying a *de facto* control analysis under Texas law to bank accounts not legally owned by a debtor.  *See In re IFS Fin. Corp., 669 F.3d 255* (5th Cir. 2012) (applying Texas law, noting scant case law on the issue, and ruling "control is the primary determinant of ownership of bank accounts"); *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 158 (5th Cir. 2015) (applying *de facto* control analysis to bank accounts).  On first blush, these cases offer some support for the Trustee's theory that a debtor's estate has an interest in property legally owned by another entity if the debtor had *de facto* control of the asset, particularly in cases where the debtor has used convoluted corporate structures to engage in fraudulent conduct to conceal assets.  But these cases apply Texas law, and the Court has not found any case adopting a *de facto* control analysis under Georgia law.  This distinction is significant given that Texas appears to allow reverse veil-piercing claims, and at least one court has found the *IFS* and *Templeton* "cases are really just examples of situations in which courts elected to ignore corporate forms."  *Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC (In re Stillwater Asset Backed Offshore Fund Ltd.)*, 559 B.R. 563, 595 (Bankr. S.D.N.Y. 2016).  Further, the scope of both *IFS* and *Templeton* are much narrower than the broad application sought by the Trustee here.  First, *IFS* and *Templeton* deal only with specific bank accounts, not control of corporate entities.  As the *Stillwater* decision notes, finding that "'control' of a corporate entity should be equated with ownership of that entity's assets [] would eliminate all corporate distinctions between parent companies and their wholly owned subsidiaries and would be flatly contrary to countless other decisions."  *Id.*  Finally, in both *IFS* and *Templeton*, the issue was whether the estate held an interest in the accounts for the purpose of satisfying one element of fraudulent transfer claims—that the debtor had an interest in the money in the accounts.  The decisions did not apply a *de facto* control analysis for the purpose of declaring assets held in the name of a non-debtor to be assets of the debtor's estate.

of Menser's alleged alter ego entities into the bankruptcy estate. Those claims are not recognized under Georgia law and will be dismissed.

### 3. *Counts I, II, and III are shotgun pleadings*

Even if the Court were to recognize reverse veil-piercing or some independent claim for *de facto* ownership or sham entity, counts I, II, and III would still be dismissed as shotgun pleadings. The named defendants in counts I, II, and III are the "Menser Entities," "Menser Entity Defendants," "Menser Trust," or "Menser Family Trusts." Menser Entities is defined as "more than thirty-five different interrelated entities currently known to Plaintiff" that "Debtor has created and held direct or indirect ownership interests in and/or control of." Compl. ¶ 35. To define "Menser Trusts," the Complaint states, "In addition, [Debtor] has been involved in the creation of numerous trusts (the 'Menser Trusts')." *Id.* The Menser Family Trust is a specific named defendant, but it is separately defined as the "Family Trust."[4] The Court finds these defined terms to be too vague in the context of counts I, II, and III and fail "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach City. Sheriff*, 792 F.3d at 1323.

Initially, the defined terms encompass numerous entities and trusts that are not named as defendants. The named defendants include, at most, 22 different entities, while the defined term Menser Entities includes, at least, 35 entities. As for trusts, the only named trust defendant is the Menser Family Trust, but the term "Menser Trusts" is defined to include "numerous" trusts. While use of the word "defendants" in counts I, II, and III helps solve potential problems with claims for relief against unnamed defendants, the Complaint is not as fastidious as it should be in this respect,

---

[4] Count III refers to the Menser Family Trusts. It is unclear if this pluralized form of Menser Family Trust is intended to refer to the more broadly defined term of Menser Trusts or is meant to be the Menser Family Trust specifically.

and it is nonetheless confusing to assert claims against a defined group that includes numerous parties not named as defendants.

Moreover, the indiscriminate lumping together of all Menser Entities and Family Trusts into one group and the incorporation of nearly all previous paragraphs into counts I, II, and III makes it difficult for each individual defendant to determine the "grounds upon which each claim rests." While it may be possible to determine from context the grounds applicable to certain defendants for which there are substantial allegations, many of the named Menser Entities are the subject of only 2 or 3 allegations in the entirety of the Complaint and allege little more than addresses, registered agents, dates of creation, initial ownership structures, and sometimes how ownership changed at various points in time. For instance, Archer I, L.L.L.P. ("Archer I"), is discussed specifically in only three paragraphs of the Complaint. Compl. ¶¶ 20, 97, and 98. All that is alleged for Archer I is its registered agent and address, that it was formed in 2005, its general partner and one minority partner as of 2014, its original general partner, and the fact that Debtor signed its certificate of partnership. From these scant allegations, the Trustee concludes in paragraph 98 that "Archer I should be disregarded as a sham entity and to the extent that it currently holds any assets transferred to it by the Debtor without Debtor receiving consideration in return, those assets should be turned over to the Plaintiff for the bankruptcy estate." These allegations do not state any cognizable claim (even if Georgia law recognized the asserted claims), but the Trustee nonetheless lumps Archer I into the Menser Entities in counts I, II, and III and asks that its assets and ownership be declared property of the bankruptcy estate. By lumping defendants like Archer I and numerous other defendants with similarly scant allegations into the "Menser Entities," the Trustee places a significant burden on the defendants and Court to sift through hundreds of allegations against two dozen defendants to find which defendants have substantial allegations

14

lodged against them and which appear to have been included for no reason other than the tried and true method of throwing everything at the wall and hoping something sticks.

Count III suffers from another general infirmity in that the named defendants are the Menser Entities, but it is the owners of the Menser Entities against whom the Trustee is truly seeking relief by stripping them of their ownership interests. It is impossible to determine from the Complaint who owns the various Menser Entities, and the Court does not understand how it can declare all those unknown ownership interests effectively null and void without naming the owners of the Menser Entities as defendants. The Court understands that the Trustee may not have much of this information and many of the owners are family members already named as defendants, but the Trustee cannot plead around this difficulty by ignoring the true parties in interest. Moreover, according to the Complaint, at least some of the Menser Entities are owned by non-familial business partners, whose ownership rights would nonetheless be stripped under count III (and the assets of the entities they own taken away in counts I and II).

For instance, the Complaint asserts Dayna Lawson is or was a business partner of Debtor, but Lawson is not a named defendant, and nothing in the Complaint suggests Lawson is a straw person or a part of Debtor's alleged scheme. Further, Lawson appears to continue to hold ownership interests in at least two Menser Entities—Lodge America and Travel Concepts. Similarly, at least one other Menser Entity, Bibb 185 L.L.L.P., appears to have third-party owners not otherwise related to the Debtor according to allegations in the Complaint. The Trustee ignores Lawson's and other third-party interests by having their ownership interests in the Menser Entities and the Menser Entities' assets declared property of the estate. These difficulties highlight one of the concerns raised by courts rejecting reverse veil-piercing claims—protecting innocent creditors and shareholders of the entities to be pierced. *See Acree v. McMahan*, 276 Ga. 880, 874 (2002)

("Some jurisdictions permit such claims, but place strict limitations on its application, such as requiring the plaintiff to prove that no innocent third-party creditor or shareholder would suffer harm or prejudice as a consequence of reverse veil-piercing."). The Trustee has not only failed to assert that his claims would not prejudice creditors or shareholders of the Menser Entities, but he has ignored those interests completely. Perhaps the number of Menser Entities for which these issues are relevant is small, but that is the problem with the way the Trustee has pled these claims. By lumping such a broad and ill-defined group of defendants together in the broad claims asserted, it is very difficult, if not impossible, to parcel out which Menser Entities have third-party owners (or creditors) and how their rights and interests can be protected.

Counts I, II, and III indiscriminately lump a large group of defendants together in a way that unduly increases the burden on the defendants and the Court to ascertain the nature of the claims against them and the grounds supporting such claims. Given that the current Complaint is the Trustee's third attempt to plead these claims, and given that the claims as pled are not recognized under Georgia law, counts I, II, and III will be dismissed with prejudice.

### C.     Counts V and VI.

Counts V and VI apply only to George Connell ("Connell"), Archer Augusta, LLC ("Archer"), and Damascus 36 L.L.L.P ("Damascus"). Connell and Archer are both Connell Defendants and moved to dismiss counts V and VI against them. Damascus has not sought dismissal of any counts against it. Accordingly, the Court addresses counts V and VI only as they apply to Connell and Archer.

Count V seeks to avoid the "Augusta Transfers" as fraudulent transfers, and count VI requests a constructive trust on the "Augusta Property." The Augusta Transfers are defined in paragraph 95(B) of the Complaint, but one must read paragraphs 83-96 to understand the definition

and counts V and VI. The following facts are taken from the Complaint and accepted as true.

Damascus was formed in 2005 with Debtor and Connell sharing 50/50 ownership, but Debtor was

not a named owner by 2014. At some point between its formation and December 2014, Damascus

became the owner of property called the "Augusta Property." In December of 2014, Damascus

sold the Augusta Property to the newly-formed Archer. Debtor and Connell were the 50/50 owners

of Archer at the time of the sale. The Augusta Property had a fair market value of $560,000 at the

time, but it is unclear how much money was exchanged as part of the sale. Archer, however,

funded the purchase of the Augusta Property from Damascus with a $300,000 loan secured by the

Augusta Property and guaranteed by Debtor and Connell (the "Archer Loan"). The Archer Loan

agreement required a $15,000 interest reserve, which was paid directly by Debtor. In 2016, Debtor

used his own funds to pay $7,500 directly to the bank for the Archer Loan and paid a $50 fee to

the Georgia Secretary of State. In 2017, Debtor wrote a check to Damascus for $6,400 on the same

date that Damascus issued a check for $6,389.83 to pay the Archer Loan. The Trustee alleges all

these payments directly from the Debtor's funds were either made to or for the benefit of Archer

or Connell.

The Complaint alleges that by 2017, Debtor's interest in Archer decreased to 35.2% and

Connell's increased to 64.8% without any apparent consideration for the change in ownership.[5]

The Complaint also alleges Archer sold the Augusta Property to an entity named Play Six

LLC in 2019 (post-petition) for $300,000 and that Play Six also executed a security deed to Connell

for the Augusta Property in December 2019 in the principal amount of $175,000.

The Trustee defines "Augusta Transfers" to include the sale of the Augusta Property from

Damascus to Archer in 2014, the sale of the Augusta Property from Archer to Play Six in 2019,

---

[5] This change in ownership in Archer is the subject of a separate count for which the Connell Defendants have not sought dismissal.

the security deed from Play Six in 2019, and each of the above-described payments of the Debtor's funds directly to the bank on the Archer Loan, the Georgia Secretary of State, and to Damascus. The Trustee seeks to avoid all these transfers as fraudulent transfers made to or for the benefit of Archer, Connell, or Damascus.

The Connell Defendants assert the counts fail as a matter of law because (1) the Complaint does not assert that Debtor ever had a direct ownership interest in the Augusta Property, and (2) the payments of Debtor's funds were not made directly to Connell or Archer. The Complaint, however, alleges Debtor made certain payments with his own funds that were for the benefit of Archer and Connell by paying down the Archer Loan and/or expenses of Archer. Section 550 allows for recovery of fraudulent transfers from both the initial transferee "or the entity for whose benefit such transfer was made." The Complaint states a plausible claim for fraudulent transfers of the Debtor's funds for the benefit of Connell and Archer, even if the transfers were not directly to them. Further, the Complaint alleges Debtor's 50% interest in Archer is property of the estate, and through that interest the estate is entitled to the proceeds of the sale of the Augusta Property to Play Six and/or the resulting security deed in favor of Connell. The allegations at least state a plausible claim that the estate, as part owner of Archer, has an interest in the proceeds of any transfer of Archer's property after the petition date. Accordingly, the Court will deny the Connell Motion to Dismiss counts V and VI.

### D.    Count XI

Count XI applies to defendants Phyllis Menser, Charles Menser III, Sarah Connell, and George Connell. George Connell is the only defendant who seeks dismissal of count XI.

In count XI, the Trustee seeks to avoid several transfers from the Debtor related to a property called the Rabun Property. Again, the Court takes the following facts from the Complaint

and accepts them as true.  The Rabun Property was originally purchased in 1992 in the name of Phyllis Menser.  Phyllis transferred title to the Rabun Property to defendant Lot 710, LLC in late 2012.  At its formation, Debtor and Phyllis each owned 47.5% of Lot 710 while George and Sarah Connell each owned 1%.  Lot 710's 2018 tax returns show, however, that Phyllis owned 99%, and the Debtor owned only 1% by that time.  Thus, at some point between 2012 and 2018, George Connell's 1% ownership interest terminated, though it is not clear from the Complaint when that occurred.  The Complaint, however, alleges, "On information and belief, Defendants Charles III, George [Connell] and Sarah all held interests in Lot 710 at some time during the Rabun Transfers, as evidenced by Lot 710's tax returns." Compl. ¶ 164.

The Complaint alleges that between February 21, 2017, and March 6, 2018, Debtor paid approximately $38,934.23 of expenses and mortgage payments on the Rabun Property.  The Trustee alleges these payments are fraudulent transfers for the benefit of the owners of Lot 710.

The Complaint further alleges the Rabun Property was sold in a short sale for $1.4 million in October of 2017 at a time when Phyllis Menser owned 95% of Lot 710.  All proceeds of the sale, however, went to closing costs or the mortgage on the property.

Connell moves to dismiss count XI against him because (1) the Complaint fails to adequately allege he had any interest in Lot 710 at the time of the alleged transfers, (2) he could not have benefited from the sale of the Rabun Property because it was sold with no proceeds, and (3) the transfers were paid directly to third parties.

The Court will deny Connell's motion on count XI.  While the Complaint is not crystal clear that Connell had an interest in Lot 710 at the time of the transfers, the Court accepts as true the allegation that based on tax returns the Trustee believes Connell had an interest in Lot 710 while some of the transfers at issue occurred.  The Trustee need not have conclusive proof of every

element of his case at the pleading stage, especially when he does not have all the necessary ownership information. The facts alleged show that Connell had a 1% interest in Lot 710 at its formation, that at some point in 2018 Phyllis's interest increased to 99% based on the 2018 tax return, but also that Phyllis had 95% ownership at the time of the sale of the property in October of 2017. It is plausible to infer that Connell still had his ownership interest during 2017 when the bulk of the transfers occurred as the Trustee alleges. Further, the transfers at issue here are not the sale of the Rabun Property but the transfer of Debtor's funds to pay the mortgage and expenses of the Rabun Property. Payment of debt on Lot 710's primary asset plausibly asserts a claim that the payments were for the benefit of Lot 710's owners, even if the ultimate sale of the asset created no proceeds. Finally, the Court rejects Connell's arguments regarding the initial transferee for the same reasons discussed in the section on counts V and VI—Connell need not be the transferee to be the entity for whose benefit the transfer was made.

### E.    Counts XVII and XIX

Count XVII seeks a declaratory judgment that all "[Phyllis] Menser's Nominal Assets" are *de facto* property of Debtor's estate; count XIX seeks turnover of property of the estate held by Phyllis Menser. The Complaint defines Phyllis Menser's Nominal Assets as "assets titled in her name but used and controlled by the Debtor, including, but not limited to, the Residence . . ., the 1401 Garmon Property, the 1266 Moores Mill property, the real property located at 214 Townsend Place, ownership interests in numerous entities, a valuable coin collection, and certain cash and/or investment accounts." Compl. ¶ 181. It then asserts, "[Phyllis] Menser's title to these assets is a façade. While she maintains a bare title to these assets, the Debtor exercises complete dominion and control over them, and enjoys a secret equitable interest in them, and *de facto* legal title." Compl. ¶ 337. In many ways this claim is a species of the reverse veil-piercing claims in counts

I, II, and III in which the Trustee seeks to declare the assets and ownership interests in all Menser

Entities belong to the estate based on "*de facto*" control.  The Court concludes a similar analysis

applies to count XVII to the extent it can be characterized as a reverse veil-piercing claim.  To the

extent count XVII asserts some other type of claim based on "secret equitable interests," the Court

likewise rejected such claims in the *Webster* decision (*supra*).

   In *Webster*, the debtor transferred title of a house to his spouse via quit claim deed for no

consideration approximately 11 years prior to the bankruptcy case.  The debtor, however,

continued to pay the mortgage (for which he was personally liable) and other house expenses

through an LLC he solely owned.  The Court rejected the trustee's claims that the bankruptcy

estate held a 50% equitable interest in the house, finding no support in Georgia law for such a

claim.[6]  Instead, the Court found the *Webster* trustee's equitable interest claim was really "a

fraudulent transfer argument repackaged as a claim in equity to avoid potential statute of

limitations hurdles resulting from the fact that the Transfer from Debtor to Mrs. Webster occurred

over ten years ago."  *In re Webster*, 629 B.R. at 666.

   Here, the sweeping breadth of the Trustee's claims against Phyllis Menser underscores the

Court's concerns raised in *Webster* about repackaging fraudulent transfer claims.  The Trustee's

response to the Phyllis Menser Motion to Dismiss confirms the Court's concern by arguing that

what count XVII really alleges is "that the Debtor has fraudulently transferred nearly all of his

assets to Phyllis, that same are fraudulent and avoidable transfer[s] pursuant to O.C.G.A. § 18-2-

---

[6] In doing so, the Court rejected the trustee's reliance on *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312 (11th Cir. 2009), in which the Eleventh Circuit recognized some form of equitable interest in a non-filing spouse's business where the debtor "diverted the fruits of his labor to increase the value of his wife's businesses and then used business assets to support his personal lifestyle."  *Coady*, 588 F.3d at 1315.  *Coady*, however, was an objection to discharge case, and the Court in *Webster* found *Coady's* reliance on an equitable interest for purposes of a discharge denial to be too nebulous for the purposes of finding the estate had an entitlement to 50% of the value of a home owned by the non-filing spouse.  Here, the Debtor has already waived his discharge, and the Court again declines to extend the reasoning of *Coady* to the claims asserted by the Trustee.

74, et seq. (GUVTA) and 11 U.S.C. § 548, et seq. and that all of her assets are derived from the Debtor's assets, and thus her assets are de facto property of the Debtor." Doc. No. 83, pp. 8-9, Trustee's Resp. to Phyllis Menser Motion to Dismiss ("Trustee's Response"). This is exactly what the Court found troubling in *Webster*—repackaging fraudulent transfer claims to avoid the substantive requirements of fraudulent transfer law.

For instance, Phyllis Menser's Nominal Assets include, among other things, the 1401 Garmon Property. The Complaint alleges title to that property was put in Phyllis Menser's name in 1990, and there is no allegation title was placed in Debtor's name prior to its sale for $1.7 million in 2017. It is not exactly clear which assets the Trustee seeks to have declared an asset of the estate in connection with the Garmon Property, but the Trustee's responsive brief confirms that his claim for "secret equitable interest" and "*de facto*" control in that property is really a fraudulent transfer claim on a transaction that occurred 28 years prior to the bankruptcy case and at least two decades before the debts of the major creditors in this case arose. How is a 28-year-old transfer avoidable under either O.C.G.A. § 18-2-74 or 11 U.S.C. § 548? Was the Debtor insolvent when the Garmon Property was transferred to Phyllis? What badges of fraud indicate an actual intent to defraud creditors in 1990? Who knows, but none of that matters according to the Trustee's theory. A similar analysis holds true for various assets sought to be declared property of the estate: gold coins that may have been purchased and put in Phyllis Menser's name as early as 2008; ownership in "numerous entities" that Phyllis Menser has owned, at least in part, since the 90s. All of these should be declared assets of the estate, the Trustee argues, because they were fraudulent transfers regardless of whether they fall within the applicable look-back periods or satisfy other substantive requirements of fraudulent transfer law.

The Trustee cites to O.C.G.A. § 18-2-77(a)(3) in support for his claims in count XVII, arguing that section "provides that courts may provide 'other relief the circumstances may require' to permit creditors to recover fraudulent transfers." Trustee's Response, p. 9. In citing this portion of a section of the Georgia statute, the Trustee ignores the lead-in to the section, which states, "In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitations in Code Section 18-2-78, may obtain . . . ." O.C.G.A. § 18-2-77(a). The "other relief circumstances may require" is then included in the list of available relief. The section specifically limits its application to the four-year look-back period in § 18-2-78 and otherwise must be tied to "an action for relief against a transfer or obligation under this article." The Court reads § 18-2-77(a) to be a remedial section to aid creditors in the recovery of fraudulently transferred assets, but the Trustee must otherwise satisfy the requirements of the Georgia fraudulent transfer statute to get the benefit of the remedies under § 18-2-78. The "other relief the circumstances may require" is not *carte blanche* to fashion new claims divorced from the other requirements of the statute. The only authority cited by the Trustee in support confirms that the remedies under O.C.G.A. § 18-2-78 are available "to the extent that [plaintiff] has asserted claims for fraudulent transfers upon which relief properly might be granted." *Speedway Motorsports, Inc. v. Pinnacle Bank*, 727 S.E.2d 151, 159 (Ga. App. 2012). If count XVII were limited in scope to fraudulent transfers that otherwise have been adequately pled, then count XVII might be a proper count simply seeking a remedy on otherwise voidable transfers. But count XVII goes much further than a remedy on adequately pled avoidable transfers. It seeks to bypass the substantive requirements of fraudulent transfer law altogether and declare virtually all assets of Phyllis Menser to be assets of the estate regardless of when or how she obtained them.

The Court is not unsympathetic to the fact that the Trustee may not have all the information needed to assert specific fraudulent transfer claims against Phyllis Menser and other defendants, but he cannot avoid the requirement that he plead "who transferred what to whom and when" and that the facts pled satisfy the elements of a fraudulent transfer under applicable law. The Trustee has done that in numerous fraudulent transfer claims against Phyllis Menser totaling, according to the Phyllis Menser Defendants, over $769,000, and according to the Trustee, over $1.9 million.[7] Those claims are not at issue in the current Motions to Dismiss, and it appears the Trustee will have the opportunity to recover those transfers if he can prove his claims. Moreover, the remedies under O.C.G.A § 18-2-78 are available if the Trustee is successful on those claims. Indeed, as discussed below, the Court will allow the Trustee's claim for constructive trust to remain because the Court reads it to be a remedy on fraudulent transfer claims the Trustee has adequately pled.

Further, if the Trustee uncovers additional transfers that are subject to avoidance, he may be able to amend his complaint to add such transfers.[8] What the Trustee cannot do, however, is bypass the elements of fraudulent transfer claims and assert a blanket interest in all assets of a non-debtor based on a conclusory assertion that all her assets are the result of fraudulent transfers. Other than the fraudulent transfer theories discussed above, the Trustee has offered no authority supporting his claims for secret equitable interests and *de facto* control in Phyllis Menser's assets. As in *Webster*, the Court declines to cobble together a concrete theory of recovery under Georgia law from the bits and pieces of equitable interest and *de facto* ownership cases the Court has reviewed, and the Trustee's theory of fraudulent transfer does not save count XVII, which goes far beyond actionable fraudulent transfer claims. Accordingly, counts XVII and XIX (which is little

---

[7] The Court expresses no opinion on which number is accurate.

[8] The Court expresses no opinion on whether the Trustee will be able to amend the Complaint to add additional transfers, and all parties' rights are reserved with respect to any potential future amendment.

more than the companion claim to count XVII seeking turnover of the Phyllis Menser Nominal Assets) will be dismissed with prejudice as pled. Dismissal of this count with prejudice, however, does not preclude the Trustee from seeking leave to amend to assert specific fraudulent transfer claims, or other cognizable claims substantively distinct from the claims in count XVII, if he can adequately plead such claims and leave to amend is otherwise appropriate. The Trustee should not take these statements as an invitation to replead the substance of count XVII under a new legal theory or with new authority not previously provided. Nor is the Court granting leave to amend the Complaint at this time, and Defendants retain all rights to oppose any requested amendments.

### F.    Counts XXIV and XXV

Count XXIV seeks a declaratory judgment that title to any Menser Entities held in the name of George Connell is *de facto* property of the debtor; count XXV seeks turnover of such assets. Putting aside the parties' arguments on whether the Complaint adequately pleads any interests held by Connell in a Menser Entity, this count is little more than a more specific counterpart to count III seeking a declaratory judgment that all ownership interests in any Menser Entity are *de facto* property of the estate and is similar to count XVII against Phyllis Menser discussed above. For the same reasons as discussed above in connection with counts I, II, III, and XVII, the Court reads these claims to be a species of either reverse veil-piercing claims or equitable interest claims. While the Trustee argues it is not reverse veil-piercing because it simply seeks turnover of estate property, the Trustee articulates no legal theory by which the Court can declare assets of George Connell to be assets of the Debtor other than through conclusory assertions of "*de facto* legal title" and "secret equitable interests." The Court rejected similar arguments in *Webster*, and the Trustee has offered no authority or analysis that the Court's ruling in *Webster* is incorrect as a matter of law or how this case is different than the reverse veil-piercing and equitable interest claims at issue

in *Webster*.  Until such authority exists, the Court is not persuaded that the Trustee's claims under counts XXIV and XXV are viable under Georgia law and will be dismissed with prejudice.  As with count XVII, dismissal with prejudice does not preclude the Trustee from seeking leave to amend to assert specific fraudulent transfer claims or other claims substantively distinct from count XXIV, but George Connell equally reserves all rights to challenge any requested amendment.

### G.    Count XXVIII

Count XXVIII seeks an accounting for the 4 years preceding the Debtor's petition date of any and all of the Debtor's assets, Phyllis Menser's assets, the assets of George Connell, Charles Menser III, Sarah Connell, and the Menser Entities.  The Connell Defendants and the Debtor seek dismissal of this count because the Trustee has not alleged that the defendants' accounts are complex or that adequate remedies at law are not available.  The Trustee argues the Debtor's finances and his network of entities and transactions are extremely complex and that normal discovery has not proven adequate in the underlying bankruptcy case.

The Complaint does not include any contractual or statutory basis for the accounting, but both parties cite primarily to *Wells Fargo Bank v. Crowley*, 2014 WL 11370437, *1, *6 (N.D. Ga. Feb. 20, 2014) in support of their positions on this count.  In *Crowley*, the court analyzed a claim for equitable accounting under Georgia law and could not conclude whether it was an equitable form of relief or a separate cause of action, but in either case

> [C]ourts have been clear that if discovery or some other remedy at law is available, then an equitable accounting is not warranted. . . .  Accordingly, under Georgia law, even if an equitable accounting is understood to be a separate cause of action, when a party does not allege or otherwise demonstrate that the account in question is either complicated or intricate, or allege that remedies at law are inadequate, a claim for accounting must fail.

*Id.*  The Court agrees with defendants that the Trustee has not adequately alleged a claim for an accounting, assuming a separate claim exists.

26

First, the Court is not convinced that every aspect of the defendants' financial information for four years is really an "account" as contemplated in *Crowley* (dealing with an accounting of payments on a promissory note) and O.C.G.A. § 23-2-70 (cited by *Crowley*). Generally, the concept of "account" and "accounting" arises in more specific circumstances where the parties have engaged in a series of transactions over time, not a broad request for all of a defendant's financial information. Regardless of that issue, the Trustee's basis for this count is that the Debtor has created a complex web of transfers and entities, and the Trustee's efforts in the underlying bankruptcy to obtain documents from the Debtor and other defendants have been difficult. The Trustee's goal in this count appears to be bypassing the normal discovery process to gain access to the defendants' finances because he believes discovery will be difficult. The allegation that discovery may prove difficult does not equate to an allegation that discovery is inadequate. Nor is it appropriate for the Trustee to bypass the normal discovery process altogether because he believes it will be difficult. If the Trustee believes defendants are not honoring their discovery obligations, then the Federal Rules provide mechanisms to address that failure, including case-dispositive sanctions when appropriate. Further, the Court does not understand how an accounting will provide the Trustee any greater advantage than the normal discovery process given that the scope of this case already involves nearly every transaction between the Debtor and the named defendants during the four years prior to the bankruptcy case. Count XXVIII will be dismissed without prejudice.

### H.    Count XXX

Count XXX seeks to impose a constructive trust on the assets of Phyllis Menser, the Menser Entities, and the Menser Family Trust. Substantive discussion on this count in the Motions to Dismiss and response briefs is scant. Both the Connell Defendants and Phyllis Menser

Defendants lump this count into its broader discussions of reverse veil-piercing, *Webster*, and shotgun pleadings, but they fail to articulate specific arguments on this count other than the Phyllis Menser Defendants' argument that its incorporation of all preceding paragraphs makes it a shotgun pleading. The Trustee, for his part, only states that count XXX does not seek to reverse veil-pierce against the Menser Entity Defendants but instead seeks to recover fraudulent transfers made by the Debtor to, *inter alia*, the Menser Entity Defendants.

The count itself is short and contains only four paragraphs. Paragraph 393 incorporates all previous paragraphs except for counts XVIII and XIX. Paragraph 394 alleges that "the assets of the Menser Entities, [Phyllis] Menser, and the Menser Family Trust have been used by the Debtor for his own personal purposes, and the Debtor has repeatedly transferred his own personal assets to the Menser Entities, the Menser Family Trust and [Phyllis] Menser." Paragraphs 395 and 396 then allege that the transfers are avoidable as fraudulent transfers and that a constructive trust should be placed on the named Defendants' assets to facilitate the recovery of the fraudulently transferred assets. The Court agrees with the Trustee on this count, but only to the extent the count is remedial to recover fraudulent transfers otherwise adequately pled in the Complaint.

Under Georgia law, a constructive trust "is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." O.C.G.A. § 53-12-132.

> It arises "by equity with respect to property acquired by fraud, or although acquired without fraud where it is against equity that the property should be retained by the one who holds it. It is true "that a claim for the imposition of a constructive trust is not an independent cause of action. In this case, however, [the plaintiffs] have sufficiently alleged a supporting cause of action[, the fraud discussed above]."

*Lyle v. Fulcrum Loan Holdings, LLC*, 841 S.E.2d 182, 188 (2020).

Unlike count XVII, which the Court construes to be an independent claim against Phyllis Menser and not a remedial claim on other counts, the Court does not read count XXX to be an independent claim against the defendants for constructive trust on all assets held by defendants based on reverse veil-piercing doctrines, but a remedial count to assist in the recovery of transfers otherwise avoided as fraudulent transfers. The Complaint alleges, and defendants have not sought dismissal of, numerous fraudulent transfer claims against Phyllis Menser, the Menser Family Trust, and numerous Menser Entities. While this count uses the amorphous "Menser Entities" definition, the Court does not find use of the term in this particular count to be a shotgun pleading given the Court's dismissal of counts I, II, and III and the fact that the remaining fraudulent transfer counts name specific defendants that are identifiable as Menser Entities in context. Finally, the incorporation of all previous allegations also is not a shotgun pleading given that the constructive trust claims cover all previously alleged fraudulent transfer claims and the facts supporting such claims. It would be more cumbersome and confusing if the Trustee pled a separate constructive trust claim for each fraudulent transfer count or restated all previous fraudulent transfer counts in count XXX. Accordingly, count XXX will not be dismissed, provided that its scope is limited to a remedial claim on specific counts remaining in the Complaint and not a means to recover generally against all assets of the defendants without reference to the remaining counts.

## I.    Count XXXI

Count XXXI finally attempts to assert a catchall fraudulent transfer claim against the Menser Entities, the Menser Family Trust, and Phyllis Menser. All moving defendants other than the Debtor move to dismiss count XXXI. The count alleges "Debtor has repeatedly transferred his own personal assets to the Menser Entities, the Menser Family Trust, and Phyllis Menser without receiving any consideration in return, including any of the above referenced transfers detailed in

this Complaint not otherwise included in the above counts (the "Additional Transfers)."  Compl. ¶ 394.  The count then goes on to recite various boilerplate allegations regarding insolvency, actual fraudulent intent, and reasonably equivalent value.  This count does not put the defendants on notice of the claims against them and is a shotgun pleading.  As discussed already and cited by the Trustee, an avoidance claim must allege "who transferred what to whom and when," and this catchall count fails to plead any of those elements other than in shotgun style.  Read broadly, it includes every transfer ever made between Debtor and a named defendant, which runs afoul of any pleading standard.  Read narrowly, it seeks to catch any transfers discussed in the Complaint but for which the Trustee failed to include a specific count.  But the Complaint discusses many transfers the Trustee is not seeking to avoid specifically for various reasons, at least as the Court reads the Complaint, and it places too much burden on the defendants and the Court to try and decipher which transfers alleged in the Complaint are sought to be avoided and which are simply included for background and support for actual fraudulent intent.  Simply stated, if the Trustee does not know which transfers he is trying to avoid, how can the defendants or the Court?

Again, the Court understands the difficulty the Trustee has had in this case with discovery and the unfortunate death of the lead attorney on the case, but the Trustee had nearly three years between the Debtor's petition date and the filing of the current Complaint.  If the Trustee has omitted specific fraudulent transfer claims already pled, or if he discovers new transfers during discovery, he will have the right to seek leave to amend the Complaint to add such transfers.  Defendants, likewise, will have the right to challenge any such amendments.

## VI.  <u>CONCLUSION</u>

For the foregoing reasons,

IT IS ORDERED, the Motions to Dismiss are GRANTED IN PART and DENIED IN PART.

- Counts I, II, III are DISMISSED with prejudice.

- The Motions to Dismiss are DENIED on counts V, VI, and XI.

- Counts XVII and XIX are DISMISSED with prejudice.

- Counts XXIV and XXV are DISMISSED with prejudice.

- Count XXVIII is DISMISSED without prejudice.

- The Motions to Dismiss are DENIED on count XXX.

- Count XXXI is DISMISSED without prejudice to seek leave to amend to assert specific fraudulent transfers and without prejudice to the defendants' rights to oppose any such amendment.

The Clerk is directed to serve a copy of this order on all counsel of record in this adversary proceeding and on any unrepresented party.

<u>END OF DOCUMENT</u>